# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

XTO ENERGY, INC.,

      Plaintiff,

vs.                                                                      No. CIV 14-1021 JB/SCY

ATD, LLC, AIR TECH DRILLING, INC. and
ZURICH AMERICAN INSURANCE COMPANY,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Zurich American Insurance Company's Motion for Summary Judgment, filed November 13, 2015 (Doc. 32)("Motion"); and Defendant ATD, LLC's Notice of Adoption by Reference of Defendant Zurich American Insurance Company's Motion for Summary Judgment and Reply in Support of Motion for Summary Judgment, filed February 4, 2016 (Doc. 61).  The Court held a hearing on March 1, 2016.  The primary issues are: (i) whether the Master Service Contract ("Master Contract") between Plaintiff XTO Energy, Inc. and Defendant Air Tech Drilling, Inc. violates the New Mexico Oilfield Anti-Indemnity Statute, N.M. Stat. Ann. § 56-7-2; (ii) whether the Master Contract's savings clause saves the agreement from the New Mexico Oilfield Anti-Indemnity Statute's proscriptions; and (iii) whether the New Mexico Oilfield Anti-Indemnity Statute voids the commercial general liability policy ("Zurich Policy") between Zurich Insurance and Air Tech.  When the Master Contract is read in conjunction with its savings clause in § 10.4, the Master Contract complies with § 56-7-2 as New Mexico courts have interpreted it.  Because the Master Contract does not violate § 56-7-2(A) or (B), the contract similarly does not violate § 56-7-2(C).  Accordingly, while the Master Contract's savings clause limits Zurich Insurance's

duties: (i) to provide indemnity only for those losses that do not arise from any XTO Group member's own negligence; and (ii) to defend and reimburse the XTO Group members for their defense costs, the New Mexico Oilfield Anti-Indemnity Statute does not void the Zurich Policy and the Court will not grant summary judgment.  Because the Court rules on the requests for declaratory judgment, the Court denies the Motion in part and grants it in part.

## FACTUAL BACKGROUND

This case involves numerous parties who contracted with each other to provide services and insurance.  Below, the Court describes the parties involved, the contracts they entered into, and the disputes that surround those contracts.

### 1.    The Parties.

XTO Energy is an oil and gas well operator that contracts with various contractors to perform well operations.  See Defendant Zurich American Insurance Company's Memorandum in Support of Motion for Summary Judgment, filed November 13, 2015 (Doc. 33)("MSJ"); Plaintiff XTO Energy Inc.'s Memorandum in Support of Response to Defendant Zurich American Insurance Company's Motion for Summary Judgment ¶ A, at 2, filed December 21, 2015 (Doc. 44)("Response").[1]  Defendant Air Tech, a contractor, is a New Mexico Corporation

---

[1]XTO Energy does not dispute any of Defendant Zurich American Insurance Company's factual assertions.  It states in its Response that "there is no genuine issue of material fact." Response at 6.  The local rules state:

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  For those factual assertions that XTO Energy does not address, the Court will deem those facts undisputed.  Where XTO Energy asserts additional facts that appear

based in Bloomfield, New Mexico and formed on June 9, 2006.  See MSJ ¶¶ 7, 10, at 4; Response ¶ A, at 2.[2]  Air Tech's corporate status was revoked on June 28, 2010.  See MSJ ¶ 7, at 4.  Defendant ATD, LLC is a New Mexico limited liability company based in Hobbs, New Mexico, originally formed as a New Mexico Corporation on September 22, 2006 and converted into an LLC on August 27, 2009.  See MSJ ¶ 8, at 4.  Zurich Insurance is an insurance company that provides insurance for Air Tech.  See MSJ ¶ 19, at 6.

    2.    **The Master Service Contract.**



Operator              Contractor

XTO Energy —————— Air Tech

On November 8, 2006, XTO Energy entered into a Master Service Contract ("Master Contract" or "MSC") with Air Tech.  See MSJ ¶¶ 7, 10, at 4; Response ¶ A, at 2.  The Master

---

to contradict Zurich Insurance's statement of undisputed material facts, the Court will determine whether the statements are disputed.

    [2]Throughout its Response, XTO Energy does not distinguish between Air Tech and ATD, LLC, using the phrase "Air Tech/ATD" to refer to both entities.  See, e.g., Response ¶ J, at 4.  Zurich Insurance disputes all of XTO Energy's factual assertions that suggest that Air Tech and ATD, LLC are the same entity.  See Defendant Zurich American Insurance Company's Reply in Support of Motion for Summary Judgment (re: Docs. 33, 44) ¶ B, at 3, filed February 1, 2016 (Doc. 59)("Reply").  Zurich Insurance contends that Air Tech and ATD, LLC are not the same entity, and provides documents to support its objection.  See Reply ¶ B, at 3; New Mexico Secretary of State Office, information on Air Tech Drilling, Inc., filed November 13, 2015 (Doc. 33-1)(demonstrating that: (i) Air Tech's corporate status was revoked on June 28, 2010; (ii) Air Tech was a New Mexico corporation based in Bloomfield, New Mexico formed on June 9, 2006; and (iii) ATD, LLC was formed as a corporation on September 22, 2006, based in Hobbs, New Mexico and converted to a limited liability company on August 27, 2009).  Because Zurich Insurance presents credible evidence that Air Tech and ATD, LLC are not the same entity, the Court deems it disputed whether they are the same entity.  While the issue is disputed, it is not material at the summary judgment stage.  The Court will therefore refer to and treat Air Tech and ATD, LLC as distinct entities.  See D.N.M.LR-Civ. 56(b).  Additionally, the Court will refer only to Air Tech when describing the Contractor's obligations in the Master Contract.  This adoption of terminology does not determine that Air Tech and ATD, LLC are separate entities, as their independence is not relevant here.

Contract provides that Air Tech, "as 'Contractor,' would provide certain well-related services to XTO."  MSJ ¶ 10, at 4; Response ¶ A, at 2.   "The MSC defines 'XTO Group' as 'XTO, its Affiliates, co-owners . . . at the Site, joint venturers, partners, contractors and subcontractors other than Contractor or its Subcontractors and all of their respective directors, officers, employees, representatives, agents, licensees and invitees."  MSJ ¶ 11, at 4.  The Master Contract defines "Contractor Group" as "Contractor, its Affiliates, any Subcontractor of Contractor, and their respective directors, officers, employees, representatives, agents, licensees and invitees."  MSJ ¶ 13, at 4-5.  The XTO Complaint does not allege that "XTO or any defendants named in the Manley Complaint or the Betancur Complaint is a member of the 'Contractor Group,' as defined in the Master Contract, nor any allegation of wrongdoing by any member of the Contractor Group."  MSJ ¶ 14, at 5.

Master Contract § 10, entitled "RELEASE, DEFENSE, INDEMNITY, AND HOLD HARMLESS," states:

> 10.1.1  Contractor hereby agrees to release, defend, indemnify and hold the XTO Group harmless from and against any and all claims, demands, and causes of action of every kind and character (including without limitation, fines, penalties, remedial obligations, court costs and reasonable attorney's fees, including attorney's fees incurred in the enforcement of this indemnity) (hereinafter collectively referred to as the 'Indemnifiable Claims') arising out of, without limitation bodily injury and/or death of any one or more members of the Contractor Group in any manner incident to, connected with or arising out of the performance of the Work.  *This obligation is without regard to the cause or causes of such bodily injury, death, loss of or damage to property and includes, but is not limited to, Indemnifiable Claims resulting from any sole, joint or concurrent negligence, strict liability, or other act and/or omission of any one or more members of the XTO Group.*
>
> 10.1.2   To the extent not covered in Section 10.3, Contractor hereby further agrees to release, defend, indemnify and hold the XTO Group harmless from and against any and all Indemnifiable Claims *arising out of the emission, discharge or negligence, strict liability, or other act and/or omission of any one or more members of the Contractor Group, which is in any manner incident to, connected with or arises out of the performance of the Work.*

> 10.1.3  *Contractor agrees that its indemnity obligations herein will be supported by insurance* with at least the minimum amounts provided in Article XI, which insurance will be primary to any other insurance provided by or available to any one or more members of the XTO Group *and shall provide waivers of subrogation against all members of the XTO Group*.  To the extent that applicable law prohibits the monetary limits of insurance required or the indemnities voluntarily assumed hereunder, the requirements will automatically be revised to conform, to the maximum extent permitted, with applicable law.

MSJ ¶ 15, at 5 (quoting Master Contract §10.1 (emphases in MSJ)).

Master Contract § 11.4 provides that all Contractor's liability insurance policies must name "XTO Group" as an additional insured and must "contain a waiver on the part of the insurer, by subrogation or otherwise, of all rights against the XTO Group."  MSJ ¶ 16, at 5-6.

Master Contract § 10.4 also contains a savings clause, which states:

> SPECIAL PROVISION FOR NEW MEXICO.   THE FOLLOWING PROVISION APPLIES WHERE WORK IS TO BE PERFORMED IN NEW MEXICO, NOTWITHSTANDING ANY PROVISIONS IN THE CONTRACT TO THE CONTRARY.  *To the extent this Article X is governed by New Mexico law, then the provisions therein shall be read not to include indemnification for one's own negligence*.

MSJ ¶ 17, at 6 (quoting MSC §10.4 (emphasis in MSJ)).  MSC § 14.8 provides that Texas law -- "excluding the Texas rules on conflict of law" -- governs the Master Contract.  MSJ ¶ 18, at 6.

### 3.   The Zurich Policy.



- 5 -

Zurich Insurance issued "a commercial general liability policy ('Policy') to Mesa Well Servicing, LP, policy number GLO 4391238-03, effective July 1, 2012 through July 1, 2013." MSJ ¶ 19, at 6.  "The Policy's Commercial General Liability Coverage Part Declarations page identifies Mesa Well Servicing, LP as the Named Insured."  MSJ ¶ 19, at 6.  The Policy's Commercial General Liability Coverage Form states that "[t]hroughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations and any other person or organization qualifying as a Named Insured under this policy."  MSJ ¶ 20, at 6.  The Policy's Schedule of Named Insureds includes Air Tech.  See MSJ ¶ 21, at 6.

In describing the coverage, the Policy states in the section entitled "Coverage A Bodily Injury and Property Damage Liability ('Coverage A')":

> We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' *to which this insurance applies*.  We will have the right and duty to defend the insured against any 'suit' seeking those damages.  However, *we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply*.  We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result. . . .  But: . . . No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments—Coverages A and B.

MSJ ¶ 22, at 6-7 (emphasis in MSJ).

Coverage A excludes coverage for "'Bodily injury' or 'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement," except for liability for damages: "(1) That the insured would have in the absence of the contract or agreement; or (2) Assumed in a contract or agreement that is an 'insured contract', provided the 'bodily injury' or 'property damage' occurs subsequent to the execution

of the contract or agreement."[3]  MSJ ¶ 23, at 7.  The Policy defines "Insured contract" as: "That part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for 'bodily injury' or 'property damage' to a third person or organization."  MSJ ¶ 24, at 7.  The Policy defines "tort liability" as "a liability that would be imposed by law in the absence of any contract or agreement."  MSJ ¶ 24, at 7.

In the Commercial General Liability Coverage Part, the Policy defines "insured" as "any person or organization qualifying as such under Section II -- Who is an insured."  MSJ ¶ 25, at 7. The Policy contains an Additional Insured Endorsement, which modifies the insurance provided under the Commercial General Liability Coverage Part as follows:

A.  Section II -- Who Is An Insured is amended to include as an insured any person or organization who you are required to add as an additional insured on this policy under a written contract or written agreement.

