IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

XTO ENERGY, INC.,

       Plaintiff,

vs.                                       No. CIV 14-1021 JB/SCY

ATD, LLC, AIR TECH DRILLING, INC. and
ZURICH AMERICAN INSURANCE COMPANY,

       Defendants.

**MEMORANDUM OPINION AND ORDER**

     **THIS MATTER** comes before the Court on the Motion to Quash or Motion for Protective Order Regarding Subpoena to Nonparty Holland & Hart LLP, filed December 1, 2015 (Doc. 36)("Motion to Quash"), and Defendant Zurich American Insurance Company's Motion to Compel Discovery from Plaintiff, filed December 2, 2015 (Doc. 37)("Motion to Compel"). The Court held a hearing on March 1, 2016. The primary issues are: (i) whether Plaintiff XTO Energy, Inc. has access to and control over XTO Energy's counsel's billing documents and rates relating to other insurance company clients over the past five years; (ii) whether the Subpoena that Zurich Insurance sent to XTO Energy's counsel -- Holland & Hart, LLP -- is procedurally and facially valid; (iii) whether the Subpoena, which requests Holland & Hart to produce all of its agreements with any insurance company regarding rates for legal services for the past five years, and all billing documents for services that Holland & Hart provided related to the defense of an insured for the past five years, is unduly burdensome; and (iv) whether the Court should award costs and fees. Because Request for Production Nos. 5 and 6 ask for documents outside of XTO Energy's possession, custody, or control, the Court denies the Motion to Compel for these requests. Because Interrogatories Nos. 7 and 10 ask for information that is not available to XTO

Energy, the Court also denies the Motion to Compel for these requests.  Regarding the second issue, the Subpoena does not comply with rule 45's requirements, making it unenforceable. Additionally, the Subpoena imposes an undue burden on Holland & Hart.  The Court will therefore grant the Motion to Quash.  Finally, because rule 45 requires the Court to impose sanctions when a subpoena imposes an undue burden on the responding party, the Court will also award costs and fees to Holland & Hart.

## FACTUAL BACKGROUND

This case involves numerous parties who contracted with each other to provide services and insurance.  Below, the Court describes the parties involved, their contracts, and the disputes that surround those contracts.  The Court takes its facts from Defendant Zurich American Insurance Company's Motion for Summary Judgment, filed November 13, 2015 (Doc. 32)("MSJ"), Plaintiff XTO Energy Inc.'s Memorandum in Support of Response to Defendant Zurich American Insurance Company's Motion for Summary Judgment, filed December 21, 2015 (Doc. 44)("MSJ Response"), and the Defendant Zurich American Insurance Company's Reply in Support of Motion for Summary Judgment, filed February 1, 2016 (Doc. 59)("MSJ Reply").

### 1.     The Parties.

XTO Energy is an oil-and-gas well operator that contracts with various contractors to perform well operations.  See MSJ at 1; MSJ Response ¶ A, at 2.[1]  Defendant Air Tech Drilling, Inc., a contractor, is a New Mexico corporation based in Bloomfield, New Mexico and formed

---

[1]XTO Energy does not dispute any of Defendant Zurich American Insurance Company's factual assertions.  It states in its MSJ Response that "there is no genuine issue of material fact." MSJ Response at 6.

on June 9, 2006.  See MSJ ¶¶ 7, 10, at 4; MSJ Response ¶ A, at 2.[2]  Air Tech's corporate status

was revoked on June 28, 2010.  See MSJ ¶ 7, at 4.  Defendant ATD, LLC is a New Mexico

limited liability company based in Hobbs, New Mexico, originally formed as a New Mexico

corporation on September 22, 2006 and converted into a limited liability company on August 27,

2009.  See MSJ ¶ 8, at 4.  Zurich Insurance is an insurance company that provides insurance for

Air Tech.  See MSJ ¶ 19, at 6.  ATD, LLC employed Scott Manley and Jose Betancur, who were

working at the XTO Well site on November 8, 2012.  See MSJ ¶ 9, at 4.  Scott Manley and

Shanna Manley ("the Manleys"), as well as Jose and Virginia Betancur ("the Betancurs"),

individually and as Next Friend of Vanessa B. Betancur, Valerie Betancur, and Jose Betancur,

minors, filed litigation in state court against XTO Energy, Weatherford Artificial Lift Systems,

Inc., Weatherford International, Inc., Weatherford U.S., L.P., Basic Energy Services, Inc., BOS

Roustabout Service, LLC, Gabriel Valdez, and Randy Green.  See MSJ ¶¶ 1-2, at 2; Response ¶¶

M-N, at 4.

---

[2]Throughout its MSJ Response, XTO Energy does not distinguish between Air Tech and ATD, LLC, using the phrase "Air Tech/ATD" to refer to both entities.  See, e.g., MSJ Response ¶ J, at 4.  Zurich Insurance disputes all of XTO Energy's factual assertions that suggest that Air Tech and ATD, LLC are the same entity.  See MSJ Reply ¶ B, at 3.  Zurich Insurance contends that Air Tech and ATD, LLC are not the same entity, and provides documents to support its objection.  See Reply ¶ B, at 3; New Mexico Secretary of State Office, Information on Air Tech Drilling, Inc., filed November 13, 2015 (Doc. 33-1)(demonstrating that: (i) Air Tech's corporate status was revoked on June 28, 2010; (ii) Air Tech was a New Mexico corporation based in Bloomfield, New Mexico formed on June 9, 2006; and (iii) ATD, LLC was formed as a corporation on September 22, 2006, based in Hobbs, New Mexico and converted to a limited liability company on August 27, 2009).  Because Zurich Insurance presents credible evidence that Air Tech and ATD, LLC are not the same entity, the Court deems it disputed whether they are the same entity.  While the issue is disputed, it is not material to the current dispute.  The Court will therefore refer to and treat Air Tech and ATD, LLC as distinct entities.  See D.N.M.LR-Civ. 56(b).  Additionally, the Court will refer only to Air Tech when describing the Contractor's obligations in the Master Contract.  This adoption of terminology does not determine that Air Tech and ATD, LLC are separate entities, as that determination is not relevant here.

2.      **The Master Service Contract.**



Operator                                                       Contractor

XTO Energy                                   Air Tech

On November 8, 2006, XTO Energy entered into a Master Service Contract ("Master Contract" or "MSC") with Air Tech.  MSJ ¶¶ 7, 10, at 4; MSJ Response ¶ A, at 2.  The Master Contract provides that Air Tech, "as 'Contractor,' would provide certain well-related services to XTO."  MSJ ¶ 10, at 4; MSJ Response ¶ A, at 2.  "The MSC defines 'XTO Group' as 'XTO, its Affiliates, co-owners . . . at the Site, joint venturers, partners, contractors and subcontractors other than Contractor or its Subcontractors and all of their respective directors, officers, employees, representatives, agents, licensees and invitees.'"  MSJ ¶ 11, at 4.  The Master Contract defines "Contractor Group" as "Contractor, its Affiliates, any Subcontractor of Contractor, and their respective directors, officers, employees, representatives, agents, licensees and invitees."  MSJ ¶ 13, at 4-5.  The XTO Complaint does not allege that "XTO or any defendants named in the Manley Complaint or the Betancur Complaint is a member of the 'Contractor Group.'"  MSJ ¶ 14, at 5.

Master Contract § 10, entitled "RELEASE, DEFENSE, INDEMNITY, AND HOLD HARMLESS," states:

> 10.1.1  Contractor hereby agrees to release, defend, indemnify and hold the XTO Group harmless from and against any and all claims, demands, and causes of action of every kind and character (including without limitation, fines, penalties, remedial obligations, court costs and reasonable attorney's fees, including attorney's fees incurred in the enforcement of this indemnity)(hereinafter collectively referred to as the 'Indemnifiable Claims') arising out of, without limitation bodily injury and/or death of any one or more members of the Contractor Group in any manner incident to, connected with or arising out of the performance of the Work.  *This obligation is without regard to the cause or causes of such bodily injury, death, loss of or damage to property and includes, but is not limited to, Indemnifiable Claims resulting from any sole, joint or*

- 4 -

*concurrent negligence, strict liability, or other act and/or omission of any one or more members of the XTO Group.*

10.1.2   To the extent not covered in Section 10.3, Contractor hereby further agrees to release, defend, indemnify and hold the XTO Group harmless from and against any and all Indemnifiable Claims *arising out of the emission, discharge or negligence, strict liability, or other act and/or omission of any one or more members of the Contractor Group, which is in any manner incident to, connected with or arises out of the performance of the Work.*

10.1.3  *Contractor agrees that its indemnity obligations herein will be supported by insurance* with at least the minimum amounts provided in Article XI, which insurance will be primary to any other insurance provided by or available to any one or more members of the XTO Group *and shall provide waivers of subrogation against all members of the XTO Group.* To the extent that applicable law prohibits the monetary limits of insurance required or the indemnities voluntarily assumed hereunder, the requirements will automatically be revised to conform, to the maximum extent permitted, with applicable law.

MSJ ¶ 15, at 5 (quoting Master Contract §10.1 (emphases in MSJ)).

Master Contract § 11.4 provides that all Contractor's liability insurance policies must name "XTO Group" as an additional insured and must "contain a waiver on the part of the insurer, by subrogation or otherwise, of all rights against the XTO Group."  MSJ ¶ 16, at 5-6.

Master Contract § 10.4 also contains a savings clause, which states:

SPECIAL PROVISION FOR NEW MEXICO.   THE FOLLOWING PROVISION APPLIES WHERE WORK IS TO BE PERFORMED IN NEW MEXICO, NOTWITHSTANDING ANY PROVISIONS IN THE CONTRACT TO THE CONTRARY.  *To the extent this Article X is governed by New Mexico law, then the provisions therein shall be read not to include indemnification for one's own negligence.*

MSJ ¶ 17, at 6 (quoting MSC §10.4 (emphasis in MSJ)).  MSC § 14.8 provides that Texas law -- "excluding the Texas rules on conflict of law" -- governs the Master Contract.  MSJ ¶ 18, at 6.

3.      **The Zurich Policy**.



Zurich Insurance issued "a commercial general liability policy ('Policy') to Mesa Well Servicing, LP, policy number GLO 4391238-03, effective July 1, 2012 through July 1, 2013." MSJ ¶ 19, at 6.  "The Policy's Commercial General Liability Coverage Part Declarations page identifies Mesa Well Servicing, LP as the Named Insured."  MSJ ¶ 19, at 6.  The Policy's Commercial General Liability Coverage Form states that "[t]hroughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations and any other person or organization qualifying as a Named Insured under this policy."  MSJ ¶ 20, at 6.  The Policy's Schedule of Named Insureds includes Air Tech.  See MSJ ¶ 21, at 6.

In describing the coverage, the Policy states in the section entitled "Coverage A Bodily Injury and Property Damage Liability ('Coverage A')":

> We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' *to which this insurance applies*.  We will have the right and duty to defend the insured against any 'suit' seeking those damages.  However, *we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply*.  We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result. . . .  But: . . . No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments -- Coverages A and B.

MSJ ¶ 22, at 6-7 (emphasis in MSJ).

Coverage A excludes coverage for "'Bodily injury' or 'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement," except for liability for damages: "(1) That the insured would have in the absence of the contract or agreement; or (2) Assumed in a contract or agreement that is an 'insured contract', provided the 'bodily injury' or 'property damage' occurs subsequent to the execution of the contract or agreement."[3]  MSJ ¶ 23, at 7.  The Policy defines "Insured contract" as: "That part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for 'bodily injury' or 'property damage' to a third person or organization."  MSJ ¶ 24, at 7.  The Policy defines "tort liability" as "a liability that would be imposed by law in the absence of any contract or agreement."  MSJ ¶ 24, at 7.

In the Commercial General Liability Coverage Part, the Policy defines "insured" as "any person or organization qualifying as such under Section II -- Who is an insured."  MSJ ¶ 25, at 7. The Policy contains an Additional Insured Endorsement, which modifies the insurance provided under the Commercial General Liability Coverage Part as follows:

A.  Section II -- Who Is An Insured is amended to include as an insured any person or organization who you are required to add as an additional insured on this policy under a written contract or written agreement.

B.  The insurance provided to the additional insured person or organization applies only to 'bodily injury', 'property damage' . . . covered under Section I -- Coverage A -- Bodily Injury and Property Damage Liability . . . *but only with respect to liability for 'bodily injury'*, 'property damage' . . . *caused, in whole or in part, by:*

1.  *Your acts or omissions;*

2.  *The acts or omissions of those acting on your behalf, and resulting directly from your ongoing operations of 'your work' as included in the*

---

[3]XTO Energy does not address this factual assertion, so the Court deems it undisputed. See D.N.M.LR-Civ. 56(b).

*'products-completed operations hazard'*, which is the subject of the written contract or written agreement. . . .

D.  The insurance provided to the additional insured person or organization does not apply to: 'Bodily injury', 'property damage' . . . arising out of the rendering or failure to render any professional architectural, engineering or surveying services including:

      1.  The preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

      2.  Supervisory, inspection, architectural or engineering activities."

MSJ ¶ 26, at 8 (emphasis in MSJ).

The Zurich Policy further provides that, when the insured -- Air Tech -- has assumed liability for reasonable attorney's fees and expenses under an "insured contract," the insurer will reimburse those fees and expenses as damages.  Response ¶ I, at 3-4.  All of the claims asserted in the XTO Complaint are based entirely on obligations that Air Tech, ATD, LLC and Zurich Insurance allegedly owe under the Master Contract and the Zurich Policy "for the claims asserted against XTO Group members in the Manley and Betancur Complaints."  MSJ ¶ 27, at 8.

    **4.**    **The State Litigation.**

On November 8, 2012, an accident occurred at a well in Eddy County, New Mexico, resulting in a fire.  See MSJ ¶ 1, at 2; Response ¶ J, at 4.  On November 8, 2012, ATD, LLC and Air Tech provided services on the well.  See Response ¶ K, at 4.  ATD, LLC employed Scott Manley and Jose Betancur, who were working at the XTO Well site on November 8, 2012.  See MSJ ¶ 9, at 4.  The parties dispute whether XTO Energy directed or supervised Air Tech.  See XTO Complaint ¶ 15, at 3 ("The MSC further provides that Air Tech/ATD would be, at all material times, an independent contractor and would have complete and sole control over their employees, the details of the work performed and the methods by which the work was

accomplished.");  Transcript of Hearing at 35:13-16 (taken March 1, 2016)("Tr.")[4]("There is a question about whether XTO supervised and directed the work at the well site.  And that is an issue that's hotly contested by XTO in the underlying case.").  On March 13, 2013, as a result of the November 8, 2012 accident, Scott Manley and Shanna Manley ("the Manleys") filed the Plaintiffs' Complaint to Recover Damages for Personal Injury in the Fifth Judicial District Court, Eddy County, State of New Mexico, D-503-CV-2013-00241, against XTO Energy and other defendants.  MSJ ¶ 1, at 2; Response ¶ M, at 4.  On May 22, 2014, Jose and Virginia Betancur ("the Betancurs"), individually and as Next Friend of Vanessa B. Betancur, Valerie Betancur, and Jose Betancur, minors, filed their Complaint in Intervention to Recover Damages for Personal Injury ("Betancur Complaint") in the same state case in connection with the same November 8, 2012 incident.  MSJ ¶ 2, at 2; Response ¶ N, at 4.

The defendants in both state complaints consist of XTO Energy, Weatherford Artificial Lift Systems, Inc., Weatherford International, Inc., Weatherford U.S., L.P., Basic Energy Services, Inc., BOS Roustabout Service, LLC, Gabriel Valdez, and Randy Green.  See Manley Complaint at 1; Betancur Complaint at 1.  "Most or all of the other defendants in the Manley suit are members of the XTO Group."  MSJ ¶ 12, at 4.  The Betancur Complaint asserts against XTO Energy and the other defendants claims of "negligence; respondeat superior; negligent selection, retention, and supervision of contractors/subcontractors; liability for nondelegable duty/joint and several liability; and violation of statute/negligence as a matter of law."  MSJ ¶ 2, at 2.  It requests damages for J. Betancur's bodily injuries, punitive damages, and damages for loss of consortium.  See MSJ ¶ 2, at 2.  On June 2, 2014, the Manleys amended their Complaint to assert "the same claims against the same defendants as the Betancur Complaint."  MSJ ¶ 3, at 2.

---

[4]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

The Manley Complaint and Betancur Complaint allege that, "at the time of the incident, XTO owned and operated the well ('XTO Well') and that Randy Green was XTO's 'Company Man' at the well site, with overall authority and control over the site."  MSJ ¶ 4, at 3.  Both Complaints assert claims against XTO Energy, Green, and certain contractors that provided well-related services to XTO Energy at the XTO Well: Weatherford Artificial, Weatherford International, Weatherford U.S., Basic Energy, BOS Roustabout, and Valdez, a Weatherford-entity employee.  See MSJ ¶ 5, at 3.  "Neither the Manley Complaint nor the Betancur Complaint alleges any wrongdoing or asserts any claims against Air Tech, ATD, LLC, Mesa Well Servicing, LP, or their employees."  MSJ ¶ 5, at 3.