B.  The insurance provided to the additional insured person or organization applies only to 'bodily injury', 'property damage' . . . covered under Section I -- Coverage A -- Bodily Injury and Property Damage Liability . . . *but only with respect to liability for 'bodily injury'*, 'property damage' . . . *caused, in whole or in part, by:*

1.  *Your acts or omissions;*

2.  *The acts or omissions of those acting on your behalf, and resulting directly from your ongoing operations of 'your work' as included in the 'products-completed operations hazard'*, which is the subject of the written contract or written agreement. . . .

D.  The insurance provided to the additional insured person or organization does not apply to: 'Bodily injury', 'property damage' . . . arising out of the rendering or failure to render any professional architectural, engineering or surveying services including:

1.  The preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

_____

[3]XTO Energy does not address this factual assertion, so the Court deems it undisputed. See D.N.M.LR-Civ. 56(b).

- 7 -

2.  Supervisory, inspection, architectural or engineering activities."

MSJ ¶ 26, at 8 (emphasis in MSJ).

The Zurich Policy further provides that when the insured -- Air Tech -- has assumed liability for reasonable attorney's fees and expenses under an "insured contract," the insurer will reimburse those fees and expenses as damages.  See Response ¶ I, at 3-4.  All of the claims asserted in the XTO Complaint are based entirely on obligations that the Air Tech, ATD, LLC and Zurich Insurance allegedly owe under the Master Contract and the Zurich Policy "for the claims asserted against XTO Group members in the Manley and Betancur Complaints."  MSJ ¶ 27, at 8.

### 4.  **The State Litigation.**

On November 8, 2012, an accident occurred at a well in Eddy County, New Mexico, resulting in a fire.  See MSJ ¶ 1, at 2; Response ¶ J, at 4.  On November 8, 2012, ATD, LLC and Air Tech provided services on the well.  See Response ¶ K, at 4.  ATD, LLC employed Scott Manley and Jose Betancur, who were working at the XTO Well site on November 8, 2012.  See MSJ ¶ 9, at 4.  The parties dispute whether XTO Energy directed or supervised Air Tech.  See XTO Complaint ¶ 15, at 3 ("The MSC further provides that Air Tech/ATD would be, at all material times, an independent contractor and would have complete and sole control over their employees, the details of the work performed and the methods by which the work was accomplished."); Transcript of Hearing at 35:13-16 (taken March 1, 2016)("Tr.")("There is a question about whether XTO supervised and directed the work at the well site.  And that is an issue that's hotly contested by XTO in the underlying case.").[4]  As a result of the November 8, 2013 accident, Scott Manley and Shanna Manley ("the Manleys") filed the Plaintiffs' Complaint

---

[4]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

to Recover Damages for Personal Injury in the Fifth Judicial District Court, Eddy County, State of New Mexico, D-503-CV-2013-00241, against XTO Energy and other defendants on March 13, 2013.  MSJ ¶ 1, at 2; Response ¶ M, at 4.  On May 22, 2014, Jose and Virginia Betancur ("the Betancurs"), individually and as Next Friend of Vanessa B. Betancur, Valerie Betancur, and Jose Betancur, minors, filed their Complaint in Intervention to Recover Damages for Personal Injury ("Betancur Complaint") in the same case in connection with the same November 8, 2012 incident.  MSJ ¶ 2, at 2; Response ¶ N, at 4.

The defendants in both cases consist of XTO Energy, Weatherford Artificial Lift Systems, Inc., Weatherford International, Inc., Weatherford U.S., L.P., Basic Energy Services, Inc., BOS Roustabout Service, LLC, Gabriel Valdez, and Randy Green.  See Manley Complaint at 1; Betancur Complaint at 1.  "Most or all of the other defendants in the Manley suit are members of the XTO Group."  MSJ ¶ 12, at 4.  The Betancur Complaint asserts claims of "negligence; respondeat superior; negligent selection, retention, and supervision of contractors/subcontractors; liability for nondelegable duty/joint and several liability; and violation of statute/negligence as a matter of law" against XTO Energy and the other defendants.  MSJ ¶ 2, at 2.  It requests damages for J. Betancur's bodily injuries, punitive damages, and damages for loss of consortium.  See MSJ ¶ 2, at 2.  On June 2, 2014, the Manleys amended their Complaint to assert "the same claims against the same defendants as the Betancur Complaint."  MSJ ¶ 3, at 2.

The Manley Complaint and Betancur Complaint allege that, "at the time of the incident, XTO owned and operated the well ('XTO Well') and that Randy Green was XTO's 'Company Man' at the well site, with overall authority and control over the site."  MSJ ¶ 4, at 3.  Both Complaints assert claims against XTO Energy, Green, and certain contractors that provided well-

related services to XTO Energy at the XTO Well: Weatherford Artificial Lift Systems, Inc., Weatherford International, Inc., Weatherford U.S., L.P., Basic Energy Services, Inc., BOS Roustabout Service, LLC, and Gabriel Valdez, a Weatherford-entity employee.  <u>See</u> MSJ ¶ 5, at 3.  "Neither the Manley Complaint nor the Betancur Complaint alleges any wrongdoing or asserts any claims against Air Tech, ATD, LLC, Mesa Well Servicing, LP, or their employees." MSJ ¶ 5, at 3.

On February 28, 2013, XTO Energy tendered its defense to Air Tech and ATD, LLC "pursuant to the indemnity provision and the additional insured requirement" in the Master Contract that it signed.  Response ¶ O, at 4.  Zurich Insurance acknowledged XTO Energy's tender of defense and indemnity to Air Tech Drilling in its April 3, 2013 letter to XTO Energy. <u>See</u> Response ¶ P, at 4.[5]  In response to Zurich Insurance's inquiries, XTO Energy informed Zurich Insurance that Air Tech or ATD, LLC "must provide indemnity and a defense pursuant to the MSC."  Response ¶ Q, at 4.

In an email dated November 10, 2013, Zurich Insurance responded to XTO Energy, denying any obligation to indemnify XTO Energy, but agreeing to defend XTO Energy as an additional insured under a reservation of rights.  <u>See</u> Response ¶ R, at 5; Defendant Zurich American Insurance Company's Reply in Support of Motion for Summary Judgment ¶ F, at 3, filed February 1, 2016 (Doc. 59)("Reply").  XTO Energy accepted Zurich Insurance's defense tender, and Zurich Insurance stated that the law firm XTO Energy retained as counsel, Holland and Hart LLP, was on its approved counsel list.  <u>See</u> Response ¶ S, at 5.[6]  Zurich Insurance

---

[5]Zurich Insurance does not dispute this fact, so the Court deems it undisputed.  <u>See</u> D.N.M.LR-Civ. 56(b).

[6]Zurich Insurance "objects that the email speaks for itself and that the facts stated are immaterial."  Reply ¶ G, at 3.  Zurich Insurance provides no evidence in the record to suggest

attempted to reach an agreement with Holland and Hart over the firm's hourly rates for attorney's fees, but did not reimburse XTO Energy for any fees or expenses, notwithstanding that it asked to be billed directly for fees incurred after it accepted the defense tender.  See Response ¶ T, at 5.[7]  Zurich Insurance stated that it would defend XTO Energy only if it could arrive at an agreement over hourly rates for attorney's fees.  See Response ¶ U, at 5.[8]  Zurich Insurance could not reach an agreement on the law firm's hourly rates.  See Response ¶ V, at 5.[9]

---

that XTO Energy's factual assertion is untrue.  The evidence in the record that XTO Energy cites supports its factual assertion.  See Reply ¶ G, at 3.  Moreover, in O'Brien v. Mitchell, 883 F. Supp. 2d 1055 (D.N.M. 2012)(Browning, J.), the Court explained that, because the proper course is to determine a fact's relevance in the analysis section, objecting to an asserted fact as immaterial effectively deems the fact undisputed.  See 883 F. Supp. 2d at 1058 n.1.  The Court thus deems this fact undisputed and will, if necessary, determine its materiality in the analysis section.

[7]Zurich Insurance "objects that the cited documents speak for themselves and to XTO's characterization of their contents," but it does not dispute the assertion or provide evidence to indicate that Zurich Insurance paid any defense fees.  Reply ¶ H, at 3.  Because Zurich Insurance does not specifically dispute this factual assertion and does not "refer with particularity to those portions of the record" that dispute the factual assertion, the Court deems it undisputed. D.N.M.LR-Civ. 56(b).

[8]Zurich Insurance "objects that the cited documents speak for themselves and to XTO Energy's characterization of their contents," but it does not dispute XTO Energy's assertion or provide evidence to indicate that Zurich Insurance refused to pay XTO Energy's defense fees without approving the attorneys' hourly rates.  Reply ¶ H, at 3.  Furthermore, the record evidence that XTO Energy cites supports its factual assertion that Zurich Insurance's defense payment was contingent upon reaching an agreement over hourly rates.  See Letter from Butt Thornton & Baehr PC to Bradford C. Berge, Attorney for Holland & Hart (dated December 17, 2014), filed December 21, 2015 (Doc. 44-2)("If we can reach an agreement on the reasonable attorney's fees to your firm for the defense of this case, Zurich will be paying for the defense to your firm.").  The Court therefore deems this factual assertion undisputed.  See D.N.M.LR-Civ. 56(b).

[9]Zurich Insurance "objects that XTO's Complaint speaks for itself."  Reply ¶ I, at 3. Zurich Insurance does not specifically dispute XTO Energy's factual assertion and does not provide evidence to demonstrate that it is untrue.  The Court therefore deems this factual assertion undisputed.  See D.N.M.LR-Civ. 56(b).

## PROCEDURAL BACKGROUND

On November 10, 2014, XTO Energy filed the Complaint for Breach of Contract, Unfair Practices and Declaratory Relief, filed November 10, 2014 (Doc. 1)("XTO Complaint").   It alleges that "Air Tech and ATD, LLC breached contractual duties under a Master Service Contract to defend XTO against the claims asserted in the Manley and Betancur Complaints." MSJ ¶ 6, at 3.   It further asserts that Zurich Insurance breached its defense and reimbursement obligations to XTO Energy under the commercial general liability policy that Zurich Insurance issued to Mesa Well Servicing.   See MSJ ¶ 6, at 3-4.

XTO Energy alleges four claims.   It first alleges breach of contract against Air Tech and ATD, LLC.   See XTO Complaint ¶¶ 42-47, at 6-7.   It contends that "XTO and Air Tech entered into a binding written master service contract," which "is binding upon Air Tech and ATD." XTO Complaint ¶ 43, at 6.   It states that Air Tech and ATD, LLC "have materially breached the MSC by refusing to defend XTO," and that XTO Energy is "entitled to recover damages."   XTO Complaint ¶¶ 45-47, at 6-7.   Second, XTO Energy asserts a breach-of-contract claim against Zurich Insurance.   See Complaint ¶¶ 48-54, at 7.   It alleges that Zurich Insurance breached the Policy by: (i) refusing to defend XTO Energy; (ii) refusing to reimburse XTO Energy for fees and expenses incurred; and (iii) refusing to pay XTO Energy's counsel.   See XTO Complaint ¶ 51, at 7.   Third, XTO Energy contends that "Zurich's actions and inactions, as alleged [in the XTO Complaint], constitute violations of New Mexico's unfair claims practices statutes, § 59A-16-1 *et seq.*"   XTO Complaint ¶ 56, at 7.   Finally, XTO Energy asks the Court to "declare the duties and obligations of Zurich under the Policy."   XTO Complaint ¶ 60, at 8.   Scott Manley, Shanna Manley, Jose Betancur, and Virginia Betancur, individually and as next friend of Vanessa B. Betancur, Valerie Betancur, and Jose J. Betancur, Jr., minors, seek to intervene in the

litigation.  <u>See</u> Plaintiffs-in-Intervention's First Amended Motion to Intervene and Memorandum in Support, filed December 20, 2015 (Doc. 42).