On February 28, 2013, XTO Energy tendered its defense to Air Tech and ATD, LLC "pursuant to the indemnity provision and the additional insured requirement" in the Master Contract that it signed.  Response ¶ O, at 4.  Zurich Insurance acknowledged XTO Energy's tender of defense and indemnity to Air Tech Drilling in its April 3, 2013 letter to XTO Energy.  See Response ¶ P, at 4.[5]  In response to Zurich Insurance's inquiries, XTO Energy informed Zurich Insurance that Air Tech or ATD, LLC "must provide indemnity and a defense pursuant to the MSC."  Response ¶ Q, at 4.

In an email dated November 10, 2013, Zurich Insurance responded to XTO Energy, denying any obligation to indemnify XTO Energy, but agreeing to defend XTO Energy as an additional insured under a reservation of rights.  See Response ¶ R, at 5; Reply ¶ F, at 3.  XTO Energy accepted Zurich Insurance's defense tender, and Zurich Insurance stated that the law firm that XTO Energy retained as counsel, Holland & Hart LLP, was on its approved counsel list.

---

[5]Zurich Insurance does not dispute this fact, so the Court deems it undisputed.  See D.N.M.LR-Civ. 56(b).

See Response ¶ S, at 5.  Zurich Insurance attempted to reach an agreement with Holland & Hart over the firm's hourly rates for attorney's fees, but did not reimburse XTO Energy for any fees or expenses, notwithstanding that it asked to be billed directly for fees incurred after it accepted the defense tender.  See Response ¶ T, at 5.  Zurich Insurance stated that it would defend XTO Energy only if it could arrive at an agreement over hourly rates for attorney's fees.  See Response ¶ U, at 5.  Zurich Insurance could not reach an agreement on the law firm's hourly rates.  See Response ¶ V, at 5.

**PROCEDURAL BACKGROUND**

XTO Energy's Complaint for Breach of Contract, Unfair Practices and Declaratory Relief, filed November 10, 2014 (Doc. 1)("XTO Complaint"), alleges that "Air Tech and ATD, LLC breached contractual duties under a Master Service Contract to defend XTO against the claims asserted in the Manley and Betancur Complaints."  MSJ ¶ 6, at 3.  It further asserts that Zurich Insurance breached its defense and reimbursement obligations to XTO Energy under the commercial general liability policy that Zurich Insurance issued to Mesa Well Servicing.  See MSJ ¶ 6, at 3-4.

XTO Energy alleges four claims.  It first alleges breach of contract against Air Tech and ATD, LLC.  See XTO Complaint ¶¶ 42-47, at 6-7.  It contends that "XTO and Air Tech entered into a binding written master service contract," which "is binding upon Air Tech and ATD."  XTO Complaint ¶ 43, at 6.  It states that Air Tech and ATD, LLC "have materially breached the MSC by refusing to defend XTO," and that XTO Energy is "entitled to recover damages."  XTO Complaint ¶¶ 45-47, at 6-7.  Second, XTO Energy asserts a breach-of-contract claim against Zurich Insurance.  See Complaint ¶¶ 48-54, at 7.  It alleges that Zurich Insurance breached the Policy by: (i) refusing to defend XTO Energy; (ii) refusing to reimburse XTO Energy for fees

and expenses incurred; and (iii) refusing to pay XTO Energy's counsel.  See XTO Complaint ¶ 51, at 7.  Third, XTO Energy contends that "Zurich's actions and inactions, as alleged [in the XTO Complaint], constitute violations of New Mexico's unfair claims practices statutes, § 59A-16-1 *et seq.*"  XTO Complaint ¶ 56, at 7.  Finally, XTO Energy asks the Court to "declare the duties and obligations of Zurich under the Policy."  XTO Complaint ¶ 60, at 8.  The Manleys, and Jose Betancur and Virginia Betancur, individually and as next friend of Vanessa Betancur, Valerie Betancur, and Jose Betancur, Jr., minors, seek to intervene in the litigation.  See Plaintiffs-in-Intervention's First Amended Motion to Intervene and Memorandum in Support, filed December 20, 2015 (Doc. 42).

### 1.    The Motion to Compel.

On September 18, 2015, Zurich Insurance served its first set of discovery requests to XTO Energy.  See Motion to Compel at 2.  Zurich Insurance contends that XTO Energy provided "inadequate Responses to Zurich's First Set of Interrogatories and Requests for Production on November 12, 2015."  Motion to Compel at 2.  XTO Energy's response largely objected to Zurich Insurance's Motion to Compel on the ground that Zurich Insurance seeks to obtain information that XTO Energy "does not have within its care, custody, or control and over which it has no legal right to obtain."  XTO Energy, Inc.'s Response to Defendant Zurich American Insurance Company's Motion to Compel Discovery at 1, filed December 28, 2015 (Doc. 46)("Response to Motion to Compel").  Zurich Insurance states that it asked XTO Energy to supplements its responses, but that XTO Energy did not provide any supplements.  See Motion to Compel at 2.  The Court describes the specific disputes below.

### a.    Interrogatory No. 7.

Zurich Insurance explains that, in Interrogatory No. 7, it asks XTO Energy to "state the hourly billing rates charged by its current attorneys, Holland & Hart, to any insurance company

represented by Holland & Hart or who has retained Holland & Hart to represent an insured for the past five years, including rates for shareholders, associates, and paralegals." Motion to Compel at 4. XTO Energy objects that Holland & Hart is not a party to this litigation, and is therefore not an appropriate recipient of Zurich Insurance's interrogatory under rule 33 of the Federal Rules of Civil Procedure. See Motion to Compel at 4; Response to Motion to Compel at 4. It argues that the information requested is neither relevant nor likely to lead to the discovery of admissible evidence. See Motion to Compel at 4; Response to Motion to Compel at 4. XTO Energy further objects that the requested information "was confidential, privileged or proprietary." Response to Motion to Compel at 4.

Zurich Insurance contends that the "attorney's fees charged by XTO's counsel to insurance companies are clearly relevant to the issue of whether the fees proposed by Holland & Hart are reasonable." Motion to Compel at 4. Moreover, Zurich Insurance argues that Holland & Hart put the fees' reasonableness at issue by representing that its rates are reasonable. See Motion to Compel at 4 (citing Email from Brad Berge, Holland & Hart attorney representing XTO Energy, to Les Hall, Zurich Insurance at 2 (dated October 3, 2014), filed December 2, 2015 (Doc. 37-1)("Letter")).

In response, XTO Energy reiterates the same arguments that it raised in its initial objection to Interrogatory No. 7. See Response to Motion to Compel at 4-5. Specifically, it asserts that rule 33 "allows a party to serve interrogatories on another party only." Response to Motion to Compel at 4. It argues that it should not have to release the requested information, because it "is held by Holland & Hart and is clearly not in XTO's care, custody or control." Response to Motion to Compel at 4. XTO Energy further asserts that the information that Interrogatory No. 7 seeks is not relevant and will not likely lead to the discovery of admissible

evidence, because the rates that it charges clients for unrelated matters in different regions vary substantially.  See Response to Motion to Compel at 5.  Additionally, XTO Energy contends that Interrogatory No. 7's broad scope imposes an undue burden and cost.  See Response to Motion to Compel at 5-6.

Zurich Insurance disputes that the information sought is not within XTO Energy's care, custody, or control.  See Defendant Zurich American Insurance Company's Reply in Support of Motion to Compel Discovery From Plaintiff at 1, filed January 11, 2016 (Doc. 50)("Reply to Motion to Compel").  It argues that Holland & Hart can give that information to XTO Energy. See Reply to Motion to Compel at 1-2.  With respect to XTO Energy's argument that the desired information is not relevant, Zurich Insurance contends that it "is simply unable to determine the reasonableness of the $400.00 rate charged by Holland & Hart without the information on what XTO's counsel charges other insurance companies."  Reply to Motion to Compel at 2.

### b.    Interrogatory No. 8.

Along the same lines, Zurich Insurance states that Interrogatory No. 8 asks XTO Energy "to identify all insurance companies and/or businesses to which XTO has tendered a defense of the underlying Manley and Betancur lawsuits."  Motion to Compel at 5.  XTO Energy responds that it tendered the defense to Air Tech and to Basic Energy.  Zurich Insurance argues that XTO Energy must produce all written communications regarding the defense tender to Basic Energy. See Motion to Compel at 5-6.

In XTO Energy's Response to Motion to Compel, XTO Energy states that it "has offered to cure some of the discovery issues raised in Zurich's Motion."  Response to Motion to Compel at 1.  With respect to Interrogatory No. 8, it asserts that it filed an amended response clarifying that it did not tender its defense to Basic Energy.  See Response to Motion to Compel at 2.

Accordingly, XTO Energy argues that it has complied with Interrogatory No. 8 by identifying all insurance companies and businesses to which XTO Energy has tendered a defense.   <u>See</u> Response to Motion to Compel at 2.  Zurich Insurance agrees that the parties have resolved the discovery dispute surrounding Interrogatory No. 8.  <u>See</u> Reply to Motion to Compel at 7.

### c.       Interrogatory No. 10.

In Interrogatory No. 10, Zurich Insurance asks XTO Energy if Zurich Insurance has retained Holland & Hart within the past five years and, if so, to provide "the name of the case, the nature of the case, and the agreed-upon hourly rate Zurich paid to Holland and Hart in each case."  Motion to Compel at 6; Response to Motion to Compel at 6.  XTO Energy objects, stating that Holland & Hart is not a party, so it is not an appropriate recipient of Zurich Insurance's interrogatory, and that the information is not likely to lead to the discovery of admissible evidence.  <u>See</u> Motion to Compel at 6.  XTO Energy raises the same arguments for objecting in its Response to Motion to Compel.  <u>See</u> to Motion to Compel at 6.  Zurich Insurance again asserts that the information is relevant to Holland & Hart's fees' reasonableness.  <u>See</u> Reply to Motion to Compel at 4.  Furthermore, it states that XTO Energy did not provide a privilege log, meaning that XTO Energy waived any privilege.  <u>See</u> Motion to Compel at 6.

### d.       Request for Production Nos. 5 and 6.

In Requests for Production Nos. 5 and 6, Zurich Insurance requested information about the rates that Holland & Hart charged for cases in which an insurance company pays Holland & Hart.  <u>See</u> Motion to Compel at 7.  Once again, XTO Energy raises the same objection: Holland & Hart is not a party to this litigation, or an appropriate recipient of the interrogatories, and the information is not likely to lead to the discovery of admissible evidence.  <u>See</u> Motion to Compel at 7.  XTO Energy further objects that the discovery sought is confidential, privileged, or

proprietary.  See Motion to Compel at 7.  Zurich Insurance contends that the attorney's fees that XTO Energy charges to insurance companies are "entirely relevant to the issue of whether the fees proposed by Holland & Hart are reasonable in this case."  Motion to Compel at 7. Additionally, Zurich Insurance argues that Holland & Hart's objection that it is not a party to the litigation "is not a valid objection," because a party "responding to a request for production is required to provide requested documents within its possession, custody, or control."  Motion to Compel at 7.

> **d.**    **Request for Production No. 10.**

In Request for Production No. 10, Zurich Insurance requests all pleadings, written discovery, and responses, depositions, subpoenas to third parties, and responses in the underlying Manley and Betancur lawsuits.  See Motion to Compel at 8.  XTO Energy objects on the ground that production "would be unduly burdensome and overly broad."  Motion to Compel at 8. Zurich Insurance argues that XTO Energy has not shown that the burdens outweigh the "benefits to be secured from the discovery."  Motion to Compel at 8.

In XTO Energy's Response to Motion to Compel, XTO Energy asserts that it informed Zurich Insurance that, "in light of Zurich's narrowing of documents requested pursuant to its Request for Production No. 10, XTO is in the process of producing all discovery responses and document productions from the underlying Manley and Betancur lawsuits."  Response to Motion to Compel at 2.  XTO Energy agrees to produce the deposition transcripts that Zurich Insurance identifies, but states that it is waiting for Zurich Insurance to identify which particular transcripts it desires.  See Response to Motion to Compel at 2.  Zurich Insurance agrees that the parties have resolved the discovery dispute surrounding Request for Production No. 10.  See Reply to Motion to Compel at 7.

### e. Requests for Production Nos. 11, 12, and 13.

Finally, in Request for Production Nos. 11, 12, and 13, Zurich Insurance requests that XTO Energy produce "written agreements between XTO and its attorneys, Holland & Hart, and all billing documents."  Motion to Compel at 9.  XTO Energy initially raised the attorney-client privilege as its basis for objecting.  See Motion to Compel at 9.  Zurich Insurance argues that XTO Energy must produce these documents, because they can obtain control over them, and because they waived any privilege by failing to produce a privilege log.  See Motion to Compel at 9.

In its Response to Motion to Compel, XTO Energy explains that it "has offered to produce the documents subject to a protective order" to "ensure that the documents retain their attorney-client protection."  Response to Motion to Compel at 10.  Zurich Insurance contends that "a tri-partite relationship is created in Zurich's acceptance of the defense of XTO and that documents provided to Zurich as part of this defense would be protected as part of the attorney/client privilege."  Response to Motion to Compel at 7.  Although Zurich Insurance initially argued that a protective order is not necessary to preserve privilege, it later agreed that it could enter into a protective order, given that the Plaintiffs-in-Intervention sought to intervene. See Tr. at 101:1-7 (Custer); Tr. at 101:24-102:1 (Johansen).

### 2. The Subpoena.

On September 18, 2015, Zurich Insurance issued its first set of discovery requests to XTO Energy, requesting: (i) "Any agreements between Holland & Hart, LLP and any insurance company regarding rates for legal services for the past five (5) years, redacting any privileged information"; and (ii) "Any billing documents for services provided by Holland & Hart, LLP related to the defense of an insured at the request of an insurance company for the past five (5) years, redacting any privileged information."  Motion to Quash Response at 2.  Motion to Quash

- 17 -

Response at 2.  XTO Energy objects to both requests.  See Motion to Quash at 2-3; Motion to Quash Response at 2.  Despite these objections, Zurich Insurance issued a subpoena to Holland & Hart on November 19, 2015 with identical requests to those it asked for in discovery.  See Motion to Quash at 3; Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (dated November 19, 2015), filed December 1, 2015 (Doc. 36-2)("Subpoena").

 **3.**  **The Motion to Quash.**

 In the Motion to Quash, Holland & Hart requests that the Court quash Zurich Insurance's Subpoena, or issue a protective order.  See Motion to Quash at 1.  Holland & Hart explains that subpoenas issued to opposing counsel "are strongly disfavored and are generally improper." Motion to Quash at 3.  It contends that Zurich Insurance can subpoena and depose Holland & Hart only if "(1) no other means exist to obtain the information than to depose opposing counsel; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case."  Motion to Quash at 3 (describing the test, which the United States Court of Appeals for the Tenth Circuit has adopted, set forth in Shelton v. Am. Motors Corp., 805 F.2d 1323, 1327 (8th Cir. 1987)("the Shelton test")).  Holland & Hart argues that Zurich Insurance cannot meet these requirements.  See Motion to Quash at 3.

 Holland & Hart further asserts that rule 45(d) of the Federal Rules of Civil Procedure requires the Court to quash a subpoena that requires disclosure of privileged matter.  See Motion to Quash at 4.  It argues that the Court should quash the subpoena or enter a protective order, because the subpoena "requests privileged agreements and billing statements, and redacting the privileged information would be unduly burdensome."  Motion to Quash at 4.  It contends that the subpoena would provide information which is minimally relevant, which would not outweigh the heavy burden on Holland & Hart of redacting the information.  See Motion to Quash at 5.

Finally, Holland & Hart argues that technical errors in the subpoena violates rule 45.  See Motion to Quash at 5-6.  It therefore asks the Court to award it the "reasonable attorneys' fees it incurred in bringing this motion."  Motion to Quash at 6.

Zurich Insurance responded on December 15, 2015.  See Defendant Zurich American Insurance Company's Response to "Motion to Quash or Motion for Protective Order Regarding Subpoena to Nonparty Holland & Hart LLP," filed December 15, 2015 (Doc. 39)("Motion to Quash Response").  It argues that its request "complies with the test discussed in *Shelton*," because no other means exist to obtain Holland & Hart's legal fees, which "is a central issue in this case."  Motion to Quash Response at 3.  Zurich Insurance asserts that the information is essential to the case, because it supports Zurich Insurance's argument that it was justified in denying XTO Energy coverage under the Zurich Policy.  See Motion to Quash Response at 4.  Specifically, Zurich Insurance contends that it was entitled to deny coverage, because XTO Energy acted in comparative bad faith by requesting unreasonable rates.  See Motion to Quash Response at 4.  Zurich Insurance argues that, to prove this claim, it must have the information it requests in the subpoena.  See Motion to Quash Response at 4.