Zurich Insurance moves for summary judgment on all claims against it, and for a ruling on the XTO Complaint's request for declaratory relief that there is no coverage and Zurich Insurance has no duty to defend XTO Energy.  <u>See</u> MSJ at 1.  ATD, LLC adopts the facts and argument in Zurich Insurance's MSJ and similarly requests that the Court grant summary judgment and dismiss with prejudice all claims against it.  <u>See</u> Defendant ATD, LLC's Notice of Adoption by Reference of Defendant Zurich American Insurance Company's Motion for Summary Judgment and Reply in Support of Motion for Summary Judgment, filed February 4, 2016 (Doc. 61)("ATD, LLC's Motion").  Zurich Insurance asserts that the Oilfield Anti-Indemnity Statute, N.M. Stat. Ann. § 56-7-2, governs the Master Contract's agreement purporting to require the Contractor, Air Tech, to indemnify XTO Group members.  <u>See</u> MSJ at 11.  It states that, in pertinent part, the Oilfield Anti-Indemnity Statute prohibits any provisions in insurance policies that would "indemnify the indemnitee against loss or liability for damages" arising from, among other things, a well operator's negligence.  MSJ at 9-10.  It describes the New Mexico Legislature's policy decision that "freedom on contract was to be subordinated to the policies furthered by the Oilfield Anti-Indemnity Statute" that discourage well-site negligence.  MSJ at 13.  Zurich Insurance argues that the Master Contract falls within the Oilfield Anti-Indemnity Statute's scope, because it purports to require the "Contractor to indemnify XTO Group members for bodily injury . . . without regard to the cause or causes of such bodily injury."  MSJ at 14.  It contends that an agreement requiring the Contractor to indemnify XTO Group members "for their sole or concurrent negligence is void."  MSJ at 14.

Zurich Insurance recognizes that the Master Contract's § 10.4 states: "To the extent this Article X is governed by New Mexico law, then the provisions therein shall be read not to include indemnification for one's own negligence."  MSJ at 14.  Nevertheless, it argues that § 10.4 does not save the Master Contract from the Oilfield Anti-Indemnity Statute, "because there is no way to read or reform the indemnification agreement in a manner that does not run afoul of NMSA § 56-7-2(A)."  MSJ at 14.  Zurich Insurance asserts that the only way to further the New Mexico Legislature's intent "to insure the safety of persons and property at well sites," is to hold "well operators and contractors financially responsible for their own tortious conduct."  MSJ at 16.

Finally, Zurich Insurance contends that N.M. Stat. Ann. § 56-7-2(C) also voids coverage.  See MSJ at 17.  N.M. Stat. Ann. § 56-7-2(C) provides that insurance contract provisions naming an additional insured or requiring a waiver of subrogation rights "that would, if it were a direct or collateral agreement described in Subsections A and B of this section, be void, is against public policy and void."  MSJ at 17.  Zurich Insurance states that the Master Contract "purports to require Contractor to support its indemnity obligations with insurance, and to ensure that all Contractor's liability insurance policies must name 'XTO Group' as an additional insured" without any waivers of the XTO Group's rights.  MSJ at 17 (internal citations omitted).  Zurich Insurance asserts that the insurance obligations "clearly purport to do precisely that which is proscribed by NMSA § 56-7-2(C) -- i.e., impose a duty of indemnification on Contractor that would be voided if contained in an agreement falling within NMSA §§ 56-7-2(A), (B)."  MSJ at 17.

XTO Energy "concedes that New Mexico law applies to Zurich's motion," but argues that the Master Contract does not violate the Oilfield Anti-Indemnity Statute.  Response at 1.  It

asserts that § 10.4 "removes Article X of the MSC from the proscription of NMSA § 56-7-2." Response at 6.  It contends that New Mexico would follow other jurisdictions who have "enforced savings provisions and found that such provisions 'save' indemnification agreements from voidness."  Response at 7.  XTO Energy further asserts that, even if § 10.4 "does not entirely save Article X," the agreement to defend does not violate N.M. Stat. Ann. § 56-7-2. Response at 8.  XTO Energy explains the difference between defense and indemnity, and argues that "agreements to defend are not void under New Mexico's construction anti-indemnity statute."  Response at 8-9.  It contends that "there is no logical reason to recognize the distinction between indemnity and defense in the construction context, but not the oilfield context." Response at 9.

Additionally, XTO Energy states that, if the Manleys and the Betancurs prevail on their claims for strict liability or vicarious liability, XTO Energy can seek common-law indemnification.  See Response at 9-10.  It argues that, where a person's liability stems from its relationship with a third party at fault, common-law indemnification still exists.  See Response at 10.  It cites Safeway, Inc. v. Rooter 2000 Plumbing & Drain SSS, 2013-NMCA-021, ¶ 21, 297 P.3d 347 ("Safeway I"), where the Court of Appeals of New Mexico held that "a party's indemnification agreement's unenforceability under Section 56-7-1 has no effect upon a party's common law right to indemnification."  Response at 10.  XTO Energy contends that Safeway I's reasoning "means that even if NMSA § 56-7-2 voids the *contractual* indemnification obligation, Air Tech and ATD may still owe XTO and/or the XTO Group *common law* indemnification for strict liability and/or vicarious liability."  Response at 10 (emphasis in original).

Finally, XTO Energy asserts that, even if some of the agreement is void, the Court should enforce the remainder of the agreement.  See Response at 11.  It states that agreements "to

indemnify or defend that do not 'contract away liability' for one's own negligence, therefore, fall outside the statute and are not 'void.'" Response at 11. It points to other sections that allegedly do not "contract away liability" for negligence, including Master Contract § 10.1.1, which provides that Air Tech shall "release, defend, indemnify and hold the XTO Group harmless from and against any and all claims" for "Indemnifiable Claims resulting from any . . . joint . . . negligence, strict liability, or other act and/or omission of any one or more members of the XTO Group." Response at 10. It argues that an agreement to indemnify for these claims does not violate the statute. Response at 11. It further asserts that, because courts have "enforced indemnity agreements to the extent they comply with the statute," the Court should do so here. Response at 12.

Zurich Insurance replied on February 2, 2016. It first argues that Master Contract § 10.4 does not save the Master Contract Contractor obligations, "because there is no way to read the MSC in a manner that survives even NMSA § 56-7-2(A)(1)." Reply at 4. Zurich Insurance argues that the XTO Complaint does not allege that Air Tech or ATD, LLC were negligent. See Reply at 4. It concludes that, because XTO Energy's Complaint "demands indemnification for the 'sole or concurrent negligence of' the XTO Group members," it cannot be read to demand indemnification for any properly indemnifiable claims. Reply at 4-5.

Zurich Insurance next argues that the Oilfield Anti-Indemnity Statute's other provisions also void the agreement. Specifically, it contends that § 56-7-2(A)(2) "voids indemnification agreements for 'the sole or concurrent negligence of an independent contractor who is directly responsible to the indemnitee.'" Reply at 5. Zurich Insurance asserts that the persons for which the XTO Complaint seeks indemnification also fall into this category. See Reply at 5. Similarly, it states that § 56-7-2(A)(3) likewise voids the agreement, because it "voids obligations where, as

alleged in the Manley/Betancur Complaints, an accident occurs under certain circumstances." Reply at 5.

Zurich Insurance argues that the Response fails to address these provisions' impact, and that other courts have allowed a saving clause to "rescue indemnification agreements from voidness under 'comparable anti-indemnity statutes.'" Reply at 6. Zurich Insurance contends, however, that these cases are inapplicable here, because § 56-7-2 "voids Contractor obligations *other* than those that require indemnification of the indemnitee for its own negligence." Reply at 6 (emphasis in Reply). Zurich Insurance asserts that the Supreme Court of New Mexico has repeatedly declined to interpret anti-indemnity statutes narrowly. See Reply at 6. Zurich Insurance argues that, to avoid rendering any contractual provision meaningless, the Court must read the contract as a whole, without simply deleting one provision. See Reply at 7-8.

Further, Zurich Insurance asserts that § 56-7-2 "voids every MSC Contractor obligation XTO seeks to enforce here, including the obligations to defend, indemnify, and support its indemnity obligations by insurance." Reply at 9. Zurich Insurance acknowledges the difference between the duty to indemnify and the duty to defend, but asserts that "it is inconceivable that the Legislature intended that a Contractor duty to defend should survive." Reply at 9. Zurich Insurance therefore argues that the Court should not enforce any portion of the contract, including the duty to defend. See Reply at 9-11.

The Court held a hearing on March 1, 2016. Zurich Insurance stated that § 56-7-2(C) voids the Master Contract's provision requiring Contractor to name XTO Energy as an additional insured. See Tr. at 8:1-9 (Johansen). The Court asked how agreements requiring oil-field contractors to obtain insurance and name operators as additional insureds violate New Mexico policy. See Tr. at 4:19-24 (Court). Zurich Insurance responded that § 56-7-2(C) encourages

- 17 -

large operators, like XTO Energy, to obtain insurance themselves rather than forcing small contractors to obtain insurance.  See Tr. at 16:6-10 (Johansen).  It explained that large operators have "a lot of economic clout," and do not allow contractors to work with them without agreeing "to indemnify and defend them."  Tr. at 8:1-9 (Johansen).  According to Zurich Insurance, this arrangement often allows operators to escape the burden of paying insurance premiums and to thrust the entire burden onto smaller contractors.  See Tr. at 8:5-16 (Johansen); id. at 16:7-9 ("XTO interestingly enough does not have a liability policy.  They put all the burden on the small subcontractors.").  In short, Zurich Insurance argued that XTO Energy was delegating all of XTO Energy's risk to the contractors, who cannot get the job unless they agree to indemnify XTO Energy.  See Tr. at 8:5-16 (Johansen).  Zurich Insurance asserted that § 56-7-2(C) sought to address this situation by requiring operators to obtain their own insurance.  It argued that this requirement furthered safety goals, "[b]ecause if XTO is being indemnified for anything that happens on the well site, they don't have a safety motivation, a motivation to create safety on a well site where people can very easily get injured."  Tr. at 8:11-15 (Johansen).  Zurich Insurance concluded that § 56-7-2(C) therefore invalidated the Zurich Policy and did not require Zurich Insurance to defend XTO Energy.  See Tr. at 8:11-9:25 (Johansen).

Zurich Insurance then turned to § 56-7-2(A) and argued that the savings clause, see Master Contract § 10.4, does not prevent the Master Contract from violating the New Mexico Oilfield Anti-Indemnity Statute.  See Tr. at 11:2-18 (Johansen).  Zurich Insurance conceded, however, that the savings clause could allow the indemnity provision to escape § 56-7-2(A)(1), but maintained that it did not apply to § 56-7-2's other prohibitions.  See Tr. at 12:3-6 (Johansen)(stating that the savings clause "only deals with part of the section (A)(1) of the Oil and Gas Anti-Indemnity Statute," and "does not in any form or fashion save this agreement"

from § 56-7-2(A)(1) or (2)).  Zurich Insurance further argued that, because the savings clause was ineffective, the Court must void the entire indemnity provision, including the duty to defend.  See Tr. at 24:19-25:25 (Johansen).  Zurich Insurance argued that requiring Zurich Insurance to defend XTO Energy violates public policy because such a conclusion requires Zurich Insurance to defend XTO Energy for its own negligence, which does not provide XTO Energy with the proper safety motivation.  See Tr. at 25:7-14 (Johansen).

Next, Zurich Insurance questioned why XTO Energy mentioned common-law indemnity issues in its Response when it did not assert a common-law indemnity claim.  See Tr. at 12:13-16 (Johansen).  Further, Zurich Insurance alleged that any common-law indemnity claim that XTO Energy raises down the road should be alleged against Air Tech or ATD, LLC, the injured parties' employer.  See Tr. at 12:16-24 (Johansen).  Finally, Zurich Insurance stated that workers compensation would bar any future common-law indemnity claim.   See Tr. at 12:24-2 (Johansen).  In response to Zurich Insurance's argument, XTO Energy stated that its claim was "a contractual claim" and not "a common law claim."  Tr. at 34:3-6 (Ramirez).