Zurich Insurance further asserts that it does not seek any privileged information, because "information regarding legal fee arrangements is [] not subject to the attorney-client privilege."  Motion to Quash Response at 3.  Additionally, Zurich Insurance contends that its request is not overly burdensome and that Holland & Hart "is certainly capable of providing the responsive information without providing every billing entry for the past five (5) years."  Motion to Quash Response at 4.  Furthermore, Zurich Insurance states that its subpoena complies with rule 45, despite a technical error on the first page, meaning that Holland & Hart is not entitled to an attorney's fees award.  See Motion to Quash Response at 5.

Holland & Hart replied, reiterating that the subpoena's requests are irrelevant.  See Reply in Support of Motion to Quash or Motion for Protective Order Regarding Subpoena to Nonparty Holland & Hart LLP, filed January 4, 2016 (Doc. 49)("Motion to Quash Reply").  It emphasizes that, "when a Subpoena is directed to opposing counsel, the requesting party must meet a higher burden -- the discovery must be crucial to the requesting party's case, not simply relevant." Motion to Quash Reply at 2.  Holland & Hart maintains that several jurisdictions "have rejected a comparative bad faith defense in the insurance context," which means that the requested discovery "is thus not relevant to a valid claim or defense."  Motion to Quash Reply at 2.

Holland & Hart next contends that Zurich Insurance can prove its case through other means, so the discovery is not essential to the case.  See Motion to Quash Reply at 2-3.  Holland & Hart suggests that Zurich Insurance can: (i) hire an expert to opine on the rates' reasonableness; or (ii) request from XTO Energy the rates that XTO Energy has agreed to pay to Holland & Hart or to other law firms that represent XTO Energy.  See Motion to Quash Reply at 3.  Holland & Hard concludes by emphasizing the burden that the discovery requests place on it. See Motion to Quash Reply at 5.

### 4.    The Hearing.

The Court held a hearing on March 1, 2016 to address the Motion to Quash and the Motion to Compel.  See Transcript of Hearing (taken March 1, 2016)("Tr.").[6]  XTO Energy explained that the Defendants have "asserted an affirmative defense of comparative bad faith against XTO, and in its papers it has alleged that the reasonableness of Holland & Hart's rate is relevant to the comparative bad faith defense."  Tr. at 84:20-24 (Custer).  It argued that the only relevant issue to the bad faith defense is XTO Energy's actions rather than Holland & Hart's

_____

[6]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

actions.  See Tr. at 85:1-4 (Custer).  It stressed that "Zurich needs to be able to show that XTO itself acted in bad faith," and that "Zurich has cited nothing to support that the acts of Holland & Hart could be or should be imputed to XTO in a comparative bad faith defense."  Tr. at 85:9-14 (Custer).

XTO Energy also raised the same arguments it made in its Motion to Quash.  See Tr. at 86:1-87:23 (Custer).  It reiterated that Zurich Insurance can discover whether Holland & Hart's rates are reasonable in numerous other ways.  See Tr. at 86:1-7 (Custer).  It conceded that "fee agreements are generally not privileged," but contended that "they may contain privileged information."  Tr. at 87:7-13 (Custer).  It explained that combing through "potentially hundreds if not thousands of pages of billing documents and hav[ing] to redact all the information, simply so that Zurich can see the rates that Holland & Hart has charged to other clients . . . [is] simply not reasonable."  Tr. at 87:18-23 (Custer).  Finally, XTO Energy asserted that Zurich Insurance's subpoena is "woefully overbroad."  Tr. at 89:13 (Custer).  It stated that the proper method to assess a fee's reasonableness is to consider "the prevailing market rate and the locality."  Tr. at 89:13-17 (Custer).  It argued that, in contrast, Zurich Insurance seeks all billing documents in every location.  See Tr. at 89:14-20 (Custer).

Zurich Insurance then argued that it should be able to obtain the desired information through both the subpoena and its Motion to Compel.  See Tr. at 91:10-92:7 (Johansen).  Zurich Insurance responded that a determination of the fees' reasonableness is not "solely relevant to a comparative bad faith analysis."  Tr. at 91:10-12 (Johansen).  It stated that the information is also relevant to Zurich Insurance's defense against XTO Energy's breach-of-contract claim.  See Tr. at 91:10-15 (Johansen).  Further, it argued that Holland & Hart put the specific hourly rate at issue by saying "Holland & Hart's rates are reasonable for this work, and Air Tech is legally

obligated to pay those rates." Tr. at 91:19-25 (Johansen). It agreed "to consider a narrower scope" of discovery, but stated that it "would like to know what Holland & Hart charges other insurance companies." Tr. at 92:3-7 (Johansen).

XTO Energy asserted that it did not have to give this information to Zurich Insurance "simply because XTO does not have this information." Tr. at 95:11-14 (Custer). In response to Zurich Insurance's arguments on the Motion to Compel, XTO Energy grouped the discovery requests into two sets: (i) Request for Production Nos. 5 and 6 and Interrogatory Nos. 7 and 10; and (ii) Requests for Production Nos. 11, 12, and 13.

With respect to the first group, XTO Energy argued that the information that Zurich Insurance requested was not in XTO Energy's control or possession. See Tr. at 96:5-11 (Custer).

> Interrogatory No. 7 asks for Holland & Hart's hourly billing rates charged to any insurance company in the past five years, not limited to any representation of XTO. Interrogatory No. 10 asks for information regarding Zurich's retention of Holland & Hart within the past five years. In request for production five and six [they] asked for Holland & Hart's billing agreements with insurance companies regarding Holland & Hart's rates and for billing documents provided by Holland & Hart related to the defense of an insured for the past five years. As the requests make clear, Zurich is asking for information regarding Holland & Hart's representation of not just XTO, but other clients as well. And what's important is that Zurich has propounded those requests on XTO. That is not information that is within XTO's possession, custody or control.

Tr. at 96:16-25 (Custer). XTO Energy asserted that other courts "have found that the client is not in possession, custody, or control of documents or information that the attorney has that are unrelated to that attorney's representation of the client." Tr. at 97:7-10 (Custer). It further stated: "It is inconceivable that the attorney should be compelled to produce the document belonging to another client because the adversary of one of his clients demands it." Tr. at 98:4-7 (Custer).

Regarding the second group of requests, XTO Energy explained that Zurich Insurance requested Holland & Hart's engagement agreement with XTO Energy and for XTO Energy's billing documents.  See Tr. at 100:23-101:1 (Custer).  It stated that XTO Energy and Zurich Insurance "spoke before this hearing and agreed that the parties could probably work something out on that issue and enter into a protective order, given that the landscape of the case has changed."  Tr. at 101:1-7 (Custer).  It therefore requested that the Court deny the Motion to Compel as to Requests for Production Nos. 11, 12, and 13 to "allow the parties to try to figure out a solution among themselves that protects XTO's information."  Tr. at 101:15-18 (Custer). Zurich Insurance stated that it agreed with XTO Energy regarding the second group of requests - - Requests for Production Nos. 11, 12, and 13 -- and that the parties could arrive at an agreement. See Tr. at 101:24-102:1 (Johansen).  In reference to the remaining requests, Zurich Insurance asserted that it is willing to work with XTO Energy to obtain the information it needs, but maintained that it is entitled to the information.  See Tr. at 102:23-103:2 (Johansen).

## RELEVANT LAW REGARDING DISCOVERY

Rule 34 of the Federal Rules of Civil Procedure governs discovery requests for tangible objects.  See Fed. R. Civ. P. 34.  Rule 34(a) states:

A party may serve on any other party a request within the scope of Rule 26(b):

**(1)**    to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, custody, or control:

**(A)**    any designated documents or electronically stored information -- including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations -- stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or

**(B)**      any designated tangible things; or

**(2)**      to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

Fed. R. Civ. P. 34(a).  Rule 26(b)(1) explains that the proper scope of discovery is "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ."  Fed. R. Civ. P. 26(b)(1).  The factors that bear upon proportionality are: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26 (b)(1).

Federal courts have held that the scope of discovery under rule 26 is broad.  See Gomez v. Martin Marrietta Corp., 50 F.3d 1511, 1520 (10th Cir. 1995); Sanchez v. Matta, 229 F.R.D. 649, 654 (D.N.M. 2004)(Browning, J.)("The federal courts have held that the scope of discovery should be broadly and liberally construed to achieve the full disclosure of all potentially relevant information.").  The federal discovery rules reflect the courts' and Congress' recognition that "mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation."  Hickman v. Taylor, 329 U.S. 495, 507 (1947).  A district court is not, however, "required to permit plaintiff to engage in a 'fishing expedition' in the hope of supporting his claim."  McGee v. Hayes, 43 F. App'x 214, 217 (10th Cir. 2002)(unpublished).[7]  "'Discovery . . .

---

[7]McGee v. Hayes is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support.'" Rivera v. DJO, LLC, No. CIV 11-1119 JB/RHS, 2012 WL 3860744, at *1 (D.N.M. Aug. 27, 2012)(Browning, J.)(quoting Tottenham v. Trans World Gaming Corp., No. CIV 00-7697 WK, 2002 WL 1967023, at *2 (S.D.N.Y. June 21, 2002)(Knapp, J.)). See Hardrick v. Legal Servs. Corp., 96 F.R.D. 617, 618 (D.D.C. 1983)(Burnett, M.J.)(noting that courts do and should remain concerned about "fishing expeditions, discovery abuse and inordinate expense involved in overbroad and far-ranging discovery requests")(internal quotation marks omitted). "[B]road discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." Gomez v. Martin Marietta Corp., 50 F.3d at 1520 (internal quotation marks omitted).

The 2000 amendments to rule 26(b)(1) began narrowing the substantive scope of discovery and injected courts deeper into the discovery process. See Simon v. Taylor, 2015 WL 2225653, at *23 (D.N.M. April 30, 2015)(Browning, J.). Before the 2000 amendments, rule 26(b)(1) defined the scope of discovery as follows:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending actions, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity

---

In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . .   However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that McGee v. Hayes, Miller v. Regents of the Univ. of Colo., 188 F.3d 518, 1999 WL 506520 (10th Cir. 1999), and SEC v. Dowdell, 144 F. App'x 716 (10th Cir. 2005) have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

> and location of persons having knowledge of any discoverable matter.   The
> information sought need not be admissible at the trial if the information sought
> appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1)(1996).  The 2000 amendments made the following changes, shown here

in redline form with the deleted language stricken and the added material underlined:

> Parties may obtain discovery regarding any matter, not privileged, that ~~which~~ is
> relevant to ~~the subject matter involved in the pending actions, whether it relates to~~
> the claim or defense of ~~the party seeking discovery or to the claim or defense of~~
> any ~~other~~ party, including the existence, description, nature, custody, condition
> and location of any books, documents, or other tangible things and the identity
> and location of persons having knowledge of any discoverable matter.  <u>For good
> cause, the court may order discovery of any matter relevant to the subject matter
> involved in the action.  Relevant</u> ~~The~~ information ~~sought~~ need not be admissible
> at the trial if <u>discovery</u> the ~~information sought~~ appears reasonably calculated to
> lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1).  Putting aside the changes to the last sentence -- which the advisory

committee's notes make clear was a housekeeping amendment to clarify that inadmissible

evidence must still be relevant to be discoverable -- the 2000 amendments have two effects:

(i) they narrow the substantive scope of discovery in the first sentence; and (ii) they inject courts

into the process in the entirely new second sentence.

> In 1978, the Committee published for comment a proposed amendment,
> suggested by the Section of Litigation of the American Bar Association, to refine
> the scope of discovery by deleting the "subject matter" language.  This proposal
> was withdrawn, and the Committee has since then made other changes in the
> discovery rules to address concerns about overbroad discovery.  Concerns about
> costs and delay of discovery have persisted nonetheless, and other bar groups
> have repeatedly renewed similar proposals for amendment to this subdivision to
> delete the "subject matter" language.  Nearly one-third of the lawyers surveyed in
> 1997 by the Federal Judicial Center endorsed narrowing the scope of discovery as
> a means of reducing litigation expense without interfering with fair case
> resolutions.  [Federal Judicial Center, T. Willging, J. Shapard, D. Stienstra, & D.
> Miletich, Discovery and Disclosure Practice, Problems, and Proposals for
> Change] 44-45 (1997).  The Committee has heard that in some instances,
> particularly cases involving large quantities of discovery, parties seek to justify
> discovery requests that sweep far beyond the claims and defenses of the parties on
> the ground that they nevertheless have a bearing on the "subject matter" involved
> in the action.

The amendments proposed for subdivision (b)(1) include one element of these earlier proposals but also differ from these proposals in significant ways. The similarity is that the amendments describe the scope of party-controlled discovery in terms of matter relevant to the claim or defense of any party.  The court, however, retains authority to order discovery of any matter relevant to the subject matter involved in the action for good cause.  The amendment is designed to involve the court more actively in regulating the breadth of sweeping or contentious discovery.  The Committee has been informed repeatedly by lawyers that involvement of the court in managing discovery is an important method of controlling problems of inappropriately broad discovery.   Increasing the availability of judicial officers to resolve discovery disputes and increasing court management of discovery were both strongly endorsed by the attorneys surveyed by the Federal Judicial Center.  See Discovery and Disclosure Practice, supra, at 44. Under the amended provisions, if there is an objection that discovery goes beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action.  The good-cause standard warranting broader discovery is meant to be flexible.

**The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action.  The dividing line between information relevant to the claims and defenses and that relevant only to the subject matter of the action cannot be defined with precision.  A variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action.  For example, other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard.  Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information.  Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable.  In each instance, the determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action.**

The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings.  In general, it is hoped that reasonable lawyers can cooperate to manage discovery without the need for judicial intervention.  When judicial intervention is invoked, the actual scope of discovery should be determined according to the reasonable needs of the action.  The court may permit broader discovery in a particular case depending on the

circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested.

The amendments also modify the provision regarding discovery of information not admissible in evidence.  As added in 1946, this sentence was designed to make clear that otherwise relevant material could not be withheld because it was hearsay or otherwise inadmissible.  The Committee was concerned that the "reasonably calculated to lead to the discovery of admissible evidence" standard set forth in this sentence might swallow any other limitation on the scope of discovery.  Accordingly, this sentence has been amended to clarify that information must be relevant to be discoverable, even though inadmissible, and that discovery of such material is permitted if reasonably calculated to lead to the discovery of admissible evidence.  As used here, "relevant" means within the scope of discovery as defined in this subdivision, and it would include information relevant to the subject matter involved in the action if the court has ordered discovery to that limit based on a showing of good cause.

Finally, a sentence has been added calling attention to the limitations of subdivision (b)(2)(i), (ii), and (iii).  These limitations apply to discovery that is otherwise within the scope of subdivision (b)(1).  The Committee has been told repeatedly that courts have not implemented these limitations with the vigor that was contemplated.  See 8 Federal Practice & Procedure § 2008.1 at 121.  This otherwise redundant cross-reference has been added to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery.  Cf. Crawford-El v. Britton, 118 S. Ct. 1584, 1597 (1998) (quoting Rule 26(b)(2)(iii) and stating that "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly").

Fed. R. Civ. P. 26 advisory committee's notes (emphasis added).

One gets the impression from reading the advisory committee's notes that the amendment was not intended to exclude a delineable swath of material so much as it is intended to send a signal to district judges to become more hands-on in the process of regulating -- mostly limiting -- discovery on relevance grounds alone.  The "two effects" of the 2000 amendments might, thus, be only one effect: directing district judges to roll up their sleeves and manage discovery, and to do so on the basis of relevance.  The change in substantive scope from "subject matter," to "claim or defense," would, therefore, seem to exist more to "add teeth" to the relevance standard than to effectuate a substantive narrowing.  The amendments sent a signal to district judges to

become more hands-on in the process of regulating -- mostly limiting -- discovery on relevance grounds alone.  They directed district judges to roll up their sleeves and manage discovery, and to do so on the basis of relevance.  The change in substantive scope from "subject matter," to "claim or defense," added teeth to the relevance standard more than it substantively narrowed discovery.  It is not surprising that the Supreme Court and Congress would want to increase judicial presence: "relevance" is a liberal concept in the context of trial, see Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

Of course, regardless of this individual court's philosophical thoughts about the new rules, courts should also seek to give substantive content to amendments.  Read literally, the rule does not permit parties to discover information relevant only to the claim or defense of another party; they must use discovery only to investigate their own claims and defenses.  More problematically, however, the rule may prevent using the Federal Rules' compulsory discovery process to obtain "background" information not specifically relevant to any one claim or defense -- e.g., a plaintiff naming a pharmaceutical company as a defendant and then using discovery to educate itself generally about medicine, biochemistry, and the drug industry by using the defendant's expertise.

In In re Cooper Tire & Rubber Co., 568 F.3d 1180 (10th Cir. 2009), the Tenth Circuit clarified that the 2000 Amendments to rule 26 "implemented a two-tiered discovery process; the first tier being attorney-managed discovery of information relevant to any claim or defense of a party, and the second being court-managed discovery that can include information relevant to the subject matter of the action."  568 F.3d at 1188.  The Tenth Circuit further stated that,

> when a party objects that discovery goes beyond that relevant to the claims or defenses, "the court would become involved to determine whether

the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action." This good-cause standard is intended to be flexible. When the district court does intervene in discovery, it has discretion in determining what the scope of discovery should be. "[T]he actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested."