XTO Energy then argued that the savings clause -- Master Contract § 10.4 -- saves the indemnity provision.  See Tr. at 29:1-3 (Ramirez).  XTO Energy explained that the savings clause removed all of the indemnity provision's requirements that the Contractor indemnify not only XTO Energy, but also the XTO Group members.  See Tr. at 32:15-19 (Ramirez).  The Court asked XTO Energy how the savings clause saved the indemnity provision from § 56-7-2(A)(2), (3).  See Tr. at 53:15-19 (Court).  XTO Energy argued that the New Mexico Legislature sought to accomplish the same goal through all three provisions: to prevent a party from "contracting away their own negligence."  Tr. at 53:20-23 (Ramirez).  Further, XTO Energy argued that the

savings clause is "not limited to just XTO.  It's anyone's negligence that is excluded from the request for indemnity," including any XTO Group member.  Tr. at 53:23-54:4 (Ramirez).

XTO Energy next contended that, because the savings clause brings the indemnity provision outside of the Oilfield Anti-Indemnity Statute's scope, the Court may enforce the duty to defend.  See Tr. at 36:6-11 (Ramirez); id. at 37:9-20 (Ramirez)("If we're right, and § 10.4 brings the indemnity provision into compliance, then this now is an insurance coverage case."). XTO Energy argued that the additional insured coverage comes from "the validity of the MSC indemnity agreement."  Tr. at 37:11-13 (Ramirez).  XTO Energy stated: "So once we have a showing that § 10.4 saved this provision, we're an additional insured under the Zurich policy and now we apply your standard duty to defend language."  Tr. at 37:14-20 (Ramirez).

After Zurich Insurance and XTO Energy concluded their arguments, the Court gave all other parties currently involved in the litigation the opportunity to make arguments.  See Tr. at 39:14-15 (Court)(offering the Manleys and the Betancurs the opportunity to speak); id. at 58:16-20 (Court)(offering Basic Energy the opportunity to make arguments); id. at 59:8 (Court)(offering Weatherford U.S. the opportunity to argue).  Basic Energy stated that its interests "are in line with arguments made by XTO" Energy and that it does "not intend on submitting anything on this issue specifically on behalf of Basic other than adopting what XTO has already submitted and argued to the Court."  Tr. at 58:23-59:7 (Curtis).  Weatherford U.S. stated that it agreed with XTO Energy, but asked the Court whether it could submit any supplemental authority it may find.  See Tr. at 59:12-16 (Byers).  The Manleys and the Betancurs also agreed with XTO Energy's position.  See Tr. at 39:21-40:1 (Sanders).  They acknowledged that the Court had not granted the requests in their Motion to Intervene, but asked for the opportunity to address Zurich Insurance's arguments before the Court decided the Motion.  See

Tr. at 40:1-8 (Sanders).   The Court directed the parties to file any additional arguments or authority as soon as possible, because the Court intended to proceed promptly to decide the Motion.  See Tr. at 83:13-22 (Court).

The Plaintiffs-in-Intervention filed their additional comments on March 7, 2016.  See Potential Plaintiffs-in-Intervention's Position Paper, filed March 7, 2016 (Doc. 77)("Motion Supporting MSJ").  They argue many of the same points that XTO Energy raises in its Motion. See Motion Supporting MSJ at 3-5.  The Plaintiffs-in-Intervention add that they "did not sue ATD in the underlying litigation because ATD was the employer of the Plaintiffs-in-Intervention," not because they do not believe that ATD, LLC was negligent.   Motion Supporting MSJ at 4.  They argue that the state litigation could "involve issues about ATD's negligence," in which case XTO Energy could obtain indemnity.  Motion Supporting MSJ at 4.

Further, the Plaintiffs-in-Intervention contend that Zurich Insurance's position renders the Zurich Policy illusory.  See Motion Supporting MSJ at 5.  The Plaintiffs-in-Intervention explain that Zurich Insurance charged Air Tech premiums for the coverage, yet "now argues that the MSC's indemnity provisions, including those requiring support of indemnity agreements by insurance, which would be the Zurich policy, are void."   Motion Supporting MSJ at 5. Accordingly, they argue that "Zurich's issuance of the coverage, when Zurich's position is that the indemnity clauses requiring such issuance are void, was unlawful because it charged premiums for coverage it believed to be void and invalid."  Motion Supporting MSJ at 5-6.

Zurich Insurance filed its response to the Motion Supporting MSJ on March 10, 2016. See Defendant Zurich American Insurance Company's Response to Potential Plaintiffs-in-Intervention Position Paper (re: Doc. 77), filed March 10, 2016 (Doc. 80)("Response to Plaintiffs-in-Intervention").  It primarily made the same arguments that it made in its Motion.

- 21 -

See Response to Plaintiffs-in-Intervention at 1-4.  Zurich Insurance observes that the Plaintiffs-in-Intervention and XTO Energy allege that they do not seek indemnity for anything other than ATD, LLC's negligence, but argues that the Master Contract's savings clause does not limit the indemnity provision as XTO Energy now seeks to read it.  See Response to Plaintiffs-in-Intervention at 3-4.  Finally, it asserts that the Zurich Policy "is not rendered 'illusory' by the decision of the New Mexico Legislature to void as against public policy certain provisions of an insurance policy."  Response to Plaintiffs-in-Intervention at 5.

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must satisfy its burden of production in one of two ways.  First, the movant can introduce evidence into the record that affirmatively disproves an element of the nonmoving party's case." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Second, the movant can direct "the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Cardoso v. Calbone, 490 F.3d at 1197 (quoting Celotex Corp. v. Catrett, 477 U.S. at 323-25).  See Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013) (Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).

"If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would

- 22 -

entitle it to a directed verdict if not controverted at trial."  Celotex Corp. v. Catrett, 477 U.S. at

331 (Brennan, J., dissenting)(emphasis in original).[10]  Once the movant meets this burden, rule

56 requires the nonmoving party to designate specific facts showing that there is a genuine issue

for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts

showing that there is a genuine issue for trial as to those dispositive matters for which it carries

the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d

1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)

("However, the nonmoving party may not rest on its pleadings but must set forth specific facts

showing that there is a genuine issue for trial as to those dispositive matters for which it carries

the burden of proof.")(internal quotation marks omitted).  Rule 56(c)(1) provides: "A party

asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to

particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations (including those made for purposes of the

motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It

is not enough for the party opposing a properly supported motion for summary judgment to "rest

on mere allegations or denials of his pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S.

at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v.

---

[10]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation omitted)(internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted). Where a

rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue -- whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.  550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for

the nonmoving party, there is no 'genuine issue for trial.'"   Matsushita Elec.
Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote
omitted).   "[T]he mere existence of *some* alleged factual dispute between the
parties will not defeat an otherwise properly supported motion for summary
judgment; the requirement is that there be no *genuine* issue of *material* fact."
Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . .   When opposing
parties tell two different stories, one of which is blatantly contradicted by the
record, so that no reasonable jury could believe it, a court should not adopt that
version of the facts for purposes of ruling on a motion for summary judgment.

> That was the case here with regard to the factual issue whether respondent
> was driving in such fashion as to endanger human life.   Respondent's version of
> events is so utterly discredited by the record that no reasonable jury could have
> believed him.   The Court of Appeals should not have relied on such visible
> fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The United States Court of Appeals for the Tenth Circuit applied this doctrine in

Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the
> litigation, a plaintiff's version of the facts must find support in the record: more
> specifically, "[a]s with any motion for summary judgment, when opposing parties
> tell two different stories, one of which is blatantly contradicted by the record, so
> that no reasonable jury could believe it, a court should not adopt that version of
> the facts."   York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)
> (quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v.
> Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312 (brackets omitted).   "The Tenth Circuit, in Rhoads

v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[11]] explained that the

---

[11]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished
opinion to the extent its reasoned analysis is persuasive in the case before it.   See 10th Cir. R.
32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive
value.").   The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have
> generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its
> disposition, we allow a citation to that decision.

blatant contradictions of the record must be supported by more than other witnesses'
testimony[.]"    Lymon  v.  Aramark  Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)
(Browning, J.)(citation omitted), aff'd, 499 F. App'x 771 (10th Cir. 2012).

> In evaluating a motion for summary judgment based on qualified immunity, we
> take the facts "in the light most favorable to the party asserting the injury." Scott
> v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the
> plaintiff's version of the facts," id. at 378, unless that version "is so utterly
> discredited by the record that no reasonable jury could have believed him," id.
> at 380.  In Scott, the plaintiff's testimony was discredited by a videotape that
> completely contradicted his version of the events.  550 U.S. at 379.  Here, there is
> no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads'
> testimony. There is only other witnesses' testimony to oppose his version of the
> facts, and our judicial system leaves credibility determinations to the jury. And
> given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory
> problems go to the weight of his testimony, not its admissibility . . . .  Mr. Rhoads
> alleges that his injuries resulted from a beating rendered without resistance or
> provocation. If believed by the jury, the events he describes are sufficient to
> support a claim of violation of clearly established law under Graham v. Connor,
> 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,

United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal

question of qualified immunity and "determine whether plaintiff's factual allegations are

sufficiently grounded in the record such that they may permissibly comprise the universe of facts

that will serve as the foundation for answering the legal question before the court," before

inquiring into whether there are genuine issues of material fact for resolution by the jury.

584 F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th

---

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court
finds that Rhoads v. Miller, 352 F. App'x 289 (10th Cir. 2009), has persuasive value with respect
to material issues, and will assist the Court in its preparation of this Memorandum Opinion and
Order.

Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## ANALYSIS

When the Master Contract's § 10 is read in conjunction with its savings clause in § 10.4, the Master Contract's § 10 does not violate the New Mexico Oilfield Anti-Indemnity Statute. After § 10.4 is applied, the Master Contract complies with § 56-7-2 as New Mexico courts have interpreted it.  Because § 10 does not violate § 56-7-2(A) or (B), the Master Contract similarly does not violate § 56-7-2(C).  Accordingly, the New Mexico Oilfield Anti-Indemnity Statute does not void the Zurich Policy.

## I.  WITHOUT THE SAVINGS CLAUSE, THE NEW MEXICO OILFIELD ANTI-INDEMNITY STATUTE VOIDS THE DUTY TO INDEMNIFY.

The New Mexico Oilfield Anti-Indemnity Statute governs the Master Contract's agreements: (i) requiring the Contractor to indemnify XTO Group members; and (ii) requiring the Contractor to support its indemnity obligations with liability insurance and to name the XTO Group as an additional insured on all of its liability insurance policies.  See N.M. Stat. Ann. § 56-7-2(A), (B)(1) (governing agreements "pertaining to a well for oil, gas or water, or a mine for a mineral, within New Mexico" that concern operations related to "a well drilled for the purpose of producing or disposing of oil, gas or other minerals or water"); Pina v. Gruy Petroleum Mgmt. Co., 2006-NMCA-063, ¶ 1, 136 P.3d 1029, 1030 (applying § 56-7-2 over a contract's choice-of-law provision applying Texas law).  XTO Energy "concedes that New Mexico law applies to Zurich's motion," but argues that the Master Contract does not violate the New Mexico Oilfield Anti-Indemnity Statute.  Response at 1.

A.      **WITHOUT THE SAVINGS CLAUSE, SECTION 56-7-2(A) VOIDS THE INDEMNITY PROVISION.**

The New Mexico Oilfield Anti-Indemnity Statute states, in relevant part:

**§ 56-7-2. Oil, gas or water wells and mineral mines; agreements, covenants and promises to indemnify void**

A.   An agreement, covenant or promise, foreign or domestic, contained in, collateral to or affecting an agreement pertaining to a well for oil, gas or water, or mine for a mineral, within New Mexico, that purports to indemnify the indemnitee against loss or liability for damages arising from the circumstances specified in Paragraph (1), (2) or (3) of this subsection is against public policy and is void:

> (1) the sole or concurrent negligence of the indemnitee or the agents or employees of the indemnitee;
>
> (2) the sole or concurrent negligence of an independent contractor who is directly responsible to the indemnitee; or
>
> (3) an accident that occurs in operations carried on at the direction or under the supervision of the indemnitee, an employee or representative of the indemnitee or in accordance with methods and means specified by the indemnitee or employees or representatives of the indemnitee.