568 F.3d at 1188-89 (quoting the advisory committee's notes to the 2000 amendments to Fed. R.

Civ. P. 26(b)(1))(citations omitted)(footnote omitted)(alteration in original).

The 2015 amendments to rule 26(b)(1) continued this process of narrowing the substantive scope of discovery and injecting courts further into the discovery process. The 2015 amendment made notable deletions and additions, both of which aimed to emphasize the need to make discovery proportional to the needs of the case. See Fed. R. Civ. P. 26(b)(1). Rule 26(b)(1), with the deletions and additions, provides:

> *(1) Scope in General.* Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense ~~including the existence, description, nature, custody, condition and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. All discovery is subject to the limitations imposed by Rule 26(b)(2)(C).~~ [and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.]

Fed. R. Civ. P. 26(b)(1)(alterations added).

The first deletion removes the statement that discovery is available for any matter relevant to any party's claim or defense, "including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter." Fed. R. Civ. P. 26(b)(1) (pre-December 2015

version).  The Committee Notes express that this deletion does not make a substantive change.

Rather, the deletion was made because "[d]iscovery of such matters is so deeply entrenched" in

standard discovery that including it would be "clutter."  Fed. R. Civ. P. 26(b) advisory

committee's note to 2015 amendment.[8]

Regarding the second deletion, the Committee Notes explain that the former provision for

discovery of relevant but inadmissible information that appears "reasonably calculated to lead to

the discovery of admissible evidence" is also deleted.[9]  Fed. R. Civ. P. 26(b) advisory

committee's note to 2015 amendment.

> The phrase has been used by some, incorrectly, to define the scope of discovery.
> As the Committee Note to the 2000 amendments observed, use of the "reasonably
> calculated" phrase to define the scope of discovery "might swallow any other
> limitation on the scope of discovery."  The 2000 amendments sought to prevent
> such misuse by adding the word "Relevant" at the beginning of the sentence,
> making clear that "'relevant' means within the scope of discovery as defined in
> this subdivision . . . ."  The "reasonably calculated" phrase has continued to create
> problems, however, and is removed by these amendments.  It is replaced by the
> direct statement that "Information within this scope of discovery need not be
> admissible in evidence to be discoverable."   Discovery of nonprivileged
> information not admissible in evidence remains available so long as it is otherwise
> within the scope of discovery.

---

[8]The Court regrets this deletion.  Moving things out of the text of a statute often creates mischief, especially for courts that rely heavily on the text's plain language.  The drafters might be astonished how often the Court sees objections to interrogatories and requests that seek basic information about documents.  The rule is well-established because the deleted language was in the rule; now that the language is not in the rule, the rule may be eroded or, more likely, ignored or overlooked by those who do not spend time in the weeds of the advisory notes.  What the advisory comments describe as "clutter" is a simple instruction to practitioners who do not practice in federal court every day for every case.  This deletion might incrementally increase unnecessary litigation rather than shorten it.  Some of the amendments seem more designed to help the nation's large corporations, represented by some of the nation's most expensive law firms, cut down expenses than they are to help courts and practitioners in more routine cases.

[9]Arguably, older lawyers will have to learn a new vocabulary and ignore the one they have used for decades.  If the changes were not made to change the scope of discovery, it is unclear what the benefit of all this really is.

Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment.  The deletion, therefore, did not necessarily change the scope of discovery, but clarified it.  Accordingly, "[r]elevance is still to be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on' any party's claim or defense."  State Farm Mutual Auto. Ins. Co. v. Fayda, 2015 WL 7871037, at *2 (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)).

The most notable addition to rule 26(b) is the proportionality concept.  Rule 26(b)(2)(C)(iii) has always limited overly burdensome discovery and required proportionality.  See Fed. R. Civ. P. 26(b)(2)(C)(iii)(pre-2015 version).  The proportionality requirement was relocated to 26(b)(1) to address the "explosion" of information that "has been exacerbated by the advent of e-discovery."[10]  Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.  Describing how e-discovery is the driving factor in the 2015 amendment, the Notes state:

> The burden or expense of proposed discovery should be determined in a realistic way.  This includes the burden or expense of producing electronically stored

---

[10]This relocation -- rather than substantive change -- is one reason that the Court is skeptical that the 2015 amendments will make a considerable difference in limiting discovery or cutting discovery costs.  Courts have been bringing common sense and proportionality to their discovery decisions long before the 2015 amendments.  See Aguayo v. AMCO Ins. Co., 59 F. Supp. 3d 1225, 1275 (D.N.M. 2014)(Browning, J.)("[T]he Court expects that discovery and motion practice bear some proportionality to the case's worth."); Cabot v. Wal-Mart Stores, Inc., 2012 WL 592874, at *11-12 (limiting the scope of discovery because it was unduly burdensome in relation to the relevance and need).  The real import of the rule is that it will likely lead to more "proportionality" objections and more disputes that the district courts will have to resolve, which is what the drafters apparently intended.  It is unclear how more judicial involvement in discovery can be squared with a federal court docket that is at a breaking point already.  It is also unclear what was wrong with the old goal of discovery of being largely self-executing.  The new rules also require attorneys to learn the new vocabulary of "proportionality," delete their old stock legal sections from their briefs, and rewrite these new sections to use the correct language.  Older lawyers must be particularly alert to read and learn the new rules, read the comments, and understand the thrust of the drafting.  Finally, given that "proportionality" is a very subjective standard, it will be hard for any court to sanction any attorney for raising this objection.  In sum, the rules are just as likely to increase the costs of discovery as to decrease it.

information. Computer-based methods of searching such information continue to develop, particularly for cases involving large volumes of electronically stored information. Courts and parties should be willing to consider the opportunities for reducing the burden or expense of discovery as reliable means of searching electronically stored information become available.

Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.

Chief Justice Roberts' 2015 Year-End Report on the Federal Judiciary indicates that the addition of proportionality to rule 26(b) "crystalizes the concept of reasonable limits on discovery through increased reliance on the common-sense concept of proportionality."[11]  Chief

---

[11]The Rules Enabling Act, 28 U.S.C. §§ 2071-2077, empowers the federal courts to prescribe rules for the conduct of their business. See 28 U.S.C. § 2071. The Judicial Conference -- the policy making body of the federal judiciary -- has overall responsibility for formulating those rules. See Chief Justice John Roberts, 2015 Year-End Report on the Federal Judiciary at 6, Supreme Court of the United States, available at http://www.supremecourt.gov/publicinfo/year-end/year-endreports.aspx ("2015 Year-End Report").  The Chief Justice leads the Judicial Conference.  The Judicial Conference's Committee on Rules of Practice and Procedure, known as the Standing Committee, enlists guidance from advisory committees and conferences to draft proposed rules and amendments for the Judicial Conference's consideration. See 2015 Year-End Report.  Chief Justice Roberts, a former clerk for Chief Justice William Rehnquist, appointed the Honorable David Campbell, United States District Judge for the District of Arizona, also a former Rehnquist clerk and President George W. Bush appointee, to chair the Civil Rules Advisory Committee.  Campbell and David Levi, Dean of the Duke University School of Law, a former clerk to Justice Lewis Powell, and former chief judge of the United States District Court for the Eastern District of California, appointed as United States Attorney by President Ronald Reagan and appointed to the Eastern District of California by President George W. Bush, led the effort to increase proportionality and hands-on judicial case management in the 2015 amendments. See Report to the Standing Committee at 4, Advisory Committee on Civil Rules (May 8, 2013), available at http://www.uscourts.gov/rules-policies/archives/committee-reports/advisory-committee-rules-civil-procedure-may-2013.  After the Judicial Conference concurred on the 2015 amendments, it sent the proposed rules and amendments to the Supreme Court, which approved them.  Chief Justice Roberts submitted the proposed rules to Congress for its examination.  See 2015 Year-End Report at 6. Because Congress did not intervene by December 1, the new rules took effect.  Some scholars have noted that the rules reflect the conservative nature of those who have participated in drafting the amendments. See Edward A. Purcell, Jr., From the Particular to the General: Three Federal Rules and the Jurisprudence of the Rehnquist and Roberts Courts, 162 U. Pa. L. Rev. 1731 (2014); Corey Ciocchetti, The Constitution, The Roberts Court, and Business: The Significant Business Impact of the 2011-2012 Supreme Court Term, 4 Wm. & Mary Bus. L. Rev. 385 (2013).  In particular, the New Mexico Trial Lawyer published an article asserting that the amendments favored corporate defendants, which was partially the result of Chief Justice Roberts' appointment of "corporate-

Justice John Roberts, 2015 Year-End Report on the Federal Judiciary at 6, Supreme Court of the United States, available at http://www.supremecourt.gov/publicinfo/year-end/year-endreports.aspx ("2015 Year-End Report").  He states that the proportionality concept seeks to "eliminate unnecessary or wasteful discovery," and to impose "careful and realistic assessment of actual need."  2015 Year-End Report at 7.  This assessment may, as a practical matter, require "judges to be more aggressive in identifying and discouraging discovery overuse by emphasizing the need to analyze proportionality before ordering production of relevant information."  State Farm Mutual Auto. Ins. Co. v. Fayda, 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015)(Francis IV, M.J.)(internal quotation marks omitted).  The burden of demonstrating relevance remains on the party seeking discovery, and the newly revised rule "does not place on the party seeking discovery the burden of addressing all proportionality considerations."  Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment.  See Dao v. Liberty Life Assurance Co. of Boston, 2016 WL 796095, at *3 (N.D. Cal. 2016)(LaPorte, M.J.)(observing that the 2015 amendment "reinforces the Rule 26(g) obligation of the parties to consider these factors in making discovery requests, responses or objections"); Williams v. U.S. Envt'l Servs., LLC, 2016 WL 617447, at *1 n.2.  In general, "the parties' responsibilities [] remain the same" as they were under the rule's earlier iteration so that the party resisting discovery has the burden of showing undue burden or expense.  Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment.  See Dao v. Liberty Life Assurance Co. of Boston, 2016 WL 796095, at *3 (noting that, "while the language of the Rule has changed, the amended rule does not actually place a greater burden on the parties with respect to their discovery obligations").

---

minded judges to the Rules Advisory Committee that drafted the amendments."  Ned Miltenberg & Stuart Ollanik, The Chief Umpire is Changing the Strike Zone at 1, The New Mexico Trial Lawyer (Jan./Feb. 2016).  The Court shares some of the concerns with the new amendments being pro-business and giving corporations new tools to limit plaintiffs' discovery.

Like with the 2000 amendments, it is unsurprising that the drafters are unable to articulate precise language narrowing the substantive scope of discovery.   Instead of being Aristotelian and trying to draft rules, the drafters largely opted to make federal judges Plato's enlightened guardians.   They have decided that no single general rule can adequately take into account the infinite number of possible permutations of different claims, defenses, parties, attorneys, resources of parties and attorneys, information asymmetries, amounts in controversy, availabilities of information by other means, and other factors.   They have dropped all discovery disputes into judges' laps.   The drafters have decided that this determination requires the individualized judgment of someone on the scene, and that presence is what the rulemakers want when they: (i) encourage district judges to take a firmer grasp on the scope of discovery; and (ii) put their thumbs on the scale in favor of narrower discovery in the rule's definition of the scope of discovery.

## LAW REGARDING MOTIONS TO COMPEL

Rule 37 provides enforcement mechanisms for rule 34.   According to rule 37, if a party does not respond to an interrogatory or to a request for production, the party requesting the discovery may move the Court to compel the opposing party to respond.   See Fed. R. Civ. P. 37(a)(2)(B).   "[A]n evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond."   Fed. R. Civ. P. 37(a)(3).   See Lewis v. Goldberry, No. CIV 11-0283 JB/ACT, 2012 WL 681800, at *4 (D.N.M. Feb. 27, 2012)(Browning, J.).   Rule 37(a) provides:

> On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery.   The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action.

Fed. R. Civ. P. 37(a).  Under rule 37(a)(4), "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond."  Fed. R. Civ. P. 37(a)(4). If a party refuses to turn over documents through proper discovery, a defendant should move to compel production pursuant to rule 37.  See Lane v. Page, 727 F. Supp. 2d 1214, 1236 n.15 (D.N.M. 2010)(Browning, J.).

## LAW REGARDING RULE 45

"Discovery of non-parties must be conducted by subpoena pursuant to Fed. R. Civ. P. 45."  Myers v. Andzel, No. CIV 06-14420 RWS, 2007 WL 3256879, at *1 (S.D.N.Y. 2007)(Sweet, J.).  See, e.g., Highland Tank & Mfg. Co. v. PS Int'l, Inc., 227 F.R.D. 374, 379 (W.D. Pa. 2005)(Gibson, J.)("Rule 45 is the only discovery method whereby information may be obtained from a nonparty to the suit.");  Blazek v. Capital Recovery Assocs., Inc., 222 F.R.D. 360, 361 (E.D. Wis. 2004)(Adelman, J.)("[A]ny person may be required to produce documents and any property may be inspected. . . .  If the person is not a party to the litigation, the party seeking such discovery must utilize a subpoena to compel such discovery.").  Accordingly, courts have denied motions to compel non-parties to produce information where the moving party did not first attempt to subpoena the information that it sought to compel.  In Harco National Insurance Co. v. Sleegers Engineering, Inc., No. CIV 06-11314 TLL, 2014 WL 5421237 (E.D. Mich. Oct. 22, 2014), for example, the Honorable Thomas L. Ludington, United States District Judge for the Eastern District of Michigan, denied the plaintiff's motion to compel a former defendant to produce information because the plaintiff had never subpoenaed the information that it sought to compel.  See 2014 WL 5421237, at *4.  Judge Ludington stated:

> By the terms of Rule 45, a party seeking discovery from a non-party must serve that non-party with a subpoena.  Here, there is no evidence that [the plaintiff] served a subpoena on [the former defendant], nor does [the former defendant] make any representations that it did so.  Because [the plaintiff] has not complied

- 36 -

with the first step of seeking discovery from a non-party, its motion to compel
will be denied.

2014 WL 5421237, at *4.  Cf. Smith v. Fla. Dep't of Corr., 369 F. App'x 36, 38 (11th Cir.
2010)(holding that the district court did not abuse its discretion when it denied the plaintiff's
motion to compel a non-party to produce information without validly serving the non-party with
a subpoena).

Rule 45 was amended on December 1, 2013 in two significant ways.  First, revised rule
45(a)(2) provides that subpoenas are issued by the court in which the action is pending, rather
than by the court where compliance is sought.  Accordingly, the issuing court will always be the
trial court and parties no longer have to serve subpoenas from the district in which the
information or witnesses sought are located.  See Fed. R. Civ. P. 45(a)(2)(providing that
subpoenas "must issue from the court where the action is pending").  In line with the broadened
authority that rule 45(a)(2) establishes for the trial court, amended rule 45(b)(2) establishes
nationwide service of process -- eliminating the previous discrepancy between federal service of
process rules in criminal and civil cases.  See Fed. R. Civ. P. 45(b)(2) (providing for the service
of a subpoena "at any place within the United States").

Second, revised rule 45(d)(3) provides that motions to quash or enforce a subpoena can
be brought in the district where compliance is required -- i.e., the district in which the subpoena's
recipient resides or works -- rather than the issuing court -- i.e., the trial court.  See Fed. R. Civ.
P. 45(d)(3).  The new rule 45(f), however, authorizes the enforcement court where compliance is
required to transfer a motion to quash or enforce a subpoena back to the trial court that issued the
subpoena in two limited instances: (i) if the person subject to the subpoena consents to the
transfer; or (ii) "if the court finds exceptional circumstances."  Fed. R. Civ. P. 45(f).  The
advisory committee notes provide some guidance as to when exceptional circumstances may be

found:

> The prime concern should be avoiding burdens on local nonparties subject to subpoenas, and it should not be assumed that the issuing court is in a superior position to resolve subpoena-related motions. In some circumstances, however, transfer may be warranted in order to avoid disrupting the issuing court's management of the underlying litigation, as when that court has already ruled on issues presented by the motion or the same issues are likely to arise in discovery in many districts. Transfer is appropriate only if such interests outweigh the interests of the nonparty served with the subpoena in obtaining local resolution of the motion.

Fed. R. Civ. P. 45 advisory committee's note to the December 1, 2013, amendments.