N.M. Stat. Ann. § 56-7-2(A).

The Master Contract's § 10 attempts to indemnify the XTO Group members in a way that violates § 56-7-2(A).  The Master Contract asserts that Air Tech, the Contractor, must defend and indemnify the XTO Group members against "any and all claims, demands, and causes of action of every kind . . . arising out of . . . the performance of the Work . . . . without regard to the cause or causes of such bodily injury, death, loss of or damage to property."  Master Contract § 10.1.1.  The Master Contract's § 10 forms the basis of the XTO Complaint.  See XTO Complaint ¶¶ 42-60, at 6-9.  All of the relief that XTO Energy seeks falls within each of § 56-7-2(A)'s categories of prohibited indemnification agreements.  See XTO Complaint ¶¶ 42-60, at 6-9.

First, in demanding indemnity and defense for XTO Group members, the XTO Complaint asks for relief in contravention of § 56-7-2(A)(1).  The Manley Complaint and the Betancur Complaint name the same defendants, each of which is a member of the XTO Group as the Master Contract defines the term.  See Master Contract § 2.7 (defining the XTO Group to include "XTO, its Affiliates, co-owners . . . at the Site, joint venturers, partners, contractors and subcontractors other than Contractor or its Subcontractors and all of their respective directors, officers, employees, representatives, agents, licensees and invitees").  XTO Energy admitted at the hearing that it did not seek relief for any person or organization that was not an XTO Group member.  See Tr. at 36:16-19 (Ramirez); XTO Complaint ¶ 24, at 4 (admitting that "[m]ost or all of the other defendants in the Manley suit are members of the XTO Group").  The Betancur Complaint asserts against XTO Energy and other defendants claims of: (i) negligence; (ii) respondeat superior; (iii) negligent selection, retention, and supervision of contractors/subcontractors; (iv) liability for nondelegable duty/joint and several liability; and (v) violation of statute/negligence as a matter of law.  See MSJ ¶ 2, at 2.  The Manley Complaint asserts "the same claims against the same defendants as the Betancur Complaint."  MSJ ¶ 3, at 2.  Accordingly, in seeking indemnification and defense for the XTO Group for those claims the Manley Complaint and the Betancur Complaint assert, XTO Energy seeks indemnification and defense for the "sole or concurrent negligence of" the XTO Group members named as defendants in the Manley and Betancur Complaints in violation of § 56-7-2(A)(1).  N.M. Stat. Ann. § 56-7-2(A)(1).

Second, § 56-7-2(A)(2) also voids the indemnity agreement.  XTO Energy contends that it does not seek indemnity for its own negligence.  See Tr. at 29:10-21 (Ramirez).  Section 56-7-2(A)(2) voids agreements to indemnify "the sole or concurrent negligence of an independent

contractor who is directly responsible to the indemnitee."  § 56-7-2(A)(2).  The defendants in the

Manley and Betancur Complaints -- Basic Energy and Weatherford U.S. -- fit into this category.

See Manley Complaint at 1; Betancur Complaint at 1.  The indemnity provision therefore seeks

to indemnify XTO Energy for its independent contractors' sole or concurrent negligence.

Third, § 56-7-2(A)(3) voids agreements to indemnify for "an accident that occurs in

operations carried on at the direction or under the supervision of the indemnitee, an employee or

representative of the indemnitee or in accordance with methods and means specified by the

indemnitee or employees or representatives of the indemnitee."  N.M. Stat. Ann. § 56-7-2(A)(3).

The Manley and the Betancur Complaints allege that XTO Energy owned and operated the XTO

Well, where the incident occurred, and that Green had overall authority and control over the site,

and over the selection and control of the contractors providing well-related services at the site.

See Betancur Complaint ¶¶ 12-19, at 4-5; Manley Complaint ¶¶ 10-17, at 3-4; XTO Complaint ¶

21, at 4 (alleging that XTO Energy "owns the majority of the working interest in the Nash United

#49H well" in Eddy County).   Because the indemnity provision requires the Contractor to

indemnify XTO Energy for "all claims, demands, and causes of action of every kind and

character . . . arising out of the performance of the Work," Master Contract § 10.1.1, it requires

the Contractor to indemnify XTO Energy for "an accident that occurs in operations carried on at

the direction or under the supervision of the indemnitee" in contravention of § 56-7-2(A)(3).

**B.    THE SAVINGS CLAUSE SAVES THE MASTER CONTRACT'S INDEMNITY PROVISION.**

The Master Contract's § 10.4, the "savings clause," provides that, "[t]o the extent this

Article X is governed by New Mexico law, then the provisions therein shall be read not to

include indemnification for one's own negligence."  Master Contract § 10.4.  XTO Energy

asserts that § 10.4 "means that XTO cannot be indemnified for its own negligence," which would

include concurrent negligence.  Plaintiff XTO Energy Inc.'s Response to Notice of Supplemental Authority, filed February 29, 2016 (Doc. 72)("Supplemental Response").   In other words, according to XTO Energy, § 10.4 means that the contract does not require indemnification for an XTO Group member's sole or concurrent negligence.  See Supplemental Response at 1-2.

By prohibiting indemnification for "one's own negligence," Master Contract § 10.4, the Master Contract does not require Air Tech to indemnify XTO Energy for its "sole or concurrent negligence," N.M. Stat. Ann. § 56-7-2(A)(1).  Section 10.4's plain language therefore removes § 10's indemnity provision from § 56-7-2 (A)(1)'s ambit.  Zurich Insurance conceded that § 10.4 accomplished this result.  See Tr. at 12:3-6 (Johansen)(stating that the savings clause "only deals with part of the section (A)(1) of the Oil and Gas Anti-Indemnity Statute"); id. at 43:14-16 (Johansen).  Section 10.4 also saves Article X from § 56-7-2(A)(2).  It states that the provisions shall not "include indemnification for one's own negligence."  MSC § 10.4 (emphasis added).  At the hearing, XTO Energy clarified that "one's own negligence" applies not only to XTO Energy, but to all XTO Group members.  Tr. at 32:15-19 (Ramirez).  If § 10.4 precludes any XTO Group member from seeking indemnification for its sole or concurrent negligence, then the MSC's indemnity provision does not violate § 56-7-2(A)(2).  See N.M. Stat. Ann. § 56-7-2(A)(2); Safeway Inc. v. Rooter 2000 Plumbing and Drain SSS, 2016 WL 683814, at *12 (N.M. Feb. 18, 2016)("Safeway II")(voiding an indemnity provision under New Mexico's Construction Anti-Indemnity Statute, because it required the contractor to indemnify Safeway, Inc. for Safeway, Inc.'s concurrent negligence).

Zurich Insurance argues that § 10.4 fails to save § 10's indemnity provision from § 56-7-2 (A)(3), which voids an agreement promising to indemnify the indemnitee for: "an accident that occurs in operations carried on at the direction or under the supervision of the indemnitee, an

employee or representative of the indemnitee or in accordance with methods and means specified by the indemnitee or employees or representatives of the indemnitee."  N.M. Stat. Ann. § 56-7-2(A)(3).  On its face, this provision would make the operator statutory liable for all operations carries on under its supervision and not allow the operator to shift any liability -- its own or anyone else's.  Arguably, such a policy would advance the policy that the Supreme Court of New Mexico has identified -- making the operator extremely diligent about safety on the site.  On the other hand, such a policy has obvious drawbacks, such as decreasing the incentive of contractors to maximize safety on the site, because they know that the operator will be liable.  If the Court were writing on a clean slate, it would enforce the policy precisely as the New Mexico Legislature wrote it.  This approach would advance the Legislature's preferred policy, and, if the policy needs adjusting, the New Mexico Legislature could amend its language.  The Court is not, however, writing on a clean slate.

The Court recognizes that § 56-7-2(A)(3)'s language is broad.  The Court must apply the law as the Supreme Court of New Mexico would apply it, not as it thinks best or even as the New Mexico Legislature envisions it.  See De Leon v. Lynch, 808 F.3d 1224, 1230-31 (10th Cir. 2015)(stating that it "must predict how [the state supreme court] would rule on the issue" and "follow the decisions of the state's highest court").  The New Mexico courts have already limited § 56-7-2(A)(3)'s broadest possible remedy.  New Mexico courts have cabined § 56-7-2(A)(3)'s scope by "constru[ing] Section 56-7-2 to permit indemnity agreements that do not purport to relieve the indemnitee from liability for its own negligence."  Pina v. Gruy Petroleum Mgmt. Co., 2006-NMCA-063, ¶ 10, 136 P.3d 1029, 1031-32 (discussing Guitard v. Gulf Oil Co., 1983-NMCA-103, ¶ 19, 670 P.2d 969, 973 ("Guitard"), which the Supreme Court of New Mexico describes as "the controlling" and "leading New Mexico case" on New Mexico's Oilfield Anti-

Indemnity Statute in <u>Amoco Prod. Co. v. Action Well Service, Inc.</u>, 1988-NMSC-040, ¶ 9, 755 P.2d at 55). New Mexico courts permit indemnity agreements that do not relieve the indemnitee from liability for its own negligence,

> since in the case of such agreements, "[b]oth the operator [indemnitee] and the subcontractor [indemnitor] will have incentive to monitor the safety of the operation knowing that they will be responsible for their respective percentage of negligence." *Guitard*, 100 N.M. at 362, 670 P.2d at 973. We upheld the indemnity agreement at issue in *Guitard* because we interpreted it to require the indemnitor to indemnify the indemnitee only for the indemnitor's percentage of negligence.

<u>Pina v. Gruy Petroleum Mgmt. Co.</u>, 2006-NMCA-063, ¶ 10, 136 P.3d at 1031-32. <u>See</u> <u>Amoco Prod. Co. v. Action Well Serv., Inc.</u>, 1988-NMSC-040, ¶ 10, 755 P.2d at 55 (citing <u>Guitard</u>, 1983-NMCA-103, ¶ 19, 670 P.2d at 973).

In the Court of Appeals opinion that the Supreme Court of New Mexico describes as the "leading New Mexico case," the Court of Appeals explained how it would be unfair to hold the indemnitee liable for the indemnitor's negligence.

> Harrison Western's interpretation, which has not been adopted by any court, is that if Gulf is even 1% negligent then the indemnity agreement is void. Assume that Harrison Western is 99% negligent. Were we to adopt Harrison Western's interpretation, Harrison Western, despite its express contract to indemnify Gulf, and the fact that Harrison Western was 99% negligent, would have to pay only workmen's compensation benefits. Gulf would be liable for 100% of the damages even though it was only 1% negligent. This result would be unfair.

<u>Guitard</u>, 1983-NMCA-103, ¶ 17, 670 P.2d at 72.

In <u>Amoco Production Co. v. Action Well Service, Inc.</u>, the Supreme Court of New Mexico described how reading New Mexico's Oilfield Anti-Indemnity Statute to preclude only those contracts that contract away one's own negligence aligned with the state's comparative negligence scheme. <u>See</u> 1988-NMSC-040, ¶ 7, 755 P.2d at 55.