## LAW REGARDING QUASHING SUBPOENAS

"A court may quash or modify a subpoena pursuant to rule 45(c)." Morales v. E.D. Etnyre & Co., 228 F.R.D. 694, 696 (D.N.M. 2005)(Browning, J)(citing Fed. R. Civ. P. 45(c)). Rule 45(d)(3)(A)(iv) states that the Court "must quash or modify a subpoena that . . . subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv). Furthermore, rule 45(c)(3)(B) states that a court "may, on motion, quash or modify the subpoena if it requires . . . disclosing a trade secret or other confidential research, development, or commercial information." Fed. R. Civ. P. 45(d)(3)(B). "The party . . . moving to quash a subpoena has the burden to demonstrate good cause and/or privilege to be protected." Morales v. E.D. Etnyre & Co., 228 F.R.D. at 696. See Sentry v. Shivers, 164 F.R.D. 255, 256 (D. Kan. 1996)(Rushfelt, M.J.)("[A] party seeking a protective order also has the burden to show good cause for it."). Generally, "only the party or person to whom the subpoena is directed has standing to move to quash or otherwise object to a subpoena." Beach v. City of Olathe, Kansas, No. 99-2217GTV, 2001 WL 1098032, at *1 (D. Kan. Sept. 17, 2001)(Waxse, M.J.)(citing Hertenstein v. Kimberly Home Health Care, Inc., 189 F.R.D. 620, 635 (D. Kan. 1999)(Rushfelt, M.J.)). Moreover, "[a]bsent a claim of privilege, a party has no standing to challenge a subpoena to a nonparty." Trujillo v. Bd. of Educ. of the

Albuquerque Pub. Schs., No. CIV 03-1185 JB/LFG, 2007 WL 2296916, at *1 (D.N.M. June 26, 2007)(Browning, J.)(quoting Donahoo v. Ohio Dep't of Youth Servs., 211 F.R.D. 303, 306 (N.D. Ohio 2002)).   "The exception to this rule is that 'a party has standing to move to quash a subpoena addressed to another if the subpoena infringes upon the movant's legitimate interests.'" Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 2007 WL 2296916, at *1 (quoting United States v. Raineri, 670 F.2d 702, 712 (7th Cir. 1982)).

## LAW REGARDING PROTECTIVE ORDERS

Federal district courts have broad discretion over discovery.   See Gomez v. Martin Marietta Corp., 50 F.3d 1511, 1520 (10th Cir. 1995).   "The trial court has discretion to grant a protective order pursuant to rule 26(c) of the Federal Rules of Civil Procedure."   Morales v. E.D. Etnyre & Co., 228 F.R.D. at 696 (citing Thomas v. Int'l Bus. Machines, 49 F.3d 478, 482 (10th Cir. 1995)).   Rule 26(c) provides that, upon a showing of good cause, a court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," which order may include forbidding disclosure or discovery.   Fed. R. Civ. P. 26(c)(1)(A).   See Miller v. Regents of the Univ. of Colo., 188 F.3d 518, 1999 WL 506520, at *12 (10th Cir. 1999)(unpublished table decision)(reasoning that "[t]he district court is in the best position to weigh these variables and determine the appropriate limits because, unlike an appellate court, the district court has the ability to view firsthand the progression of the case, the litigants, and the impact of discovery on parties and nonparties").   "Federal Rule of Civil Procedure 26(c) expressly limits who may move for a protective order to parties or the person from whom discovery is sought."   SEC v. Dowdell, 144 F. App'x 716, 722-23 (10th Cir. 2005)(unpublished)(noting that a third party may not move for a rule 26(c) protective order if it

is not a party to the underlying action, has not intervened, or has not been served a subpoena seeking discovery).

"It is the party seeking the protective order who has the burden to show good cause for a protective order." Velasquez v. Frontier Med. Inc., 229 F.R.D. 197, 200 (D.N.M. 2005)(Browning, J.). See Murphy v. Gorman, 271 F.R.D. 296, 303 (D.N.M. 2010)(Browning, J.). The party seeking the protective order must submit "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." Gulf Oil Co. v. Bernard, 452 U.S. 89, 102 n.16 (1981)(internal quotation marks omitted). Although rule 26(c) is silent regarding the time within which the movant must file for a protective order, the United States Court of Appeals for the Tenth Circuit has held that "a motion under [rule] 26(c) for protection . . . is timely filed if made before the date set for production." In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 669 F.2d 620, 622 n.2 (10th Cir. 1982)(quoting In re Halkin, 598 F.2d 176, 193 (D.C. Cir. 1979), overruled on other grounds by Seattle Times Co. v. Rhinehart, 467 U.S. 20, 33 (1984)).

## LAW REGARDING DEPOSITIONS OF COUNSEL

In managing discovery, rule 26(c) provides that the court, upon a showing of good cause, "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). The Tenth Circuit has explained that "[r]ule 26(c) is broader in scope than the attorney work product rule, attorney-client privilege and other evidentiary privileges because it is designed to prevent discovery from causing annoyance, embarrassment, oppression, undue burden or expense not just to protect confidential communications." Boughton v. Cotter Corp., 65 F.3d 823, 829-30 (10th Cir. 1995). Moreover, the Tenth Circuit has acknowledged special problems that arise

when a party attempts to depose the opposing party's attorney.  See Boughton v. Cotter Corp., 65

F.3d at 829-30.  As the United States Court of Appeals for the Eighth Circuit stated in Shelton v.

American Motors Corp.:

> Taking the deposition of opposing counsel not only disrupts the adversarial
> system and lowers the standards of the profession, but it also adds to the already
> burdensome time and costs of litigation.  It is not hard to imagine additional
> pretrial delays to resolve work-product and attorney-client objections, as well as
> delays to resolve collateral issues raised by the attorney's testimony.  Finally, the
> practice of deposing opposing counsel detracts from the quality of client
> representation.  Counsel should be free to devote his or her time and efforts to
> preparing the client's case without fear of being interrogated by his or her
> opponent.  Moreover, the "chilling effect" that such practice will have on the
> truthful communications from the client to the attorney is obvious.

805 F.3d 1323, 1327 (8th Cir. 1986).  The law therefore permits trial courts to issue protective

orders pursuant to rule 26(c) that bar depositions of opposing counsel.  In Boughton v. Cotter

Corp., the Tenth Circuit adopted a three-prong test to be used in analyzing whether a party can

take opposing counsel's deposition.  See Archuleta v. City of Santa Fe, 2005 WL 3662903

(D.N.M., Aug.10, 2005)(Browning, J.)(citing Boughton v. Cotter Corp., 65 F.3d at 829-30).  In

the Tenth Circuit, courts may issue such protective orders when any one or more of those prongs

are not met.  See Archuleta v. City of Santa Fe (citing Boughton v. Cotter Corp., 65 F.3d at

830)("[O]rdinarily the trial court . . . has the discretion under Rule 26(c) to issue a protective

order against the deposition of opposing counsel when any one or more of the three ... criteria for

deposition listed above are not met."); Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1112

(10th Cir. 2001).

    The first prong of the Boughton v. Cotter Corp. factors is that "no other means exist to

obtain the information than to depose opposing counsel."  Boughton v. Cotter Corp., 65 F.3d at

829 (citing Shelton v. Am. Motors Corp., 805 F.2d at 1327); E.E.O.C. v. Roswell Radio, Inc.,

2007 WL 2305521 at, *3 (D.N.M., June 12, 2007)(Browning, J.).  The second prong is that "the

information sought is relevant and nonprivileged." Boughton v. Cotter Corp., 65 F.3d at 829;
E.E.O.C. v. Roswell Radio, Inc., 2007 WL 2305521 at, *3.  The third and final prong is that "the
information is crucial to the preparation of the case."  Boughton v. Cotter Corp., 65 F.3d at 829;
E.E.O.C. v. Roswell Radio, Inc., 2007 WL 2305521, at *3.   The party seeking to take the
deposition of opposing counsel bears the burden of establishing that the three factors are
satisfied.  See Boughton v. Cotter Corp., 65 F.3d at 831 n.10.

## ANALYSIS

Rule 33 of the Federal Rules of Civil Procedure restricts discovery to information within
the responding party's "possession, custody, and control," while rule 34 restricts discovery to
information within the responding party's availability.  Zurich Insurance's discovery requests ask
for information that is largely outside of XTO Energy's control and availability under both rules.
Accordingly, the Court denies the Motion to Compel.  The Court will also grant the Motion to
Quash, because: (i) Zurich Insurance did not comply with rule 45's requirements; and (ii) its
discovery requests impose an undue burden on Holland & Hart.  Because the discovery requests
impose an undue burden on Holland & Hart, the Court must award costs and fees pursuant to
rule 45(c).

## I.    THE COURT DENIES THE MOTION TO COMPEL.

Rule 34 allows discovery of documents only within the responding parties "possession,
custody, or control."  Fed. R. Civ. P. 34(a)(1).  Because Request for Production Nos. 5 and 6 ask
for documents outside of XTO Energy's possession, custody, or control, the Court denies the
Motion to Compel for these requests.  Rule 33 requires a party to respond to interrogatories only
with information that is available to them.  See Fed. R. Civ. P. 33(a)(1).  Because Interrogatories
Nos. 7 and 10 ask for information that is not available to XTO Energy, the Court also denies the
Motion to Compel for these requests.  Finally, pursuant to the parties' agreement at the hearing,

the Court will allow the parties to resolve the disputes surrounding Request for Production Nos. 10, 11, 12, and 13.

### A.     THE COURT DENIES THE MOTION TO COMPEL WITH RESPECT TO REQUEST FOR PRODUCTION NOS. 5 AND 6.

Request for Production Nos. 5 and 6 ask XTO Energy to provide documentation regarding Holland & Hart's agreements with other clients and the associated billing rates.

> **<u>Request for Production No. 5:</u>**
> Please provide any agreements between Holland and Hart, LLP and any insurance company regarding rates for legal services for the past five (5) years, redacting any privileged information.
>
> **<u>Request for Production No. 6:</u>**
> Please provide any billing documents for services provided by Holland and Hart, LLP related to the defense of an insured at the request of an insurance company for the past five (5) years, redacting any privileged information.

Response to Motion to Compel at 7.

Rule 34 allows a party to serve requests to produce certain items "on any other party . . . in the responding party's <u>possession, custody, or control</u>."  Fed. R. Civ. P. 34(a)(1)(emphasis added).  <u>See</u> <u>Hickman v. Taylor</u>, 329 U.S. at 504 (explaining that rule 34 "is limited to parties to the proceeding, thereby excluding their counsel or agents").  Although Zurich Insurance sent the discovery request to XTO Energy, the requests ask for information in Holland & Hart's possession and custody.  As XTO Energy has neither possession nor custody of the requested information or documents, whether it must disclose the information turns on whether it controls the information.  <u>See</u> <u>United States v. 2121 Celeste Road SW, Albuquerque, N.M.</u>, 307 F.R.D. 572, 590 (D.N.M. 2015)(Browning, J.)(denying a motion to compel, because the discovery requested was not in the opposing party's custody or control); <u>Ice Corp. v. Hamilton Sundstrand Corp.</u>, 245 F.R.D. 513, 516 (D. Kan. 2007)(Sebelius, J.)(stating that a party can obtain discovery of information if it can "meet the burden of proving that the Defendants do have the requisite

'control' of the documents"); Heartland Surgical Specialty Hospital, LLC v. Midwest Division, Inc., 2007 WL 950282, at *17 n.23 (D. Kan. March 26, 2007).

The party seeking production bears the burden of proving that the opposing party has the control which rule 34 requires.  See Norman v. Young, 422 F.2d 470, 472 (10th Cir. 1970); United States v. Intern. Union of Petroleum & Indus. Workers, 870 F.2d 1450, 1452 (9th Cir. 1989).  "Neither legal ownership nor physical possession of [a] document . . . is required for a non-party to control it."  Simon v. Taylor, 2014 WL 6633917, at *34 (internal quotation marks omitted).  "Instead, courts have broadly construed control as 'the legal right, authority, or practical ability to obtain the materials sought upon demand.'"  United States v. 2121 Celeste Road SW, Albuquerque, N.M., 307 F.R.D. at 590 (quoting S.E.C. v. Credit Bancorp, Ltd., 194 F.R.D. 469, 471 (S.D.N.Y. 2000)).  See Super Film of Am., Inc. v. UCB Films, Inc., 219 F.R.D. 649, 653 (D. Kan. 2004)(concluding that control comprehends not only possession, but "the right, authority, or ability to obtain the documents").

Applying this standard, courts have found that corporations control documents in their subsidiaries' hands, clients control case files in their attorneys' hands, and patients control health records in their healthcare providers' hands.  See United States v. Stein, 488 F. Supp. 2d 350, 360-62 (S.D.N.Y. 2007)(Kaplan, J.); CSI Inv. Partners II, L.P. v. Cendant Corp., 2006 WL 617983, at *6 (S.D.N.Y. March 13, 2006)(Eaton, M.J.)(compelling a client's attorney to disclose documents in the attorney's possession regarding the attorney's representation of that particular client, but only insofar as the documents were relevant).  An employee's or corporation's ability to access the documents in the normal course of business weighs in favor of finding control. See, e.g., Gerling Int'l Ins. Co. v. Comm'r of Internal Revenue, 839 F.2d 131, 140-41 (3d Cir. 1988)(where "agent-subsidiary can secure documents of the principal-parent to meet its own

business needs . . . the courts will not permit the agent-subsidiary to deny control for purposes of discovery"); Camden Iron & Metal v. Marubeni America Corp., 138 F.R.D. 438, 441 (D.N.J. 1991)(including "demonstrated access to documents in the ordinary course of business" in list of factors to be considered in determining control).

Courts have specifically considered whether clients control information in their attorneys' hands.  Because a client has the right "to obtain copies of documents gathered or created by its attorneys pursuant to their representation of that client, such documents are clearly within the client's control."  Am. Soc. For Prevention of Cruelty to Animals v. Ringling Bros. and Barnum & Bailey Circus, 233 F.R.D. 209, 212 (D.D.C. 2006)(Facciola, M.J.).  See Poppino v. Jones Store Co., 1 F.R.D. 215, 219 (W.D. Mo. 1940)("It is quite true that if an attorney for a party comes into possession of a document as attorney for that party his possession of the document is the possession of the party.")(emphasis in original).  Consequently, a party may be required to produce a document that it has turned over to its attorney when the document relates to the attorney's representation of that client on a specific matter.  See In re Ruppert, 309 F.2d 97, 98 (6th Cir. 1962)(per curiam).  See Hanson v. Garland S.S. Co., 34 F.R.D. 493, 495 (N.D. Ohio 1964)(Connell, J.)(concluding that witness statements taken by a party's attorney in preparation of the case were within the party's control and subject to production under rule 34 on a proper showing); Kane v. News Syndicate Co., 1 F.R.D. 738, 738-39 (S.D.N.Y. 1941)(Mandelbaum, J.)(determining that a plaintiff in an action for copyright infringement could require the defendants' attorneys to produce a document from which the plaintiff hoped to ascertain whether material had been obtained from his copyrighted works).

> The mere fact, however, that the attorney for a party has possession of a document does not make his possession of the document the possession of the party.  The paper may be one of his private papers which he had before the relation of attorney and client was established.  It is inconceivable that he should be required

> to produce such a paper for the inspection of his client's adversary.  The paper which he has in his possession may be the property of some other client.  It is inconceivable that he should be compelled to produce the document belonging to another client because the adversary of one of his clients demands it.

Poppino v. Jones Store Co., 1 F.R.D. at 219.  See Hobley v. Burge, 433 F.3d 946 (7th Cir. 2006)(observing that a party may not have had control over its former attorney's documents); Ontario Inc. v. Auto Enterprises, Inc., 205 F.R.D. 195 (E.D. Mich. 2000).  Simply put, if a person, corporation, or a person's attorney or agent can pick up a telephone and secure the document, that individual or entity controls it.  See Simon v. Taylor, 2014 WL 6633917, at *34 ("Control is defined as the legal right to obtain documents upon demand.").

    Although Zurich Insurance argues that Holland & Hart can give the requested documents to XTO Energy, see Reply to Motion to Compel at 1-2, it does not explain how XTO Energy has any right to obtain information and documents that do not relate to its own engagement of Holland & Hart.  In most cases in which courts have required parties to turn over documents that their attorneys hold, the documents relate to the attorney's work on the specific case at hand. See In re Ruppert, 309 F.2d at 98; Hanson v. Garland S.S. Co., 34 F.R.D. at 495.  For example, in CSI Investment Partners II, L.P. v. Cendant Corp., the Honorable Douglas Eaton, United States Magistrate Judge for the Southern District of New York, compelled a client to disclose documents in its attorney's possession regarding the attorney's representation of that particular client on that specific case, and only insofar as those documents were relevant.  See 2006 WL 617983, at *6.  Zurich Insurance's requests are not so limited.  Unlike the movant in CSI Investment Partners II, L.P. v. Cendant Corp., Zurich Insurance seeks all agreements between Holland & Hart and any insurance company regarding rates for the past five years, and all billing documents regarding Holland & Hart's representation of any insured clients spanning the past five years.  The mere fact that Holland & Hart "has possession of a document does not make [its]

possession of the document the possession of the party. . . .  It is inconceivable that [it] should be compelled to produce the document belonging to another client because the adversary of one of [its] clients demands it."  Poppino v. Jones Store Co., 1 F.R.D. at 219.  Accordingly, Zurich Insurance has not demonstrated that XTO Energy has control over the vast majority of the documents requested, and the Court denies the Motion to Compel with respect to Request for Production Nos. 5 and 6.