> The court of appeals in *Guitard* accurately held that its ruling was consistent with that in *Bartlett v. New Mexico Welding Supply, Inc.*, 98 N.M. 152, 646 P.2d 579 (Ct. App.), *cert. denied*, 98 N.M. 336, 648 P.2d 794 (1982). The latter case

established the rule as to comparative negligence in this jurisdiction, whereby two or more tortfeasors are liable for damages to a victim arising from their negligence, according to the percentage of negligence for which each of the tortfeasors was responsible. Thus, read together, *Guitard* and *Bartlett* stand for the proposition that both indemnitor and indemnitee may be liable to the victim of an accident such as that which occurred here, but only to the extent of their respective percentages of negligence.

Amoco Prod. Co. v. Action Well Serv., Inc., 1988-NMSC-040, ¶ 7, 755 P.2d at 55.

The only way to faithfully comply with the Supreme Court of New Mexico's plain language, which has consistently approved Guitard, and to facilitate New Mexico's public policy requires the Court to read § 56-7-2(A)(3) to preclude only those agreements that purport to indemnify the indemnitee for its own direct negligence, and not negligence attributed to it by virtue of vicarious liability. First, interpreting § 56-7-2(A)(3) to void indemnity agreements when the indemnitee is not directly negligent would undercut the Supreme Court of New Mexico's plain language. See Amoco Prod. Co. v. Action Well Serv., Inc., 1988-NMSC-040, ¶ 7, 755 P.2d 52, 55; Guitard, 1983-NMCA-103, ¶ 24, 16, 670 P.2d at 973. The Supreme Court of New Mexico suggested that, by precluding those obligations that "contract away liability for [one's] own percentage of negligence," the Supreme Court of New Mexico sought to void only those agreements where the indemnitor seeks indemnity for its own direct negligence and not for those accidents where it is vicariously liable for the indemnitor's negligence. Amoco Prod. Co. v. Action Well Serv., Inc., 1988-NMSC-040, ¶ 7, 755 P.2d at 55 (emphasis added).

Second, with respect to the public policy, the Supreme Court of New Mexico stated: "Our interpretation furthers the public policy behind the statute, which is to promote safety. Both the operator and the subcontractor will have incentive to monitor the safety of the operation knowing that they will be responsible for their respective percentage of negligence." Amoco Prod. Co. v. Action Well Serv., Inc., 1988-NMSC-040, ¶ 10, 755 P.2d at 55 (citing Guitard, 1983-NMCA-103, ¶ 19, 670 P.2d at 972-73). Interpreting § 56-7-2(A)(3) to "void[] an indemnity agreement

when the indemnitee, though not negligent, is liable under the doctrine of respondeat superior"

for the indemnitor's negligence, Heckart v. Viking Exploration, Inc., 673 F.2d 309, 312 (10th

Cir. 1982), would undercut the Supreme Court of New Mexico's rationale, which seeks to force

subcontractors to "be responsible for their respective percentage of negligence," Amoco Prod.

Co. v. Action Well Serv., Inc., 1988-NMSC-040, ¶ 10, 755 P.2d at 55.   The Tenth Circuit has

explained the difference between liability for one's own direct negligence[12] and liability for

another contractor's negligence under the doctrine of respondeat superior:

> A crucial difference exists between liability as master (respondeat superior) and
> direct liability.  Respondeat superior is a doctrine of vicarious liability based upon
> public policy -- the notion that the person who benefits by the acts of the servant
> must pay for wrongs committed by the servant; the one held liable as master need
> not be at fault in any way.  See Holmes, The History of Agency, 4 Harv. L. Rev.
> 345 (1882).

Heckart v. Viking Expl., Inc., 673 F.2d at 312 (quoting McClelland v. Facteau, 610 F.2d 693,

695 (10th Cir. 1979)).  Reading § 56-7-2(A)(3) to preclude indemnity agreements only for one's

own direct negligence -- not negligence attributed to the indemnitee as a result of the

indemnitor's negligence -- is the only way to fulfill the policy of holding each party accountable

for the injuries that its own negligence has caused.

The Supreme Court of New Mexico has favorably cited a Court of Appeals of New

Mexico decision applying this same reasoning to New Mexico's analogous Construction Anti-

Indemnity Statute.  See Safeway II, 2016 WL 683814, at * 15 (quoting City of Albuquerque v.

BPLW Architects & Engineers, Inc., 2009-NMCA-081, ¶ 19, 722, 213 P.3d 1146, 1153).  The

Supreme Court of New Mexico stated that the Construction Anti-Indemnity Statute allows

indemnitors "to indemnify for causes of action that arise from the indemnitor's own negligent

conduct . . . . [to] promot[e] safety in construction projects by holding each party to the contract

---

[12]By "direct" negligence, the Court refers to XTO Energy's own negligence, compared to
negligence attributable to XTO Energy as the result of a contractor's direct negligence.

accountable for injuries caused by its own negligence."  Safeway II, 2016 WL 683814, at * 15

(quoting City of Albuquerque v. BPLW Architects & Engineers, Inc., 2009-NMCA-081, ¶ 19,

722, 213 P.3d 1146, 1153).  The Court of Appeals of New Mexico reiterated this conclusion in

Holguin v. Fulco Oil Services., L.L.C., 2010-NMCA-091, 245 P.3d 42, when it stated:

"[R]equiring the contractor to indemnify and defend the City for the contractor's alleged

negligence does not violate the construction anti-indemnity statute or the policy behind it."

2010-NMCA-091, ¶ 43, 245 P.3d 42, 51.  Citing Guitard, it asserted that "[i]nterpreting the anti-

indemnity statute to permit enforcement of an indemnity clause, to the extent the clause requires

indemnification for the indemnitor's negligence, is also in keeping with prior New Mexico case

law in this area."  See Holguin v. Fulco Oil Services., L.L.C., 2010-NMCA-091, ¶¶ 41-42, 245

P.3d at 51.  That New Mexico courts have concluded that allowing indemnity agreements for an

indemnitor's negligence in the construction context fulfills public policy suggests that allowing

such indemnity agreements in the oilfield context will also fulfill public policy.

The Court's major hesitation in furthering the policy this way -- other than concerns

about the breadth of § 56-7-2(A)(3)'s plain language -- is that the two statutes contain significant

linguistic differences.[13]  Specifically, the Construction Anti-Indemnity Statute expressly provides

---

[13]The two statutes provide, in relevant part:

### § 56-7-1. Real property; indemnity agreements; agreements void

A.  A provision in a construction contract that requires one party to the contract to indemnify, hold harmless, insure or defend the other party to the contract, including the other party's employees or agents, against liability, claims, damages, losses or expenses, including attorney fees, arising out of bodily injury to persons or damage to property caused by or resulting from, in whole or in part, the negligence, act or omission of the indemnitee, its officers, employees or agents, is void, unenforceable and against the public policy of the state.

B.  A construction contract may contain a provision that, or shall be enforced only to the extent that, it:

> (1) requires one party to the contract to indemnify, hold harmless or insure the other party to the contract, including its officers, employees or agents, against liability, claims, damages, losses or expenses, including attorney fees, only to the extent that the liability, damages, losses or costs are caused by, or arise out of, the acts or omissions of the indemnitor or its officers, employees or agents; or
>
> (2) requires a party to the contract to purchase a project-specific insurance policy, including an owner's or contractor's protective insurance, project management protective liability insurance or builder's risk insurance.

. . . .

F.  As used in this section, "indemnify" or "hold harmless" includes any requirement to name the indemnified party as an additional insured in the indemnitor's insurance coverage for the purpose of providing indemnification for any liability not otherwise allowed in this section.

N.M. Stat. Ann. § 56-7-1 (emphasis added).

### § 56-7-2. Oil, gas or water wells and mineral mines; agreements, covenants and promises to indemnify void

A.  An agreement, covenant or promise, foreign or domestic, contained in, collateral to or affecting an agreement pertaining to a well for oil, gas or water, or mine for a mineral, within New Mexico, that purports to indemnify the indemnitee against loss or liability for damages arising from the circumstances specified in Paragraph (1), (2) or (3) of this subsection is against public policy and is void:

> (1) the sole or concurrent negligence of the indemnitee or the agents or employees of the indemnitee;
>
> (2) the sole or concurrent negligence of an independent contractor who is directly responsible to the indemnitee; or
>
> (3) an accident that occurs in operations carried on at the direction or under the supervision of the indemnitee, an employee or representative of the indemnitee or in accordance with methods and means specified by the indemnitee or employees or representatives of the indemnitee.

that one party may indemnify another party for damages that arise out of the indemnitor's

negligence:

> A construction contract may contain a provision that . . . requires one party to the contract to indemnify, hold harmless or insure the other party to the contract, including its officers, employees or agents, against liability . . . only to the extent that the liability, damages, losses or costs are caused by, or arise out of, the acts or omissions of the indemnitor or its officers, employees or agents.

N.M. Stat. Ann. § 56-7-1(B)(1).   The Oilfield Anti-Indemnity Statute lacks such a provision,

which suggests that the New Mexico Legislature did not intend to allow indemnity agreements in

the oilfield context that indemnify the operator for the contractor's negligence.   This

interpretation would be consistent with the principle of statutory construction to read statutes in

pari materia.   See United Rentals Nw., Inc. v. Yearout Mechanical, Inc., 2010-NMSC-030, ¶¶

---

> B. As used in this section, "agreement pertaining to a well for oil, gas or water, or mine for a mineral" means an agreement:
>
>> (1) concerning any operations related to drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, plugging or otherwise rendering services in connection with a well drilled for the purpose of producing or disposing of oil, gas or other minerals or water;
>>
>> (2) for rendering services in connection with a mine shaft, drift or other structure intended for use in the exploration for or production of a mineral; or
>>
>> (3) to perform a portion of the work or services described in Paragraph (1) or (2) of this subsection or an act collateral thereto.
>
> C. A provision in an insurance contract indemnity agreement naming a person as an additional insured or a provision in an insurance contract or any other contract requiring a waiver of rights of subrogation or otherwise having the effect of imposing a duty of indemnification on the primary insured party that would, if it were a direct or collateral agreement described in Subsections A and B of this section, be void, is against public policy and void.

N.M. Stat. Ann. § 56-7-2.

- 39 -

27-28, 237 P.3d 728, 736 (directing courts to "look to other statutes in pari materia in order to determine legislative intent," but instructing them to also "view[] related statutes in light of their common legislative policies"); State ex rel. Quintana v. Schnedar, 1993-NMSC-033, ¶ 4, 855 P.2d 562, 565-66 ("[T]wo statutes covering the same subject matter should be harmonized and construed together when possible.").  It conflicts, however, with: (i) the Supreme Court of New Mexico's policy of furthering safety by requiring each party to be responsible for its own negligence; and (ii) the Supreme Court of New Mexico's clear statements to interpret the two statutes to further the same policy.  See United Rentals Nw., Inc. v. Yearout Mechanical, Inc., 2010-NMSC-030, ¶¶ 27-28, 237 P.3d at 736.

Despite the linguistic differences between the statutes -- which on a clean slate the Court would find significant -- the Supreme Court of New Mexico has held that there is "no reason to conclude that the New Mexico Legislature intended to create different protections for mine workers and construction workers," despite the textual differences between the two statutes. United Rentals Nw., Inc. v. Yearout Mechanical, Inc., 2010-NMSC-030, ¶¶ 27-28, 237 P.3d 728, 736 (cautioning courts "against using wording variations in pari materia statutes as a conclusive determinant of differing legislative intent").  In fact, the Supreme Court of New Mexico rejected the argument that the Legislature sought "to give more protection to well and mine workers than to construction workers," because the two statutes contained different language.  United Rentals Nw., Inc. v. Yearout Mechanical, Inc., 2010-NMSC-030, ¶¶ 27-28, 237 P.3d at 736.[14]

---

[14]The Supreme Court of New Mexico described several other linguistic differences between the two statutes to emphasize that textual differences between these particular statutes do not necessarily indicate that the Legislature intended a different result.