The only billing documents over which XTO Energy would conceivably have control are those documents related to Holland & Hart's representation of XTO Energy as an insured.  Even then, it is unclear whether XTO Energy would have control over this information, as another insurer funded the defense rather than XTO Energy.  Nonetheless, even if XTO Energy could demand access to billing documents relating to Holland & Hart's representation of XTO Energy, the Court denies the discovery request as overbroad and unduly burdensome.  See Fed. R. Civ. P. 26(b), (g); In re First Peoples Bank Shareholders Litig., 121 F.R.D. 219, 226-27 (D.N.J. 1988)(Simandle, M.J.)(allowing limited discovery to determine reasonable attorney's fees, but only for a "table summarizing the hourly rates requested and approved for each petitioning attorney," and denying: (i) the request for all "[d]ocuments setting forth the historic billing rates for all partners, associates, and paralegals whose fees are requested"; and (ii) the request for "[b]illing records and other documents setting forth records of billing rates in non-contingent fee clients").  "The billing rates to clients in other types of matters are not sufficiently germane to require the broad based discovery of other unrelated filed which is sought in this request."  In re First Peoples Bank Shareholders Litig., 121 F.R.D. at 227.  See In re Fine Paper Antitrust Litig., 751 F.2d 562, 586-87 (3d Cir. 1984).  As to the rate that Holland & Hart is charging XTO Energy in this case, there does not seem to be any dispute.  The Court will not require XTO

Energy to produce documents related to the rates charged in this case.  See Blowers v. Lawyers

Co-op. Pub. Co., Inc., 526 F. Supp. 1324, 1327-28 (W.D.N.Y. 1981)(holding that the plaintiff

was not "entitled to discover information concerning the amount of legal fees incurred by

defendants in this action," because the "hourly rates charged to defendants by their attorneys in

this particular case is simply not relevant in determining the prevailing hourly rate in the area").

Accordingly, the Court denies the Motion to Compel regarding Request for Production Nos. 5

and 6.

> ### B.   THE COURT DENIES THE MOTION TO COMPEL WITH RESPECT TO INTERROGATORY NOS. 7 AND 10.

Interrogatory No. 7 asks XTO Energy to state

> the hourly billing rates charged by Holland and Hart to any insurance company
> represented by Holland and Hart or who has retained Holland and Hart to
> represent an insured for the past five (5) years, including rates for Shareholders,
> Associates and Paralegals. Please include the name of the insurance company, the
> nature of the case, and the address of the insurance company.

Interrogatory No. 7.  Interrogatory No. 10 asks XTO Energy to determine "if Holland and Hart

has been retained by Zurich within the past five (5) years" and to "state the name of the case, the

nature of the case, and the agreed upon hourly rate Zurich paid to Holland and Hart in each

case."  Interrogatory No. 10.

"That responsive information is within the control of a non-party is immaterial."

Pulsecard, Inc. v. Discover Card Servs., Inc., 168 F.R.D. 295, 310 (D. Kan. 1996).

"Interrogatories may relate to any matters which can be inquired into under Rule 26(b)(1)." Fed.

R. Civ. P. 33(c).  Courts have interpreted rule 33 to require answering parties to provide only

information that is "available" to the party.  Myhre v. Seventh-Day Adventist Church Reform

Movement American Union Intern. Missionary Soc., 298 F.R.D. 633, 647 (S.D. Cal. 2014)("A

party answering interrogatories has an affirmative duty to furnish any and all information

available to the party."). _See_ Bryant v. Armstrong, 285 F.R.D. 596, 612 (S.D. Cal. 2012)(Brooks, J.); National Fire Ins. Co. of Hartford v. Jose Trucking Corp., 264 F.R.D. 233, 238 (W.D. N.C. 2010)(Howell, M.J.)(stating that an answering party cannot "ignore information immediately available to him or under his control"); American Intern. Specialty Lines Ins. Co. v. NWI-I, Inc., 240 F.R.D. 401, 413 (N.D. Ill. 2007); Essex Builders Group, Inc. v. Amerisure Ins. Co., 230 F.R.D. 682, 685 (M.D. Fla. 2005). Accordingly, parties need not obtain responsive information not available to them from entities outside of their control. _See_ Pulsecard, Inc. v. Discover Card Servs., Inc., 168 F.R.D. at 310. In those cases in which courts have determined that a client has access to information that its attorney possesses, the requested information related to the attorney's investigation or preparation for that particular case and for that specific client. _See_ Wycoff v. Nochols, 32 F.R.D. 370, 371-72 (W.D. Miss. 1963).

The plain definition of "available" connotes both that which is "easy or possible to get or use," and "present or ready for use." _Available_, Merriam-Webster, http://www.merriam-webster.com/dictionary/available. "'Availability' is necessarily an elastic concept, because what is 'available' cannot be determined without reference to the efforts made to secure it." Law v. Nat'l Collegiate Athletic Ass'n, 167 F.R.D. 464, 477 (D. Kan. 1996) vacated on different grounds sub nom. Univ. of Texas at Austin v. Vratil, 96 F.3d 1337 (10th Cir. 1996). Here, the party holding the information -- Holland & Hart -- has refused to make the information available to XTO Energy. _See_ Response to Motion to Compel at 7-11. Law firms do not routinely make this sort of information available to any client who demands it. While the attorney-client privilege does not protect fee arrangements, "disclosing the actual fee contracts has the potential for revealing confidential information along with unprotected fee information." In re Grand Jury Subpoenas, 906 F.2d 1485, 1492 (10th Cir. 1990). Similarly, billing sheets or timesheets also

may contain privileged information.  See In re Grand Jury Subpoenas, 906 F.2d at 495.  Law firms have an interest in maintaining client confidences and protecting their own information. XTO Energy, therefore, does not have the power to compel Holland & Hart to release information relating to other clients simply because it is a client.

The Court further notes that Holland & Hart is not strategically withholding information to defeat the interrogatory.  It has suggested other methods for Zurich Insurance to obtain some of the information it seeks.  See Response to Motion to Compel at 6-7 (suggesting that Zurich Insurance search its own records using tax identification numbers to identify those cases in which Zurich Insurance retained Holland & Hart as counsel and the rates and nature of the case); id. at 5 (suggesting that Zurich Insurance search for rates that comparable law firms charge in the same market for comparable work to determine whether Holland & Hart's rates are reasonable). Again, the Court recognizes that a very limited amount of the information desired may be available from XTO Energy.  For the reasons stated above, however, the Court denies discovery as unduly burdensome and excessive and disproportionate to the needs of the case.  The Court therefore denies the Motion to Compel regarding Interrogatory Nos. 7 and 10.

**C.  PURSUANT TO THE PARTIES' AGREEMENT AT THE HEARING, THE COURT WILL ALLOW THE PARTIES TO RESOLVE THE DISPUTES SURROUNDING REQUEST FOR PRODUCTION NOS. 10, 11, 12, AND 13.**

XTO Energy and Zurich Insurance "agreed that the parties could probably work something out" regarding Request for Production Nos. 10, 11, 12, and 13, and would "enter into a protective order, given that the landscape of the case has changed."  Tr. at 101:1-7 (Custer). XTO Energy therefore requested that the Court deny the Motion to Compel as to Request for Production Nos. 10, 11, 12, and 13 to "allow the parties to try to figure out a solution among themselves that protects XTO's information."  Tr. at 101:15-18 (Custer).  Zurich Insurance stated

that it agreed with XTO Energy and that the parties could arrive at an agreement.  See Tr. at 101:24-102:1 (Johansen).  The Court will therefore deny the Motion to Compel and allow the parties to arrive at their own agreement.

## II.      THE COURT WILL GRANT THE MOTION TO QUASH.

The Subpoena does not comply with rule 45's requirements, making it unenforceable. Additionally, the Subpoena imposes an undue burden on Holland & Hart.  The Court will therefore grant the Motion to Quash.  Because rule 45 requires the Court to impose sanctions when a subpoena imposes an undue burden on the responding party, the Court will also award costs and fees to Holland & Hart.

### A.      THE SUBPOENA DOES NOT COMPLY WITH RULE 45'S REQUIREMENTS.

Rule 45 requires a subpoena to "state the court from which it issued."  Fed. R. Civ. P. 45(a)(1)(A)(i).  It further provides that, if a subpoena commands document production, "then before it is served on the person to whom it is directed, a notice and a copy of the subpoena must be served on each party."  Fed. R. Civ. P. 45(a)(4).  The notice requirement's purpose is to enable the opposing party to object.  See Fed. R. Civ. P. 45(a)(4) advisory committee's notes to 2013 amendment.

Zurich Insurance did not comply with either requirement.  First, the Subpoena does not state from which court it is issued, as rule 45(a)(1)(A) requires.  Second, Zurich Insurance did not provide notice to XTO Energy before it served the subpoena on Holland & Hart.  This failure prevented XTO Energy from objecting to the Subpoena before its service on Holland & Hart. Zurich Insurance does not deny that the Subpoena is inadequate.  See Response to Motion to Quash at 5.  Because the Subpoena is facially invalid, it is therefore unenforceable.  See A.H. ex rel Hohe v. Knowledge Learning Corp., 2010 WL 395184, at *2 (D. Kan. Oct. 8, 2010)(Waxse,

J.)(holding that the subpoenas were procedurally invalid and therefore unenforceable); U.S.
Bancorp Equip. Fin., Inc. v. Babylon Transit, Inc., 2010 WL 3071667, at *3 (E.D.N.Y. Aug. 4,
2010)(Boyle, J.)(same).

### B. THE SUBPOENA IMPOSES AN UNDUE BURDEN ON HOLLAND & HART.

In the Subpoena, Zurich Insurance requests: (i) "Any agreements between Holland &
Hart, LLP and any insurance company regarding rates for legal services for the past five (5)
years, redacting any privileged information"; and (ii) "Any billing documents for services
provided by Holland & Hart, LLP related to the defense of an insured at the request of an
insurance company for the past five (5) years, redacting any privileged information."  Subpoena
at 4.  Rule 45(d)(3)(A)(iv) states that the Court "shall quash or modify [a] subpoena if it . . .
subjects a person to undue burden."  Fed. R. Civ. P. 45(d)(3)(A)(iv).  Holland & Hart bears the
burden of demonstrating good cause to quash the subpoena or to obtain a protective order.  See
Morales v. E.D. Etnyre & Co., 228 F.R.D. at 696; Velasquez v. Frontier Med. Inc., 229 F.R.D.
197, 200 (D.N.M. 2005)(Browning, J.).  See Murphy v. Gorman, 271 F.R.D. 296, 303 (D.N.M.
2010)(Browning, J.).   In the alternative, XTO Energy asks that the Court forbid the requested
discovery pursuant to rule 26(c).  See Motion to Quash at 4.  Rule 26(c) provides that, upon a
showing of good cause, a court may "issue an order to protect a party or person from annoyance,
embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c)(1)(A).  "Rule
26(c) is broader in scope than the attorney work product rule, attorney-client privilege and other
evidentiary privileges because it is designed to prevent discovery from causing annoyance,
embarrassment, oppression, undue burden or expense not just to protect confidential
communications."  Boughton v. Cotter Corp., 65 F.3d at 829-30.  Consequently, even though an

attorney's fee arrangements may not be confidential communications that the attorney-client privilege protects, rule 26(c) and rule 45 may nonetheless prevent disclosure.

The Court must determine "whether a request contained in a subpoena duces tecum is overly broad or seeks irrelevant information under the same standards as set forth in Rule 26(b) and as applied to Rule 34 requests for production." Stewart v. Mitchell Transp., 2002 WL 1558210, at *3 (D. Kan. July 11, 2012).[12] Under these rules, "[u]ndue burden is identified by looking at factors such as relevance, the need for the documents, the breadth of the document request, the time period covered by such request, the particularity with which the documents are

_____

[12]The United States Court of Appeals for the Ninth Circuit discussed the meaning of "undue burden" in rule 45:

> The plain language of the provision suggests that sanctions may be imposed when a subpoenaing attorney unfairly harms a subpoena recipient by acting carelessly or in bad faith while issuing and serving a subpoena. *Id.* The history of Rule 45 provides guidance on how subsection (c)(1) should be interpreted. Rule 45 was amended in 1991 to bring the protections for subpoenaed parties under the single subdivision of Rule 45(c)(1). 9A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus, *Federal Practice and Procedure* § 2463 (3d ed. 2012). But the advisory committee notes suggest that the amendment did not effect a "change in existing law" and was designed to codify the extant practice, including to give "specific application" to the principles stated in Rule 26(g). Fed. R. Civ. P. 45(c) advisory committee's note; *see also* Wright, Miller, Kane & Marcus, *supra*, § 2463.

> Federal Rule of Civil Procedure 26(g)(1)(B) requires parties seeking discovery to act (1) consistently with the rules of existing law or with good reason to change the law; (2) without bad faith; and (3) reasonably without imposing undue burden or expense considering the needs of the case. Per the terms of Rule 26(g)(3), violation of any one of these duties without substantial justification results in sanctions. Fed. R. Civ. P. 26(g)(3). Because Rule 45(c)(1) gives "specific application" to Rule 26(g), it follows that a violation of any one of the Rule 26 duties will be relevant to assessing propriety of sanctions under Rule 45(c)(1)'s "undue burden" language. This approach is consistent with the interpretation of other courts. *See, e.g.*, *Builders Ass'n of Greater Chi. v. City of Chi.*, 215 F.R.D. 550, 553-54 (N.D. Ill. 2003).

Mount Hope Church v. Bash Back!, 705 F.3d 418, 425-26 (9th Cir. 2012)(internal footnotes omitted).

described, and the burden imposed." Moore v. Hartman, 241 F.R.D. at 63.  See Wiwa v. Royal Dutch Petroleum Co., 392 F.3d 812, 818 (5th Cir. 2004)("Whether a burdensome subpoena is reasonable 'must be determined according to the facts of the case,' such as the party's need for the documents and the nature and importance of the litigation."); Williams v. City of Dallas, 178 F.R.D. 103, 109 (N.D. Tex. 1998)(Fitzwater, J.)(determining whether a subpoena presents an undue burden by considering the information's relevance, the need for the information, the request's breadth, the time period covered, the particularity with which the party describes the request, and the burden imposed).  Holland & Hart argues that the request imposes two burdens: (i) finding the responsive documents; and (ii) redacting confidential information.  See Motion to Quash at 4-5.  In describing the burden of finding responsive documents, it states that it typically "represents policyholders and not insurance carriers, so searching for particular cases where an insurer happened to fund a defense would require a specialized, costly and time-consuming search."  Response to Motion to Compel at 9.  While computer searches typically make responding to these requests easier, Holland & Hart demonstrates that, because Zurich Insurance asks for information relating to those cases in which insurers fund the defense, responding to this request would require more time and effort.  See Response to Motion to Compel at 9.  The Court doubts that finding such cases would require significantly more effort however, as Holland & Hart likely has engagement letters with insurance companies that a computer search could probably identify.  Nevertheless, finding the responsive documents is only part of the burden that Zurich Insurance's request imposes.

With respect to redacting confidential information, the attorney-client privilege does not protect fee arrangements.  In re Grand Jury Subpoenas, 906 F.2d 1485, 1492-93 (10th Cir. 1990).  Despite this fact, "disclosing the actual fee contracts has the potential for revealing confidential

- 54 -

information along with unprotected fee information." In re Grand Jury Subpoenas, 906 F.2d at 1492-93.  Billing sheets or timesheets also may contain privileged information.  See In re Grand Jury Subpoenas, 906 F.2d at 495.  As the requested information contains privileged information, responding to the request would require a "line by line review of potentially thousands of pages of documents."  Motion to Quash at 5.  Furthermore, the Subpoena requests all of Holland & Hart's billing documents for the past five years for services relating to an insured.  See Subpoena at 4.  Redacting all of this information from so many documents imposes a considerable burden on Holland & Hart.

In comparison to the burden imposed, the information requested is minimally relevant. Zurich Insurance allegedly needs this information to determine whether Holland & Hart's rates are reasonable.  See Motion to Compel at 4.  The Tenth Circuit instructs courts to determine fees' reasonableness by comparing a particular law firm's rates to rates that other law firms charge to clients for comparable work in a comparable market.  See Ramos v. Lamm, 713 F.2d 546, 555 (10th Cir. 1983)(directing courts to establish "a billing rate for each lawyer based upon the norm for comparable private firm lawyers in the area in which the court sits"); Gottlieb v. Barry, 43 F.3d 474, 485 n.8 (10th Cir. 1994)("In this circuit, we generally do limit the hourly rate to one 'based upon the norm for comparable private firm lawyers in the area in which the court sits . . . .'").  Holland & Hart operates in many different states across the county.  See Response to Motion to Compel at 5.  The rates Holland & Hart charges other clients in different legal markets for different work is not relevant to determining whether the rates that Holland & Hart is charging to litigate the Manley and Betancur cases in Eddy County, New Mexico are reasonable.  Because courts in the Tenth Circuit determine a fee's reasonableness by referencing rates charged "in the area in which the court sits," information relating to Holland & Hart's

representation of insurance companies in other areas for other work is not necessary.  Ramos v. Lamm, 713 F.2d at 555.