> Other varying language in the mining and construction anti-indemnification statutes exemplifies the need for caution in using simplistic and formulaic analyses of statutory wording.  For example, the original language of Section 28–2–2(A) [Section 56–7–2(A)] barred indemnity agreements for "death or bodily

Moreover, the Supreme Court of New Mexico describes the policy supporting both New Mexico's Construction and New Mexico's Oilfield Anti-Indemnity Statutes in identical terms. Compare Safeway II, 2016 WL 683814, at * 15 (stating that New Mexico's Construction Anti-Indemnity Statute is based on "a public policy promoting safety in construction projects by holding each party to the contract accountable for injuries caused by its own negligence"), with Amoco Prod. Co. v. Action Well Serv., Inc., 1988-NMSC-040, ¶ 10, 755 P.2d at 55 (stating that the Oilfield Anti-Indemnity Statute is based on public policy "to promote safety" by requiring all parties "to monitor the safety of the operation knowing that they will be responsible for their respective percentage of negligence"). Accordingly, the decisions that determine how to further the Construction Anti-Indemnity Statute's public policy are informative on how to further the Oilfield Anti-Indemnity Statute's public policy.

The Supreme Court of New Mexico has chastised the federal courts for ignoring "the leading New Mexico case, *Guitard*, and by doing so ignor[ing] the public policy foundation underlying both Section 56-7-2(A)(4) and *Guitard*." Amoco Prod. Co. v. Action Well Service, Inc., 1988-NMSC-040, ¶ 9, 755 P.2d at 55 (criticizing Herrera v. Amoco Prod. Co., 623 F. Supp. 378 (D.N.M. 1985)(Burciaga, J.), aff'd 843 F.2d 1394 (10th Cir. 1988), which held that an

_____

> injury to persons" in drilling- and mining-related agreements, while the language of Section 28–2–1 [Section 56–7–1] barred indemnity agreements "arising out of bodily injury to persons." It would be unreasonable, however, to assume that Section 28–2–1's [Section 56–7–1's] omission of "death" and Section 28–2–2(A)'s [Section 56–7–2(A)'s] express mention of the term meant that the Legislature intended to prohibit only construction indemnity agreements shifting liability for bodily injury, but to allow liability-shifting for any deaths that might result from the same kind of actionable conduct. *See* [*State v.*] *Smith*, 2004–NMSC–032, ¶ 10, 136 N.M. 372, 98 P.3d 1022 ("This Court has rejected a formalistic and mechanical statutory construction when the results would be absurd, unreasonable, or contrary to the spirit of the statute.").

United Rentals Nw., Inc. v. Yearout Mech., Inc., 2010-NMSC-030, ¶ 26, 237 P.3d 728, 735-36 (alterations in original).

operator is entitled to indemnity for its own negligence if the risk is passed on to the contractor's insurer); (criticizing Brashar v. Mobil Oil Corp., 626 F. Supp. 434 (D.N.M. 1984), which held that New Mexico policy did not conflict with Texas policy, even though Texas law allowed indemnity agreements that indemnified the operator for the contractor's negligence when an insurer bore the risk).  The Supreme Court of New Mexico further criticized the federal courts for failing to certify these issues to it.  See Amoco Prod. Co. v. Action Well Service, Inc., 1988-NMSC-040, ¶ 8, 755 P.2d at 54-55 ("Whereas the federal district court of New Mexico has traditionally sought our judgment in cases of first impression, this time it did not, resulting in protracted litigation in the federal courts which was unnecessary.").  The leading New Mexico case permitted indemnity agreements that do not contract away liability for one's own negligence.  See Guitard, 1983-NMCA-103, ¶ 24, 16, 670 P.2d at 973.  Because New Mexico courts have interpreted § 56-7-2(A)(3) to prohibit parties from contracting away their own direct negligence in accidents that occur at the indemnitee's direction or supervision, the Court adopts that interpretation here.[15]

Other courts have similarly interpreted nearly identical language to permit contracts that do not contract away one's own negligence.  See Mountain Fuel Supply Co. v. Emerson, 578 P.2d 1351 (Wyo. 1978).  For example, New Mexico courts have followed Wyoming's interpretation of the Wyoming anti-indemnity statute, which is very similar to New Mexico's statute.  See Guitard, 1983-NMCA-103, ¶ 16, 670 P.2d at 972 ("We follow Emerson and hold that the language in § 56-7-2(A) . . . means only that the indemnitee cannot contract away liability for his own percentage of negligence.").  In Mountain Fuel Supply Co. v. Emerson, the

---

[15]The Court is attempting to interpret § 56-7-2 and resolve the case as the Supreme Court of New Mexico would resolve it, even if the Court would not interpret the statute the same way on its own.

Supreme Court of Wyoming considered an indemnity agreement's validity under the 1975 version of the statute, which read:

> Provisions for indemnity in certain contracts -- Invalidity. -- All agreements and all covenants or promises contained in, collateral to, or affecting any agreement pertaining to any well for oil, gas, or water, or mine for any mineral and which purport to indemnify the indemnitee against loss or liability for damages for
>
> (a) Death or bodily injury to persons, or
>
> (b) Injury to property, or
>
> (c) Any other loss, damage, or expense arising under either (a) or (b) from
>
>> (i)  The sole or concurrent negligence of the indemnitee or the agents or employees of the indemnitee or any independent contractor who is directly responsible to such indemnitee; or
>>
>> (ii)   From <u>any accident which occurs in operations carried on at the direction or under the supervision of the indemnitee or an employee or representative of the indemnitee</u> or in accordance with methods and means specified by the indemnitee or employees or representatives of the indemnitee,
>
> are against public policy and are void and unenforceable.  This provision shall not affect the validity of any insurance contract or any benefit conferred by the Workmen's Compensation Law of this state.

Wyo. Stat. Ann. § 30-28.3, W.S. 1957, C. 1967, 1975 Cum. Supp. (current version at Wyo. Stat. Ann. § 30-1-131)(emphasis added).  Despite § 30-28.3(c)(ii)'s broad language -- which could be read to impose liability on the operator that could not be indemnified, regardless of whether it was negligent -- the Supreme Court of Wyoming held that the statute "voids and makes unenforceable any agreement to the extent that it seeks to indemnify an indemnitee for his own negligence."  <u>Mountain Fuel Supply Co. v. Emerson</u>, 578 P.2d at 1357.

Likewise, the United States Court of Appeals Tenth Circuit, in considering the Wyoming anti-indemnity statute, also interpreted the statute to permit agreements that do not require indemnification for one's own negligence.  See <u>Heckart v. Viking Exploration, Inc.</u>, 673 F.2d

309 (10th Cir. 1982).  It stated: "Construing the statute to preclude indemnity only when the indemnitee was negligent is more consistent with the Wyoming Supreme Court's opinion in Mountain Fuel Supply [v. Emerson]," which New Mexico courts cite favorably in interpreting the New Mexico Oilfield Anti-Indemnity Statute.  Heckart v. Viking Exploration, Inc., 673 F.2d at 312-13.[16]  Because New Mexico courts seek to make each party responsible for their own fault and cite Wyoming case law favorably, the Court concludes that New Mexico would similarly interpret § 56-7-2(A)(3) to preclude indemnity only when the indemnitee was directly negligent, and not when the indemnitee was liable in respondeat superior, despite § 56-7-2(A)(3)'s broad language.

Zurich Insurance contends that "there is no way to read the Contractor Indemnification Agreement in a manner that survives NMSA § 56-7-2(A)(1)," because XTO Energy seeks indemnification for the claims asserted in the Manley Complaint and the Betancur Complaint. MSJ at 15.  The Master Contract's savings clause, however, states that the indemnity provisions "shall be read not to include indemnification for one's own negligence."  Master Contract § 10.4. XTO Energy does not seek indemnification for any XTO Group member's negligence.  See XTO Complaint ¶ 60, at 8-9; Tr. at 32:15-19 ("XTO does not require ATD to indemnify it for any of

---

[16]The Court recognizes that the Wyoming statute contained a preamble, which read: "AN ACT invalidating, as against public policy, provisions for indemnity in certain contracts where there is negligence attributable to the indemnitee, and providing an exemption thereto."  1969 Wyo. Sess. Laws ch. 46, § 1.  Although New Mexico's Oilfield Anti-Indemnity Statute lacks a similar preamble, the Court of Appeals of New Mexico in Guitard nonetheless read § 56-7-2 to conform to the Wyoming court's reading in Mountain Fuel Supply v. Emerson.  Furthermore, Wyoming's preamble could be read to either limit the statute or expand it, see Reding v. Texaco, Inc., 598 F.2d 513, 521-21 (9th Cir. 1979)(interpreting the Wyoming statute to void indemnity agreements when the indemnitee, though not negligent, is liable under respondeat superior), so it is not necessarily informative on § 56-7-2(A)(3)'s meaning.  Regardless of the preamble's language, the Tenth Circuit concluded that the Wyoming statute's broad language "preclude[d] indemnity only when the indemnitee was negligent."  Heckart v. Viking Exploration, Inc., 673 F.3d at 312.

XTO's or the XTO Group's sole or concurrent negligence.  It's only for ATD's potential responsibility at the end of the case.").  As New Mexico permits those agreements which do not require indemnification for one's own negligence, the savings clause saves § 10 from § 56-7-2's scope.  See Amoco Prod. Co. v. Action Well Serv., Inc., 1988-NMSC-040, ¶ 10, 755 P.2d at 55 (citing Guitard, 1983-NMCA-103, ¶ 19, 670 P.2d at 973); Pina v. Gruy Petroleum Mgmt. Co., 2006-NMCA-063, ¶ 10, 136 P.3d at 1031-32.  Accordingly, New Mexico law does not void Air Tech's obligations under the Master Contract.  The Court therefore denies ATD, LLC's Motion requesting summary judgment and dismissal of all claims against ATD, LLC.[17]

## II.   BECAUSE § 56-7-2(C) DOES NOT VOID THE MASTER CONTRACT'S REQUIREMENTS TO OBTAIN LIABILITY INSURANCE AND TO NAME THE XTO GROUP AS AN ADDITIONAL INSURED, NEW MEXICO'S OILFIELD ANTI-INDEMNITY STATUTE DOES NOT INVALIDATE THE ZURICH POLICY.

Section 56-7-2(C) provides:

C.  A provision in an insurance contract indemnity agreement naming a person as an additional insured or a provision in an insurance contract or any other contract requiring a waiver of rights of subrogation or otherwise having the effect of imposing a duty of indemnification on the primary insured party that would, if it were a direct or collateral agreement described in Subsections A and B of this section, be void, is against public policy and void.

In other words, § 56-7-2(C) invalidates provisions in insurance contract indemnity agreements that impose a duty of indemnification that would be void if contained in an agreement falling within § 56-7-2(A) and (B).  See N.M. Stat. Ann. § 56-7-2(C).  At the hearing, Zurich Insurance explained the policy behind this provision.  It asserted that § 56-7-2(C) encourages large operators, like XTO Energy, to obtain insurance themselves rather than forcing

---

[17]The Court's conclusion that the Master Contract does not violate New Mexico law does not mean that Air Tech or Zurich Insurance must indemnify XTO Energy under the facts as they stand now.  Indemnity might not be available if the state court determines that XTO Energy was entirely at fault, or under various other circumstances.  The Court determines only that the Master Contract as written does not violate New Mexico law.

small contractors to obtain insurance.  <u>See</u> Tr. at 16:6-10 (Johansen).  It explained that large operators have "a lot of economic clout," and do not allow contractors to work with them without agreeing "to indemnify and defend them."  Tr. at 8:1-9 (Johansen).  According to Zurich Insurance, this arrangement often allows operators to escape the burden of paying insurance premiums and to thrust the entire burden onto smaller contractors.  <u>See</u> Tr. at 8:5-16 (Johansen).[18]  Zurich Insurance asserted that § 56-7-2(C) sought to prevent operators from delegating all risk to contractors by requiring operators to obtain their own insurance.  <u>See</u> Tr. at 8:5-16 (Johansen).[19]

---

[18]The Court does not completely agree with Zurich Insurance's characterization that all operators are big and all contractors are small.  Some operators are relatively small compared to their larger competitors like Chevron and BP.  <u>See</u> The Independents, Independent Petroleum Association of America, http://oilindependents.org/the-independents/ (stating that the average independent oil operator produces average gross revenues of $7.85 million and employs only eleven full-time employees).  On the other hand, some contractors, like Halliburton Company and Schlumberger Ltd., may be larger than even good-sized independent operators.  <u>See</u> Halliburton Company, Annual Report (Form 10-K)(February 5, 2016)(stating that Halliburton's annual revenue was $32.9 million in 2014 and $23.6 million in 2015); Schlumberger Ltd., Annual Report (Form 10-K)(January 27, 2016)(stating that Schlumberger's annual revenue was $48.6 million in 2014 and $35.5 million in 2015).