Because the discovery request would include some documents relating to cases within the relevant geographic region for comparable work, the information may be somewhat relevant to Zurich Insurance's breach-of-contract defense.   This information would not, however, be substantially relevant to Zurich Insurance's affirmative defense of comparative bad faith.  First, Zurich Insurance has not shown that New Mexico has adopted a comparative bad-faith defense in the insurance context.  Notably, most jurisdictions have expressly rejected a comparative bad-faith defense, including California, the U.S. Virgin Islands, Hawaii, Montana, Iowa, Florida, Oklahoma, and Oregon.  See Kransco v. Am. Empire Surplus Lines Ins. Co., 2 P.3d 1 (Cal. 2000)(rejecting a comparative bad-faith defense); In re Tutu Water Wells Contamination Litig., 78 F. Supp. 2d 436, 1999 WL 1128792, at *18 (D.V.I. Nov. 29, 1999)(declining to recognize affirmative defense of comparative bad faith); Wailua Associates v. Aetna Cas. And Sur. Co., 183 F.R.D. 550, 560 (D. Haw. 1998)(same); Stephens v. Safeco Ins. Co. of Am., 258 Mont. 142, 852 P.2d 565, 567 (1993)(same); Kelly v. State Farm Mut. Auto. Ins. Co., 764 F. Supp. 1337 (S.D. Iowa 1991), summary judgment granted sub nom. Weber v. State Farm Mut. Auto. Ins. Co., 873 F. Supp. 201 (S.D. Iowa); Nationwide Prop. & Cas. Ins. Co. v. King, 568 So. 2d 990, 990-01 (Fla. Dist. Ct. App. 4th Dist. 1990)(same); Stumpf v. Cont'l Cas. Co., 102 Or. App. 302, 794 P.2d 1228, 1233 (1990)(same).   These courts have taken the position that an insured's misconduct must be treated as a defense to liability under the policy rather than as a basis for a reduction of the award against the insured.  See Kransco v. Am. Empire Surplus Lines Ins. Co., 2 P.3d at 13-14.  In 2008, the Honorable Stephen Brown, United States Magistrate Judge for the Southern District of Florida, wrote that "no Court has ever permitted" a comparative bad-faith

defense, and that "[c]ourts in Florida and around the nation have rejected these defenses." <u>Royal Indem. Co. v. Liberty Mut. Fire Ins. Co.</u>, 2008 WL 557963, at *1 (S.D. Fla. Feb. 28, 2008).

Although New Mexico has not rejected a comparative bad-faith defense, it has not recognized one either.  In <u>Jessen v. National Excess Insurance Co.</u>, 1989-NMSC-040, 776 P.2d 1244, the Supreme Court of New Mexico held that it was not error to refuse to instruct the jury on comparative bad faith, but stated that it did "not decide whether such an instruction necessarily would be inappropriate in another case."  <u>See</u> 1989-NMSC-040, ¶ 22, 776 P.2d at 1249.  As support for the comparative bad faith defense, the defendant insurer in <u>Jessen v. National Excess Insurance Co.</u> cited the California case that first adopted the defense, <u>California Casualty General Insurance Co. v. Superior Court of San Bernardino County</u>, 173 Cal. App. 3d 274 (1985)("<u>California Casualty</u>").  <u>Jessen v. National Excess Insurance Co.</u>, 1989-NMSC-040, ¶ 22, 776 P.2d at 1249.  After the Supreme Court of New Mexico decided <u>Jessen v. National Excess Insurance Co.</u>, however, the Supreme Court of California expressly rejected <u>California Casualty</u> and declined to recognize a comparative bad-faith defense.  <u>See</u> <u>Kransco v. Am. Empire Surplus Lines Ins. Co.</u>, 97 Cal. Rptr. 2d 151, 160, 2 P.3d 1, 12 (2000).  It "disagre[ed] with the California Casualty court's extension of tort comparative fault principles to an insured's contractual breach of the covenant of good faith and fair dealing."  <u>Kransco v. Am. Empire Surplus Lines Ins. Co.</u>, 97 Cal. Rptr. 2d 151, 160, 2 P.3d at 11-12 & n.11.  It explained the inequity in applying comparative tort principles to the insurer-insured relationship:

> The [California Casualty] court reasoned that the comparative fault tort doctrine should apply to insurance bad faith cases because breach of the covenant is a tort . . .  What the California Casualty court overlooked, however, is that it is an insurer's breach of the covenant of good faith and fair dealing that is governed by tort principles . . .  An insured's breach of the covenant is not a tort, and hence does not give rise to tort damages recoverable by the insurer.

Kransco v. Am. Empire Surplus Lines Ins. Co., 97 Cal. Rptr. 2d at 162 n.11, 2 P.3d at 11 n.11 (alterations in original).[13]

Like California, New Mexico recognizes the unequal bargaining power inherent in the insurer-insured relationship, which suggests that it may also determine that an insured's misconduct sounds only in contract and cannot offset damages under a comparative bad-faith theory.  See Dellaira v. Farmers Ins. Exchange, 2004-NMCA-132, ¶ 14, 102 P.3d 111, 114.  The Court of Appeals of New Mexico has described the "special and unique" insurer-insured relationship as involving an "inherent lack of balance" and presenting "the potential for the insurer to unscrupulously exert its unequal bargaining power at a time when the insured is particularly vulnerable."  Dellaira v. Farmers Ins. Exchange, 2004-NMCA-132, ¶ 14, 102 P.3d 111, 114.  See Radian Asset Assur. Inc. v. College of the Christian Bros. of N.M., 2011 WL 10977180, at *25 (D.N.M. Jan. 24, 2011)(Browning, J.).  This unequal relationship has led New Mexico courts to recognize breach of the implied covenant of good faith as tortious only "where a special relationship between the parties arises, because of the unbalanced and adhesive nature of the contract between the parties."  City of Raton v. Arkansas River Power Authority, 611 F. Supp. 2d 1190, 1207 (D.N.M. 2008)(Browning, J.).  See Heimann v. Kinder-Morgan CO2 Co., L.P., 2006-NMCA-127, ¶ 18, 144 P.3d 111, 117 (stating that the "claim for breach of good faith and fair dealing sounds in contract, at least when no 'special relationship' such as that between an insured and insurer exists").  New Mexico case law therefore indicates a willingness to conclude in a related context that insureds are in need of protection that insurers are not.

---

[13]Less than one year ago, the United States Court of Appeals for the Sixth Circuit similarly described an insured's misconduct as sounding in contract.  Accordingly, it rejected a reverse bad faith claim and observed that "[a] common law tort claim for reverse bad faith has not been recognized in any jurisdiction."  State Auto Property and Cas. Ins. Co. v. Hargis, 785 F.3d 189, 198 (6th Cir. 2015).

Allowing the insurer to allege a tort claim against the insured -- or to reduce tort damages for bad faith -- would undermine the conclusion that insureds need protection that insurers do not.  In the comparative bad faith context, therefore, New Mexico case law suggests that bad-faith conduct by the insurer may give rise to tort liability, while misconduct by the insured may give rise only to contractual liability.  If the insured's conduct is contractual in nature, then New Mexico courts would not likely allow an insured's misconduct to reduce tort damages under a comparative bad-faith defense.[14]  See Kransco v. Am. Empire Surplus Lines Ins. Co., 97 Cal. Rptr. 2d at 162 n.11, 2 P.3d at 11 n.11.

Furthermore, an insurer still has remedies for an insured's breach of the covenant of good faith and fair dealing, which would "adequately serve to protect an insurer from the insured's misconduct without creating the logical inconsistencies and troublesome complexities of a defense of comparative bad faith."  Kransco v. Am. Empire Surplus Lines Ins. Co., 97 Cal. Rptr.

---

[14]New Mexico courts refuse to recognize other defenses based on the character of the underlying action.  For example, New Mexico courts reject comparative negligence as a defense to intentional torts.  See Garcia v. Gordon, 2004-NMCA-114, ¶ 6, 98 P.3d 1044, 1046.  New Mexico has previously described the "reasoning for not comparing the fault attributable to the negligence of a plaintiff with the fault attributable to the commission of such an 'intentional tort'":

> It is the rule of law in virtually all states that fault should not be apportioned between an intentional tortfeasor and a merely negligent victim.  The reasons underlying this rule are persuasive. Intentional torts are punished not because the actor failed to use reasonable care, but because the actor intended the act. The difference between the victim's actions and the defendant's action is not one of degree, but of kind, and they are therefore not comparable.

Garcia v. Gordon, 2004-NMCA-114, 98 P.3d 1044, 1046 (quoting Florenzano v. Olson, 387 N.W.2d 168, 176, n. 7 (Minn. 1986)).  The reasoning for rejecting a comparative negligence defense in a comparative bad faith case does not directly apply to the comparative bad faith context, where both actors allegedly commit intentional conduct.  Nevertheless, that New Mexico rejects a comparative negligence defense based on the character of the action suggests that it may follow California and reject the comparative bad-faith defense, because it characterizes the insured's breach of a covenant "not as a tort," but as a breach of contract.

2d at 165, 2 P.3d at 14.  Mainly, evidence of an insured's misconduct may factually disprove the insurer's liability for bad faith by showing that the insurer acted reasonably under the circumstances.  See Ronald J. Clark, Dianne K. Kailey & Linda M. Bolduan, Defenses to Bad Faith Actions -- Comparative Bad Faith, 3 Law and Practice of Insurance Coverage Litigation § 28:35 (2015).  The insured's breach of the covenant of good faith and fair dealing is also separately actionable as a contract claim, and an insured's fraudulent misconduct may give raise to a tort action.  See Kransco v. Am. Empire Surplus Lines Ins. Co., 97 Cal. Rptr. 2d at 165 n.11, 2 P.3d at 13-14.  The Honorable Alan Kay, United States District Judge for the District of Hawaii, described the limited effect of rejecting a comparative bad-faith defense:

> The rejection of comparative bad faith does not mean that an insurer will be held liable for delays which it did not cause, or other conduct which was not undertaken in bad faith.  Rather, the Court's holding means that if an insurer acts in bad faith, it is liable in tort, and the fact that the insured simultaneously acted in bad faith will not reduce or relieve this liability, although it may give rise to a contractual or equitable defense, or may disprove the insurer's bad faith entirely.

Wailua Assocs. v. Aetna Cas. and Sur. Co., 183 F.R.D. at 561.

Moreover, even if the defense exists, the requested discovery is not essential to Zurich Insurance's preparation of the case.  "Comparative bad faith is an affirmative defense doctrine . . . whereby a defendant to a tort bad faith action can assert that the plaintiff's own bad faith contributed to the damage," thereby reducing or barring a judgment.  Larry Garrett, Comparative Fault in Legal Malpractice and Insurance Bad Faith: An Argument for Symmetry, 21 Rev. Litig. 663, 675 (Summer 2002).  See generally Douglas H. Houser et al., Comparative Bad Faith: The Two-Way Street Opens for Travel, 23 Idaho L. Rev. 367 (1987); Patrick E. Shipstead & Scott S. Thomas, Comparative and Reverse Bad Faith: Insured's Breach of Implied Covenant of Good Faith and Fair Dealing as Affirmative Defense of Counterclaim, 23 Tort & Ins. L.J. 215 (1987); William S. Anderson, Placing a Check on an Insured's Bad Faith Conduct: The Defense of

"Comparative Bad Faith", 35 South Tex. L. Rev. 485 (1994).  Although no case law is directly

on point, commentators have suggested that a comparative bad-faith defense may be applicable

where an insured breaches the cooperation clause in an insurance policy and thereby prejudices

the insurer.  See Ronald J. Clark, Dianne K. Kailey & Linda M. Bolduan, Defenses to Bad Faith

Actions -- Comparative Bad Faith, 3 Law and Practice of Insurance Coverage Litigation § 28:35

(2015).  To prove this defense, therefore, Zurich Insurance must show that XTO Energy or

Holland & Hart, acting on behalf of XTO Energy, refused to negotiate or cooperate with Zurich

Insurance.  Zurich Insurance can argue this defense using less burdensome means than obtaining

all of Holland & Hart's agreements and billing documents related to the defense of any insured

over the past five years.  See Malcom D. Smithson and Christine B. Smithson Trusts v. Amerada

Hess Corp., 2007 WL 5685112, at *10 (D.N.M. 2007)(Browning, J.)(issuing a protective order

because the plaintiffs did not demonstrate that no other means exist to obtain the information

sought).

       Zurich Insurance can use its communications with XTO Energy and Holland & Hart.  It

may search its own records to determine what it pays law firms in the relevant geographic area,

or it may conduct a market study to determine the prevailing rates.  Zurich Insurance can

compare Holland & Hart's rates to rates that courts have recently approved in attorney's fee

awards.  It also has access to information sought in Interrogatory No. 10 -- the cases in which it

retained Holland & Hart.  Furthermore, it could have requested from XTO Energy the rates that

XTO Energy has agreed to pay to other law firms that represent XTO Energy in similar cases.  It

can inquire into whether XTO Energy and Holland & Hart negotiated over these particular rates.

Those cases allowing disclosure of an attorney's fee arrangement have done so only where the

party demonstrates that "there is a legitimate need" and only with respect to the client's own fee

arrangement.   See United States v. Hodge and Zweig, 548 F.2d 1347, 1353 (9th Cir.

1977)(allowing discovery of a client's fee arrangement with his attorney to determine whether

the payment for the attorney was made pursuant to a conspiratorial agreement in furtherance of a

continuing drug conspiracy).   "[E]ven if relevant, discovery is not permitted where no need is

shown, or compliance would be unduly burdensome, or where harm to the person from whom

discovery is sought outweighs the need of the person seeking discovery of the information."

Cabot v. Wal-Mart Stores, Inc., 2012 WL 592874, at *9 (D.N.M. Feb. 16, 2012)(Browning,

J.)(citing Miscellaneous Docket Matter No. 1 v. Miscellaneous Docket Matter No. 2, 197 F.3d

922, 925 (8th Cir. 1999)).   A court "must limit the frequency or extent of discovery" when "the

discovery sought . . . can be obtained from some other source that is more convenient, less

burdensome, or less expensive."   Fed. R. Civ. P. 26(b)(2)(C).   See Cabot v. Wal-Mart Stores,

Inc., No. CIV 11-0260 JB/RHS, 2012 WL 592874, at *12; Cent. Valley Chrysler Valley Jeep,

Inc. v. Witherspoon, 2006 WL 1883363, at *4 (E.D. Cal. July 7, 2006)(O'Neill, J.)(recognizing

that the defendants did not need to produce "publicly available literature regarding global

warming" under rule 26(b) as there was a more convenient, less burdensome, or less expensive

manner to obtain the discovery).   The requested discovery is therefore not crucial to Zurich

Insurance's case.   See In re Fine Paper Antitrust Litig., 751 F.2d 562, 586-87 (3d Cir.

1984)(finding no abuse of discretion in district court's quashing of subpoenas served upon

counsel); Blowers v. Lawyers Co-op. Pub. Co., Inc., 526 F. Supp. 1324, 1327-28 (W.D.N.Y.

1981)(holding that the plaintiff was not "entitled to discover information concerning the amount

of legal fees incurred by defendants in this action," because the "hourly rates charged to

defendants by their attorneys in this particular case is simply not relevant in determining the

- 62 -

prevailing hourly rate in the area").   Accordingly, Holland & Hart has demonstrated that complying with the Subpoena would impose an undue burden under rules 26 and 45.

Furthermore, although the Tenth Circuit does not <u>require</u> the Court to issue a protective order for subpoenas duces tecum under the <u>Shelton</u> test, it provides persuasive evidence that the Court should do so here.   See <u>E.E.O.C. v. Roswell Radio, Inc.</u>, 2007 WL 2305521, at *4 (stating that, even though the <u>Shelton</u> test "may not necessarily apply" once an attorney has withdrawn from the case, "the three-part test will be useful in determining whether the Court should compel her deposition"); <u>Valencia v. Colo. Cas. Ins. Co.</u>, 2007 WL 5685360, at *4 (D.N.M. Dec. 8, 2007)(Browning, J.)(quashing subpoenas duces tecum addressed to the defendant's attorney, because the plaintiff's discovery request imposed an undue burden, and noting that the plaintiff could not meet all three of the <u>Shelton</u> test's criteria).   When the Court adopted the <u>Shelton</u> test in <u>Boughton v. Cotter Corp.</u>, the Tenth Circuit did not require trial courts to enter protective orders under certain circumstances.   See <u>Boughton v. Cotter Corp.</u>, 65 F.3d at 829 ("[W]e need only make the more limited holding that ordinarily the trial court at least has the *discretion* under Rule 26(c) to issue a protective order against the deposition of opposing counsel when any one or more of the three *Shelton* criteria for deposition listed above are *not* met.")(emphasis in original). Rather, it held that a trial court has <u>discretion</u> to allow a party to depose opposing counsel if: "(1) no other means exist to obtain the information than to depose opposing counsel; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case."   <u>Boughton v. Cotter Corp.</u>, 65 F.3d at 829 (citing <u>Shelton</u>, 805 F.2d at 1327).   See <u>Thiessen v. Gen. Elec. Capital Corp.</u>, 267 F.3d 1095, 1112 n.15.   "While a protective order may not be mandatory if the criteria are met, the Tenth Circuit made clear that the trial court generally has discretion to issue a protection order when one or more criteria are not met."