More important than size, however, may be the market.  When the energy sector is hot, there may not be enough contractors, rigs, or units to go around, so even the smallest contractor may have tremendous leverage.  <u>See</u> Owen L. Anderson, <u>The Anatomy of an Oil and Gas Drilling Contract</u>, 25 Tulsa L.J. 359, 362-63 (1990)(describing how the "energy boom greatly increased the bargaining power of drilling contractors in negotiating drilling contracts," and how the "shortage of drilling rigs, coupled with what seemed to be an unending increase in demand for rigs, drove drilling prices to all-time highs").  Energy industry scholars observe that, during market boom times, "[d]rilling contracts, traditionally operator-oriented, were modified to include more and more provisions favoring the drilling contractor."  Anderson, <u>supra</u>, at 363.  Thus, Zurich Insurance's simplistic characterization of leverage in the oilfield may, at times, be very inaccurate.

[19]This provision does not void all agreements in the oilfield context requiring an indemnitee to obtain insurance.  It voids only those agreements "that would, if it were a direct or collateral agreement described in Subsections A and B of this section, be void."  N.M. Stat. Ann. § 56-7-2(C).

Section 10.1.3 requires Air Tech to: (i) support its indemnity obligation with insurance; and (ii) provide waivers of subrogation against all members of the XTO Group.  See Master Contract § 10.1.3.  Section 11.4 provides that all of Air Tech's liability insurance policies must name "XTO Group" as an additional insured and must "contain a waiver on the part of the insurer, by subrogation or otherwise, of all rights against the XTO Group."  Master Contract § 11.4.  As explained above, however, when § 10 is read in conjunction with § 10.4's savings clause, it does not run afoul of § 56-7-2(A).  Because § 10's indemnity agreement does not violate § 56-7-2(A) and (B), § 56-7-2(C) does not invalidate Master Contract §§ 10.1.3 and 11.4.

New Mexico law does not void the Master Contract §§ 10.1.3 and 11.4, which means that nothing in New Mexico law otherwise makes the Zurich Policy invalid.  Nor does Zurich Insurance point to any state or law -- other than § 56-7-2 -- that invalidates the Zurich Policy, for which Air Tech paid premiums to insure the risk of its own negligent actions.  The Zurich Policy states that Zurich Insurance will "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Zurich Policy, Commercial General Liability Coverage Form: Section I - Coverage A, filed November 13, 2015 (Doc. 33-2)("Coverage A").  Coverage A includes coverage for liability for damages "[a]ssumed in a contract or agreement that is an 'insured contract', provided the 'bodily injury' or 'property damage' occurs subsequent to the execution of the contract or agreement." Coverage A at 2.  The Zurich Policy defines "Insured contract" as "[t]hat part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for 'bodily injury' or 'property damage' to a third person or organization." Coverage A at 3.  The Zurich Policy defines "insured" to mean "any person or organization qualifying as such under Section II."  Zurich Policy, Commercial General Liability Coverage

Form, filed November 13, 2015 (Doc. 33-2).  The Zurich Policy's Section II modifies the Zurich Policy to include as an insured "any person or organization who you are required to add as an additional insured on this policy under a written contract or written agreement."  Endorsement: Additional Insured -- Automatic -- Owners, Lessees Or Contractors at 1, filed November 13, 2015 (Doc. 33-2)("Additional Insured Endorsement").

Accordingly, the Additional Insured Endorsement modifies the Zurich Policy to include "any person or organization who you are required to add as an additional insured on this policy under a written contract or written agreement," and that inclusion refers to the "written agreement[s]" in the Master Contract's §§ 10.1.3 and 11.4, which require Air Tech to obtain liability insurance and to name XTO Group as an additional insured.  Endorsement: at 1; MSJ ¶ 26, at 8.  Because these agreements are not void under § 56-7-2(C), they constitute a "written agreement" that requires the XTO Group to be listed as an additional insured on the Zurich Policy.  Additional Insured Endorsement at 1.  Moreover, the Master Contract's requirement that Air Tech include the XTO Group as an additional insured qualifies XTO Energy and the XTO Group as "insureds" under the Zurich Policy, which means that the Zurich Policy covers agreements to defend and agreements to indemnify for claims other than those for an XTO Group member's own negligence.  Zurich Policy, Commercial General Liability Coverage Form, filed November 13, 2015 (Doc. 33-2).  Finally, the Master Contract requires Air Tech to assume another party's tort liability, which makes the Master Contract an "insured contract."  Coverage A at 3.

The Zurich Policy further provides that, when the insured -- Air Tech -- has assumed liability for reasonable attorney's fees and litigation expenses of a party -- the XTO Group -- under an "insured contract," Zurich Insurance will reimburse those fees and expenses as

damages. Zurich Policy, Exclusions, filed December 21, 2015 (Doc. 44-3). Accordingly, the Zurich Policy requires Zurich Insurance to: (i) defend XTO Group members; (ii) indemnify XTO Group members for claims that do not arise from any XTO Group member's sole or concurrent negligence; and (iii) reimburse the XTO Group's reasonable attorney's fees and expenses.

This case differs from the cases on which Zurich Insurance relies. See Sierra v. Garcia, 1987-NMSC-116, 746 P.2d 1105, Safeway II, 2016 WL 683814, at * 13-15. In those cases, the parties' indemnity clauses required the indemnitee to indemnify the indemnitor for the indemnitee's own negligence. See Safeway II, 2016 WL 683814, at * 14-15; Sierra v. Garcia, 1987-NMSC-116, ¶ 4, 746 P.2d at 1107. The Supreme Court of New Mexico held that the entire indemnification provision was void, including the provision imposing upon the indemnitor a duty to defend the indemnitee, because the indemnification provision required the indemnitor to indemnify the indemnitee for the indemnitee's own negligence. See Safeway II, 2016 WL 683814, at * 14-15; Sierra v. Garcia, 1987-NMSC-116, ¶ 10, 746 P.2d at 1108. The statute does not void the entire contractual agreement when the indemnity clause does not require the indemnitor to indemnify the indemnitee for the indemnitee's own negligence. See Safeway II, 2016 WL 683814, at *14 ("Sierra made clear that the anti-indemnity statute voids the entire contractual agreement, not merely part of it, when the clause requires the indemnitor to indemnify the indemnitee for the indemnitee's own negligence.")(emphasis added).

Here, the Master Contract does not require Air Tech to indemnify any XTO Group member for its own negligence, see Master Contract § 11.4, nor does XTO Energy seek indemnification in its XTO Complaint, see XTO Complaint ¶¶ 42-57, at 6-8. Furthermore, the Master Contract does not violate any other portion of New Mexico's Oilfield Anti-Indemnity

Statute.  The clause in the Zurich Policy, Coverage A, imposing upon Zurich Insurance a duty to defend is therefore valid.

Finally, while fairness does not have much to do with the Court's analysis -- primarily because the New Mexico courts have been mostly concerned with promoting safety and not fairness -- it is worth noting that it is hard to have much sympathy for Zurich Insurance in this case.  Zurich Insurance is trying to take advantage of a statutory provision -- and avoid all contractual duties owed to the XTO Group -- that the New Mexico Legislature designed to promote safety, protect oilfield workers, and to some degree contractors, who sometimes lack the bargaining power that operators have.  It was not designed to protect insurance companies.  Here, Air Tech paid a premium to cover a risk -- for its negligence and most likely the XTO Group's -- and Zurich Insurance is getting a break by not having to indemnify the XTO Group for its negligence.  That it must provide only a defense and limited insurance is a bit of a bargain, unless Zurich Insurance rebates some of the premiums to Air Tech and/or Air Tech lowers its billings to XTO Energy.  In the end, this opinion and order's result is fair to Zurich Insurance, although that result is only a byproduct, not a goal.

**IT IS ORDERED** that the requests in Defendant Zurich American Insurance Company's Motion for Summary Judgment, filed November 13, 2015 (Doc. 32), and in Defendant ATD, LLC's Notice of Adoption by Reference of Defendant Zurich American Insurance Company's Motion for Summary Judgment and Reply in Support of Motion for Summary Judgment, filed February 4, 2016 (Doc. 61), are granted in part and denied in part.  The Court declares that: (i) when the savings clause is applied, New Mexico's Oilfield Anti-Indemnity Statute, N.M. Stat. Ann. § 56-7-2, does not void the provisions in the Master Service Contract that require Defendant Air Tech Drilling, Inc. to indemnify Plaintiff XTO Energy, Inc. and XTO Group

members, defined as XTO Energy's "Affiliates, co-owners . . . at the Site, joint venturers, partners, contractors and subcontractors other than Contractor or its Subcontractors and all of their respective directors, officers, employees, representatives, agents, licensees and invitees," see MSJ ¶ 11, at 4, for claims that do not arise from any XTO Group member's sole or concurrent negligence; (ii) New Mexico's Oilfield Anti-Indemnity Statute does not void the provisions in the Master Contract, §§ 10.1.1, 10.1.3, and 11.4, that require Air Tech to defend the XTO Group members and to reimburse them for defense costs; and (iii) § 56-7-2 does not void the Zurich Insurance Policy to the extent that it requires Zurich Insurance to indemnify XTO Group members for claims that do not arise from their own negligence, and to defend and reimburse XTO Group members for defense costs.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Bradford C. Berge
Holland and Hart LLP
Santa Fe, New Mexico

-- and --

Katie K. Custer
Holland & Hart LLP
Denver, Colorado

-- and --

Jose A. Ramirez
Holland and Hart LLP
Greenwood Village, Colorado

     *Attorneys for Plaintiff XTO Energy, Inc.*

Sam L. Fadduol
Joshua K. Conaway
Fadduol, Cluff, Hardy & Conaway, P.C.
Albuquerque, New Mexico

-- and --

Maureen A. Sanders
Sanders & Westbrook, P.C.
Albuquerque, New Mexico

> *Attorneys for Plaintiffs-in-Intervention Scott Manley, Shanna Manley, Jose Betancur, and Virginia Betancur*

Terry R. Guebert
Robert Gentile
Guebert Bruckner, P.C.
Albuquerque, New Mexico

> *Attorneys for Defendant ATD, LLC*

James H. Johansen
Shawn S. Cummings
Amy Elizabeth Headrick
Rheba Rutkowski
Butt, Thornton & Baehr, P.C.
Albuquerque, New Mexico

> *Attorneys for Defendant and Third-Party Plaintiff Zurich American Insurance Company*

Andrew B. Curtis
Craig, Terrill, Hale & Grantham, LLP
Lubbock, Texas

> *Attorney for Third-Party Defendant Basic Energy Services, Inc.*

Matthew T. Byers
McCormick, Caraway, Tabor & Byers LLP
Carlsbad, New Mexico

-- and --

Michael Lemoine
Jones Walker
Lafayette, Louisiana

*Attorneys for Third-Party Defendant Weatherford Artificial Lift Systems, Inc.,
Weatherford International, Inc., and Weatherford U.S., L.P.*