Malcolm D. Smithson & Christine B. Smithson Trusts v. Amerada Hess Corp., 2007 WL 5685112, at *9 (citing E.E.O.C. v. Roswell Radio, Inc., 2007 WL 2305521, at *3). Accordingly, whether the Court is discussing subpoenas for attorney depositions or subpoenas duces tecum, the Shelton test as stated by the Tenth Circuit does not require the Court to enter a protective order. Nevertheless, that Zurich Insurance cannot meet all three Shelton factors provides additional evidence that the Court should not require Holland & Hart to produce the requested information.

Courts in the Tenth Circuit have applied the Shelton test's reasoning to subpoenas duces tecum, because "[t]he use of a subpoena duces tecum to attempt to obtain opposing counsel's documents and files is equally improper and may be more burdensome than merely attempting to obtain testimony." Kirzhner v. Silverstein, 2011 WL 1321750, *3 (D. Colo. Apr. 5, 2011)(Boland, M.J.), objections sustained in part and overruled in part, 870 F. Supp. 2d 1145, 1151 (D. Colo. Jan. 12, 2012)(concluding that the magistrate judge's protective order quashing the defendants' efforts to obtain documents from the plaintiff's counsel was not clearly erroneous, and observing that Shelton and Boughton v. Cotter Corp. supported the result). The Eighth Circuit's reasoning for protecting attorneys from depositions also applies here. See Shelton, 805 F.2d at 1327. Allowing discovery of the fees that a law firm charges to other clients will increase the time and costs of litigation as law firms spend time objecting to discovery requests and filing motions to quash subpoenas duces tecum. Depending on the discovery request, law firms may also raise work-product and attorney-client privilege objections. Along the same lines, counsel will have to devote time to redacting documents to protect its own information rather than devoting that time to preparing his client's case. Accordingly, the Shelton test provides added support that the Court should quash the Subpoena.

As described above, the Subpoena is minimally relevant and not crucial to Zurich Insurance's case.  The Court will therefore quash the Subpoena.

### C.       THE COURT WILL AWARD COSTS AND FEES PURSUANT TO RULE 45.

Under rule 45(d)(1), "a party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  Fed. R. Civ. P. 45(d)(1).  If an attorney does not comply with this duty, the court "must enforce this duty and impose an appropriate sanction -- which may include lost earnings and reasonable attorney's fees."  Fed. R. Civ. P. 45(d)(1).  The Court considers expense-shifting under rule 45(d)(1), because XTO Energy won on its request that the Court quash the Subpoena and because the "central underlying issue here was the propriety of the subpoena."  Muslim Community Ass'n of Ann Arbor v. Pittsfield Township, 2015 WL 5132583, at *2 (E.D. Mich. 2015)(Grand, M.J.).

Holland & Hart "attempted to confer with Zurich in good faith to avoid the expense of this motion and the undue burden responding to the Subpoena would impose."  Motion to Quash at 6.  Holland & Hart "explained to Zurich that the Subpoena was overbroad, sought irrelevant and privileged information, and was unduly burdensome, and accordingly requested Zurich withdraw or modify the Subpoena."  Motion to Quash at 6-7.  Zurich Insurance did not attempt to narrow the request to seek only those documents in XTO Energy's control; it did not send an interrogatory seeking only rates in some cases; it did not seek information limited to New Mexico cases.  Instead of a rifle shot, Zurich Insurance sent a shotgun blast.  Rather than narrowly tailoring the request to get some specific information that might be relevant and useful, the Subpoena seems to be designed more to be an "in your face" request to XTO Energy's lawyers, intended to burden and harass rather than to get a little bit of good information.  See In

re First Peoples Bank Shareholders Litig., 121 F.R.D. 219 (D.N.J. 1988)(stating that discovery relating to an attorney's fee award "must not launch an excursion into the barely relevant or beyond the borderline of harassment").

Zurich Insurance did not comply with existing law pursuant to rule 26(g)(1)(B), because its Subpoena was facially and procedurally invalid.  See supra at 44-45.  "District courts have found that parties fail to comply with existing law when they do not follow the subpoena procedures in Rule 45."  Mount Hope Church v. Bash Back!, 705 F.3d at 425-26 (citing Murphy v. Bd. of Ed., 196 F.R.D. 220, 224-25 (W.D.N.Y. 2000)(Larimer, J.)(enforcing rule 11 sanctions for failing to notify opposing counsel of subpoenas)).  Zurich Insurance's refusal to withdraw or modify its defective subpoena caused XTO Energy to incur the expense of filing the Motion to Quash.   See Precourt v. Fairbank Reconstruction Corp., 280 F.R.D. 462, 472 (D.S.D. 2011)(Schreier, J.); Night Hawk Ltd. v. Briarpatch Ltd., L.P., 2003 WL 23018833, at *9 (S.D.N.Y. Dec. 23, 2003)(Sweet, J.)("Sanctions are properly imposed and attorney's fees are awarded where, as here, the party improperly issuing the subpoena refused to withdraw it, requiring the non-party to issue a motion to quash."); Green v. MOBIS Alabama, LLC, 2014 WL 2041857, at *2-3 (M.D. Ala. May 16, 2014)(awarding costs and fees where party "failed to take any steps, let alone any reasonable ones, to avoid imposing an undue burden or expense on [the subpoenaed person]").

Zurich Insurance does not show that it attempted to discover the information it seeks by searching its own records or through any other means before sending the Subpoena, and the broad request imposes a considerable logistical burden on Holland & Hart.  Compare Mount Hope Church v. Bash Back!, 705 F.3d 418, 425 (9th Cir. 2012)(concluding that rule 45(d) sanctions were improper when "the subpoenaing party acted in good faith, narrowly tailored its

discovery request" so that it did not impose a logistical burden on the responding party, but lost "a motion to compel based on unpersuasive legal arguments").  Further, Zurich Insurance did not negotiate reasonable parameters on the Subpoena.  See Tiberi v. CIGNA Ins. Co., 40 F.3d 110, 112 (5th Cir. 1994)(reversing a sanctions award where the issuing party engaged in "sufficient good faith efforts to negotiate reasonable parameters on the subpoena").  Accordingly, Zurich Insurance did not "take reasonable steps to avoid imposing undue burden or expense" on Holland & Hart.  Fed. R. Civ. P. 45(d)(1).  See Green v. MOBIS Alabama, LLC, 2014 WL 2041857, at *2-3 (awarding costs and fees where party "failed to take any steps, let alone any reasonable ones, to avoid imposing an undue burden or expense on [the subpoenaed person]").  The Court will therefore award costs and fees against Zurich Insurance.

The Court is sympathetic to Zurich Insurance's suspicion that Holland & Hart is charging more than what it normally charges for insurance defense work.  An hourly rate of $400.00 is a considerable amount for insurance defense work in New Mexico.  A $400.00 rate is a considerable amount for any commercial litigation in New Mexico.  Typically, law firms that perform insurance defense work have lower rates, because the work is often less complex than top-flight commercial cases.  These law firms make up for the lower rates with a higher volume of insurance defense work rather than working one big case every so often.  Holland & Hart appears to be charging its usual top rates to XTO Energy rather than the insurance rate, or a negotiated rate for a repeat client.  The Court has approved rates of $300.00 per hour, see Ysasi v. Brown, 2015 WL 403930, at *28 (D.N.M. Jan. 7, 2015)(Browning, J.), and other judges in New Mexico have found rates of $350.00 per hour reasonable, but most rates in New Mexico are lower, see New Mexico v. Valley Meat Co., LLC, 2015 WL 9703255, at *23 (D.N.M. Dec. 14, 2015)(Browning, J.).

[T]he state's top attorneys charge above that amount -- [$200.00], see Jackson v. Los Lunas Center, 489 F. Supp. 2d 1267, 1273 & n.4 (D.N.M. 2007)(Parker, S.J.)(discussing fees of up to $305.25 per hour and finding those fees reasonable); Kelley v. City of Albuquerque, No. 03–507, 2005 WL 3663515, at *16 (D.N.M. Oct. 24, 2005)(Browning, J.)(finding that $250 per hour for Albuquerque attorneys is a reasonable fee), and New Mexico is a relatively poor state, with some of the lowest hourly rates in the country.  The Court has previously stated that $200.00 per hour is a "relatively low rate" for attorneys in New Mexico. Lane v. Page, 862 F. Supp. 2d 1182, 1257 (D.N.M. 2012) (Browning, J.).  See also Copar Pumice Co., Inc. v. Morris, No. CIV 07–0079 JB/ACT, 2012 WL 2383667, at *19, *21 (D.N.M. Jun. 13, 2012)(Browning, J.)(finding that "(i) $235.00 per hour for partners; (ii) $200.00 per hour for senior associates; (iii) $150.00 per hour for other associates; and (iv) $75.00 per hour for paralegals," are reasonable rates in New Mexico); Avendano v. Smith, No. CIV 11–0556, 2011 WL 5822733, at *2 (D.N.M. Nov. 3, 2011) (Browning, J.)(finding rates of $180.00 per hour reasonable); Pedroza v. Lomas Auto Mall, Inc., 716 F. Supp. 2d 1031, 1050-51 (D.N.M. 2010)(Browning, J.)(finding that $150.00 per hour is a "very reasonable" rate for commercial litigators in New Mexico); Mountain Highlands, LLC v. Hendricks, No. CIV 08–0239, 2010 WL 1631856, at **9-10 (D.N.M. Apr. 2, 2010)(Browning, J.)(approving an hourly rate of $170.00 to $210.00 per hour as reasonable for commercial litigation); Wiatt v. State Farm Ins. Cos., No. CIV 07–0526 JB/KBM, 2008 WL 2229630, at **4-5 (D.N.M. Mar. 24, 2008)(Browning, J.)(holding that a fee of $200.00 per hour for insurance defense work was reasonable); Allahverdi v. Regents of Univ. of N.M., No. CIV 05–0277, 2006 WL 1304874, at *2 (D.N.M. Apr. 25, 2006)(Browning, J.)(finding hourly rate of $225.00 reasonable in a public-employment dispute); Two Old Hippies, LLC v. Catch the Bus, LLC, 277 F.R.D. 448, 465 (D.N.M. 2011) (Browning, J.)(finding that $275.00 per hour is a reasonable rate for an attorney who is "one of the more seasoned and experienced commercial litigators in the District of New Mexico," and $195.00 is a reasonable rate for an "excellent associate.").  The Honorable William P. Johnson, District Judge for the United States District Court for the District of New Mexico, has found that a rate of $350.00 per hour is appropriate for one of "one of New Mexico's preeminent trial lawyers," who has demonstrated "superb trial advocacy skills" in a police misconduct civil rights case. Martinez v. Carson, No. 08–CV1046 WJ/LFG, Mem. Op. and Order Granting in Part Plaintiff's Motion for Attorney Fees and Expenses (Doc. 231), at 7 (D.N.M. Aug. 11, 2011)(Johnson, J.). Judge Johnson has also found that a rate of $175.00 per hour is reasonable for an attorney who has been practicing law for five years. See No. 08–CV–1046, Mem. Op. and Order Granting in Part Plaintiffs' Motion for Attorney Fees and Expenses (Doc. 231) at 8.  The Honorable Judith C. Herrera, District Judge for the United States District Court for the District of New Mexico, has approved fee awards of: $350 per hour for lawyers who graduated from law school before 1996; $300 per hour for lawyers who graduated between 1996 and 2000; $225 per hour for lawyers how graduated between 2001 and 2006; and $150 per hour for lawyers who graduated in 2007 and afterwards . . . [and] $95 per hour for legal interns and

legal support staff.  <u>Valdez v. Herrera</u>, No. 09–CV–0668 JCH/DJS, Order Granting Attorneys' Fees at 3 (Doc. 149)(D.N.M. Mar. 21, 2011)(Herrera, J.). <u>See Mackey v. Staples, Inc.</u>, No. 09–CV–0023 JCH/WPL, Order Granting Attorneys' Fees and Costs (Doc. 199) at 5 (D.N.M. Mar. 4, 2011)(Herrera, J.)(awarding fees at a rate of $350.00 per hour to civil rights litigators with thirty-seven years of experience); <u>Johnson v. Life Ins. Co. of N. Am.</u>, No. 05–CV–0357 JCH/RLP, Memorandum Opinion and Order (Doc. 127) at 4 (D.N.M. Mar. 13, 2009)(Herrera, J.)(finding that $105.00 per hour is a reasonable rate for a paralegal with nine years of experience).  The Honorable John E. Conway, Senior District Judge for the United States District Court for the District of New Mexico, has awarded fees in the range of $200.00 to $300.00 for attorneys in a police misconduct case.  <u>See Avila v. Ratchner</u>, No. 01–CV–0349 JC/LAM, Memorandum Opinion and Order (Doc. 214) at 6-7 (D.N.M. Sept. 27, 2010)(Conway, S.J.).  Five years ago, the Honorable Robert C. Brack, District Judge for United States District Court for the District of New Mexico, found that $175.00 per hour was a reasonable rate for an associate attorney with five years of experience who took an active role in a litigation.  <u>See Rivera v. Smith's Food & Drug Centers</u>, No. 05–CV–1049 RB/ACT, Memorandum Opinion and Order (Doc. 177) at 10-12 (D.N.M. June 28, 2007)(Brack, J.).  The Honorable Robert H. Jacobvitz, Bankruptcy Judge for the United States Bankruptcy Court for the District of New Mexico, found that hourly rates of $60.00 for paralegals is reasonable.  <u>See In re Fincher</u>, No. 13–08–11454 JA, 2012 WL 1155719, at *5 (Bankr. D.N.M. Apr. 5, 2012) (Jacobvitz, J.)

<u>In re Thornburg Mortg., Inc. Sec. Litig.</u>, 912 F. Supp. 2d 1178, 1258 n.41 (D.N.M. 2012)(Browning, J.).  A $400.00 rate would be close to the top, if not the top of the rates that the Court has approved or seen in New Mexico, and that rate has not been for insurance work.   In any case, while the Court is skeptical that a $400.00 rate is reasonable for insurance defense rates, Zurich Insurance does not need to hammer Holland & Hart and XTO Energy with unduly burdensome discovery to prove the point.  It can hire an expert on insurance defense, on complex commercial litigation, and on attorney's fees, and make the point easier.

    **IT IS ORDERED** that: (i) Defendant Zurich American Insurance Company's Motion to Compel Discovery from Plaintiff, filed December 2, 2015 (Doc. 37), is denied; (ii) Plaintiff XTO Energy, Inc.'s Motion to Quash or Motion for Protective Order Regarding Subpoena to Nonparty

Holland & Hart LLP, filed December 1, 2015 (Doc. 36), is granted; and (iii) the Court awards

costs and fees to Holland & Hart.


_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Bradford C. Berge
Holland & Hart LLP
Santa Fe, New Mexico

-- and --

Jose A. Ramirez
Holland & Hart LLP
Greenwood Village, Colorado

-- and --

Katie K. Custer
Holland & Hart LLP
Denver, Colorado

    *Attorneys for Plaintiff XTO Energy, Inc.*

Sam L. Fadduol
Joshua K. Conaway
Fadduol, Cluff, Hardy & Conaway, P.C.
Albuquerque, New Mexico

-- and --

Maureen A. Sanders
Sanders & Westbrook, P.C.
Albuquerque, New Mexico

    *Attorneys for Plaintiffs-in-Intervention Scott Manley, Shanna Manley, Jose Betancur, and*
     *Virginia Betancur*

Terry R. Guebert
Robert Gentile
Guebert Bruckner, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant ATD, LLC*

James H. Johansen
Shawn S. Cummings
Amy Elizabeth Headrick
Rheba Rutkowski
Butt, Thornton & Baehr, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant and Third-Party Plaintiff Zurich American Insurance Company*

Andrew B. Curtis
Craig, Terrill, Hale & Grantham, LLP
Lubbock, Texas

     *Attorney for Third-Party Defendant Basic Energy Services, Inc.*

Michael Lemoine
Jones Walker
Lafayette, Louisiana

-- and --

Matthew T. Byers
McCormick, Caraway, Tabor & Byers LLP
Carlsbad, New Mexico

     *Attorneys for Third-Party Defendant Weatherford Artificial Lift Systems, Inc.,*
        *Weatherford International, Inc., and Weatherford U.S., L.P.*