# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

XTO ENERGY, INC.,

       Plaintiff,

vs.                                                 No. CIV 14-1021 JB/SCY

ATD, LLC, AIR TECH DRILLING, INC. and
ZURICH AMERICAN INSURANCE COMPANY,

       Defendants.

ZURICH AMERICAN INSURANCE COMPANY,

       Third-Party Plaintiff,

vs.

BASIC ENERGY SERVICES, INC.,
WEATHERFORD ARTIFICIAL LIFT SYSTEMS, INC.,
WEATHERFORD INTERNATIONAL, INC., and,
WEATHERFORD U.S., L.P.,

       Third-Party Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Zurich American Insurance Company's Motion for Reconsideration; Alternatively, for Clarification and for Language Permitting Interlocutory Appeal or Certification to the New Mexico Supreme Court (re: Doc. 82), filed March 25, 2016 (Doc. 83)("Motion"). The Court held a hearing on May 26, 2016. The primary issues are: (i) whether the Court should reconsider its earlier ruling that the insurance contract between Plaintiff XTO Energy, Inc. and Defendant Zurich American Insurance Company does not violate New Mexico's Oilfield Anti-Indemnity Statute, N.M. Stat. Ann. § 56-7-2; (ii) whether the Court should clarify Zurich Insurance's obligations under the insurance contract to

explain that Zurich Insurance need only indemnify XTO Energy for liability arising from Air Tech's fault; (iii) whether the Court should amend its Memorandum Opinion and Order, filed March 25, 2016 (Doc. 83)("MSJ MOO"), to allow Zurich Insurance to file an interlocutory appeal under 28 U.S.C. § 1292(b); and (iv) whether the Court should certify the issue that the Court decided in its MSJ MOO to the Supreme Court of New Mexico pursuant to N.M. Stat. Ann. § 39-7-4.  Because the Court, in its MSJ MOO, fully addressed the issues that Zurich Insurances now raises, and because the Court remains confident that its ruling in the MSJ MOO best adheres to New Mexico case law regarding New Mexico's Oilfield Anti-Indemnity Statute, the Court will not change its ruling.  To more precisely define Zurich Insurance's obligations, however, the Court will clarify its order to state that Zurich Insurance must indemnify XTO Energy for liability arising from Air Tech's fault.  Finally, as the Court has already thoroughly considered the issues that Zurich Insurance raises, the Court will not amend its MSJ MOO to allow an interlocutory appeal or to certify any legal questions to the Supreme Court of New Mexico.  The Court therefore grants Zurich Insurance's Motion in part and denies it in part.

## FACTUAL BACKGROUND

This case involves numerous parties who contracted with each other to provide services and insurance.  Below, the Court describes the parties involved, their contracts, and the disputes that surround those contracts.  The Court takes its facts from Defendant Zurich American Insurance Company's Motion for Summary Judgment, filed November 13, 2015 (Doc. 32)("MSJ"), Plaintiff XTO Energy Inc.'s Memorandum in Support of Response to Defendant Zurich American Insurance Company's Motion for Summary Judgment, filed December 21, 2015 (Doc. 44)("MSJ Response"), and the Defendant Zurich American Insurance Company's

- 2 -

Reply in Support of Motion for Summary Judgment, filed February 1, 2016 (Doc. 59)("MSJ Reply").  The Court has previously described this case's facts in prior opinions.  See XTO Energy, Inc. v. ATD, LLC, 2016 WL 1158073, at *1-5 (D.N.M. March 11, 2016)(Browning, J.)("MSJ MOO"); XTO Energy, Inc. v. ATD, LLC, 2016 WL 1730171, at *1-5 (D.N.M. April 1, 2016)(Browning, J.)("Motion to Intervene MOO").

1.    **The Parties.**

XTO Energy is an oil-and-gas well operator that contracts with various contractors to perform well operations.  See MSJ at 1; MSJ Response ¶ A, at 2.[1]  Defendant Air Tech Drilling, Inc., a contractor, is a New Mexico corporation based in Bloomfield, New Mexico and formed on June 9, 2006.  See MSJ ¶¶ 7, 10, at 4; MSJ Response ¶ A, at 2.[2]  Air Tech's corporate status

---

[1]XTO Energy does not dispute any of Defendant Zurich American Insurance Company's factual assertions.  It states in its MSJ Response that "there is no genuine issue of material fact." MSJ Response at 6.

[2]Throughout its MSJ Response, XTO Energy does not distinguish between Air Tech and ATD, LLC, using the phrase "Air Tech/ATD" to refer to both entities.  E.g., MSJ Response ¶ J, at 4.  Zurich Insurance disputes all of XTO Energy's factual assertions that suggest that Air Tech and ATD, LLC are the same entity.  See MSJ Reply ¶ B, at 3.  Zurich American Insurance Co. contends that Air Tech and ATD, LLC are not the same entity, and provides documents to support its objection.  See Reply ¶ B, at 3; New Mexico Secretary of State Office, Information on Air Tech Drilling, Inc., filed November 13, 2015 (Doc. 33-1)(demonstrating that: (i) Air Tech's corporate status was revoked on June 28, 2010; (ii) Air Tech was a New Mexico corporation based in Bloomfield, New Mexico, formed on June 9, 2006; and (iii) ATD, LLC was formed as a corporation on September 22, 2006, based in Hobbs, New Mexico and converted to a limited liability company on August 27, 2009).  Because Zurich Insurance presents credible evidence that Air Tech and ATD, LLC are not the same entity, the Court deems it disputed whether they are the same entity.  While the issue is disputed, it is not material to the current dispute.  The Court will therefore refer to and treat Air Tech and ATD, LLC as distinct entities.  See D.N.M.LR-Civ. 56(b).  Additionally, the Court will refer only to Air Tech when describing the Contractor's obligations in the Master Contract.  This adoption of terminology does not determine that Air Tech and ATD, LLC are separate entities, as that determination is not relevant here.

was revoked on June 28, 2010.  See MSJ ¶ 7, at 4.  Defendant ATD, LLC is a New Mexico limited liability company based in Hobbs, New Mexico, originally formed as a New Mexico corporation on September 22, 2006, and converted into a limited liability company on August 27, 2009.  See MSJ ¶ 8, at 4.  Zurich American Insurance Co. is an insurance company that provides insurance for Air Tech.  See MSJ ¶ 19, at 6.  ATD, LLC employed Scott Manley and Jose Betancur, who were working at the XTO Energy Well site on November 8, 2012.  See MSJ ¶ 9, at 4.  Scott Manley and Shanna Manley ("the Manleys"), as well as Jose and Virginia Betancur ("the Betancurs"), individually and as Next Friend of Vanessa B. Betancur, Valerie Betancur, and Jose Betancur, minors, filed litigation in state court against XTO Energy, Weatherford Artificial Lift Systems, Inc., Weatherford International, Inc., Weatherford U.S., L.P., Basic Energy Services, Inc., BOS Roustabout Service, LLC, Gabriel Valdez, and Randy Green.  See MSJ ¶¶ 1-2, at 2; Response ¶¶ M-N, at 4.

### 2.  The Master Service Contract.



Operator — XTO Energy          Contractor — Air Tech

On November 8, 2006, XTO Energy entered into a Master Service Contract ("Master Contract" or "MSC") with Air Tech.  MSJ ¶¶ 7, 10, at 4; MSJ Response ¶ A, at 2.  The Master Contract provides that Air Tech, "as 'Contractor,' would provide certain well-related services to XTO."  MSJ ¶ 10, at 4; MSJ Response ¶ A, at 2.  "The MSC defines 'XTO Group' as 'XTO, its Affiliates, co-owners . . . at the Site, joint venturers, partners, contractors and subcontractors other than Contractor or its Subcontractors and all of their respective directors, officers, employees, representatives, agents, licensees and invitees.'"  MSJ ¶ 11, at 4.  The Master

Contract defines "Contractor Group" as "Contractor, its Affiliates, any Subcontractor of Contractor, and their respective directors, officers, employees, representatives, agents, licensees and invitees."   MSJ ¶ 13, at 4-5.   XTO Energy's Complaint for Breach of Contract, Unfair Practices and Declaratory Relief, filed November 10, 2014 (Doc. 1)("XTO Complaint"), does not allege that "XTO or any defendants named in the Manley Complaint or the Betancur Complaint is a member of the 'Contractor Group.'"   MSJ ¶ 14, at 5.

Master Contract § 10, entitled "RELEASE, DEFENSE, INDEMNITY, AND HOLD HARMLESS," states:

> 10.1.1   Contractor hereby agrees to release, defend, indemnify and hold the XTO Group harmless from and against any and all claims, demands, and causes of action of every kind and character (including without limitation, fines, penalties, remedial obligations, court costs and reasonable attorney's fees, including attorney's fees incurred in the enforcement of this indemnity)(hereinafter collectively referred to as the 'Indemnifiable Claims') arising out of, without limitation bodily injury and/or death of any one or more members of the Contractor Group in any manner incident to, connected with or arising out of the performance of the Work.  *This obligation is without regard to the cause or causes of such bodily injury, death, loss of or damage to property and includes, but is not limited to, Indemnifiable Claims resulting from any sole, joint or concurrent negligence, strict liability, or other act and/or omission of any one or more members of the XTO Group.*
>
> 10.1.2   To the extent not covered in Section 10.3, Contractor hereby further agrees to release, defend, indemnify and hold the XTO Group harmless from and against any and all Indemnifiable Claims *arising out of the emission, discharge or negligence, strict liability, or other act and/or omission of any one or more members of the Contractor Group, which is in any manner incident to, connected with or arises out of the performance of the Work*.
>
> 10.1.3   *Contractor agrees that its indemnity obligations herein will be supported by insurance* with at least the minimum amounts provided in Article XI, which insurance will be primary to any other insurance provided by or available to any one or more members of the XTO Group *and shall provide waivers of subrogation against all members of the XTO Group*.  To the extent that applicable law prohibits the monetary limits of insurance required or the indemnities

- 5 -

voluntarily assumed hereunder, the requirements will automatically be revised to conform, to the maximum extent permitted, with applicable law.

MSJ ¶ 15, at 5 (quoting Master Contract §10.1 (emphases in MSJ)).

Master Contract § 11.4 provides that all Contractor's liability insurance policies must name "XTO Group" as an additional insured and must "contain a waiver on the part of the insurer, by subrogation or otherwise, of all rights against the XTO Group."  MSJ ¶ 16, at 5-6.

Master Contract § 10.4 also contains a savings clause, which states:

> SPECIAL PROVISION FOR NEW MEXICO.  THE FOLLOWING PROVISION APPLIES WHERE WORK IS TO BE PERFORMED IN NEW MEXICO, NOTWITHSTANDING ANY PROVISIONS IN THE CONTRACT TO THE CONTRARY.  *To the extent this Article X is governed by New Mexico law, then the provisions therein shall be read not to include indemnification for one's own negligence.*

MSJ ¶ 17, at 6 (quoting MSC §10.4 (emphasis in MSJ)).  MSC § 14.8 provides that Texas law -- "excluding the Texas rules on conflict of law" -- governs the Master Contract.  MSJ ¶ 18, at 6.

### 3.    The Zurich Policy.



Zurich Insurance issued "a commercial general liability policy ('Policy') to Mesa Well Servicing, LP, policy number GLO 4391238-03, effective July 1, 2012 through July 1, 2013." MSJ ¶ 19, at 6.  "The Policy's Commercial General Liability Coverage Part Declarations page

identifies Mesa Well Servicing, LP as the Named Insured."   MSJ ¶ 19, at 6.   The Policy's

Commercial General Liability Coverage Form states that "[t]hroughout this policy the words

'you' and 'your' refer to the Named Insured shown in the Declarations and any other person or

organization qualifying as a Named Insured under this policy."   MSJ ¶ 20, at 6.   The Policy's

Schedule of Named Insureds includes Air Tech.   See MSJ ¶ 21, at 6.

In describing the coverage, the Policy states in the section entitled "Coverage A Bodily

Injury and Property Damage Liability ('Coverage A')":

> We will pay those sums that the insured becomes legally obligated to pay as
> damages because of 'bodily injury' or 'property damage' *to which this insurance
> applies*.   We will have the right and duty to defend the insured against any 'suit'
> seeking those damages.   However, *we will have no duty to defend the insured
> against any 'suit' seeking damages for 'bodily injury' or 'property damage' to
> which this insurance does not apply*.   We may, at our discretion, investigate any
> 'occurrence' and settle any claim or 'suit' that may result. . . .   But: . . . No other
> obligation or liability to pay sums or perform acts or services is covered unless
> explicitly provided for under Supplementary Payments -- Coverages A and B.

MSJ ¶ 22, at 6-7 (emphasis in MSJ).

Coverage A excludes coverage for "'Bodily injury' or 'property damage' for which the

insured is obligated to pay damages by reason of the assumption of liability in a contract or

agreement," except for liability for damages: "(1) That the insured would have in the absence of

the contract or agreement; or (2) Assumed in a contract or agreement that is an 'insured

contract', provided the 'bodily injury' or 'property damage' occurs subsequent to the execution

of the contract or agreement."[3]   MSJ ¶ 23, at 7.   The Policy defines "Insured contract" as: "That

part of any other contract or agreement pertaining to your business . . . under which you assume

the tort liability of another party to pay for 'bodily injury' or 'property damage' to a third person

---

[3]XTO Energy does not address this factual assertion, so the Court deems it undisputed.
See D.N.M.LR-Civ. 56(b).

- 7 -

or organization." MSJ ¶ 24, at 7. The Policy defines "tort liability" as "a liability that would be imposed by law in the absence of any contract or agreement." MSJ ¶ 24, at 7.

In the Commercial General Liability Coverage Part, the Policy defines "insured" as "any person or organization qualifying as such under Section II -- Who is an insured." MSJ ¶ 25, at 7. The Policy contains an Additional Insured Endorsement, which modifies the insurance provided under the Commercial General Liability Coverage Part as follows:

> A. Section II -- Who Is An Insured is amended to include as an insured any person or organization who you are required to add as an additional insured on this policy under a written contract or written agreement.
>
> B. The insurance provided to the additional insured person or organization applies only to 'bodily injury', 'property damage' . . . covered under Section I -- Coverage A -- Bodily Injury and Property Damage Liability . . . *but only with respect to liability for 'bodily injury'*, 'property damage' . . . *caused, in whole or in part, by:*
>
>> *1.   Your acts or omissions;*
>>
>> *2.   The acts or omissions of those acting on your behalf, and resulting directly from your ongoing operations of 'your work' as included in the 'products-completed operations hazard'*, which is the subject of the written contract or written agreement. . . .
>
> D. The insurance provided to the additional insured person or organization does not apply to: 'Bodily injury', 'property damage' . . . arising out of the rendering or failure to render any professional architectural, engineering or surveying services including:
>
>> 1.   The preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and
>>
>> 2.   Supervisory, inspection, architectural or engineering activities."

MSJ ¶ 26, at 8 (emphasis in MSJ).

- 8 -

The Zurich Policy further provides that, when the insured -- Air Tech -- has assumed liability for reasonable attorney's fees and expenses under an "insured contract," the insurer will reimburse those fees and expenses as damages.  Response ¶ I, at 3-4.  All of the claims asserted in the XTO Complaint are based entirely on obligations that Air Tech, ATD, LLC and Zurich Insurance allegedly owe under the Master Contract and the Zurich Policy "for the claims asserted against XTO Group members in the Manley and Betancur Complaints."  MSJ ¶ 27, at 8.

### 4.    __The State Litigation.__

On November 8, 2012, an accident occurred at a well in Eddy County, New Mexico, resulting in a fire.  See MSJ ¶ 1, at 2; Response ¶ J, at 4.  On November 8, 2012, ATD, LLC and Air Tech provided services on the well.  See Response ¶ K, at 4.  ATD, LLC employed Scott Manley and Jose Betancur, who were working at the XTO Well site on November 8, 2012.  See MSJ ¶ 9, at 4.  The parties dispute whether XTO Energy directed or supervised Air Tech.  See XTO Complaint ¶ 15, at 3 ("The MSC further provides that Air Tech/ATD would be, at all material times, an independent contractor and would have complete and sole control over their employees, the details of the work performed and the methods by which the work was accomplished."); Transcript of Hearing at 37:16-19 (taken March 1, 2016)("Tr."), filed April 28, 2016 (Doc. 92)(Ramirez)("There is a question about whether XTO supervised and directed the work at the well site.  And that is an issue that's hotly contested by XTO in the underlying cases.").  On March 13, 2013, as a result of the November 8, 2012 accident, Scott Manley and Shanna Manley filed the Plaintiffs' Complaint to Recover Damages for Personal Injury in the Fifth Judicial District Court, Eddy County, State of New Mexico, D-503-CV-2013-00241, against XTO Energy and other defendants.  MSJ ¶ 1, at 2; Response ¶ M, at 4.  On May 22,

2014, Jose and Virginia Betancur, individually and as Next Friend of Vanessa B. Betancur, Valerie Betancur, and Jose Betancur, minors, filed their Complaint in Intervention to Recover Damages for Personal Injury ("Betancur Complaint") in the same state case in connection with the same November 8, 2012 incident.  MSJ ¶ 2, at 2; Response ¶ N, at 4.

The defendants in both state complaints consist of XTO Energy, Weatherford Artificial Lift Systems, Inc., Weatherford International, Inc., Weatherford U.S., L.P., Basic Energy Services, Inc., BOS Roustabout Service, LLC, Gabriel Valdez, and Randy Green.  See Manley Complaint at 1; Betancur Complaint at 1.  "Most or all of the other defendants in the Manley suit are members of the XTO Group."  MSJ ¶ 12, at 4.  The Betancur Complaint asserts against XTO Energy's and the other defendants' claims of "negligence; respondeat superior; negligent selection, retention, and supervision of contractors/subcontractors; liability for nondelegable duty/joint and several liability; and violation of statute/negligence as a matter of law."  MSJ ¶ 2, at 2.  It requests damages for J. Betancur's bodily injuries, punitive damages, and damages for loss of consortium.  See MSJ ¶ 2, at 2.  On June 2, 2014, the Manleys amended their Complaint to assert "the same claims against the same defendants as the Betancur Complaint."  MSJ ¶ 3, at 2.

The Manley Complaint and Betancur Complaint allege that, "at the time of the incident, XTO owned and operated the well ('XTO Well') and that Randy Green was XTO's 'Company Man' at the well site, with overall authority and control over the site."  MSJ ¶ 4, at 3.  Both Complaints assert claims against XTO Energy, Green, and certain contractors that provided well-related services to XTO Energy at the XTO Well: Weatherford Artificial, Weatherford International, Weatherford U.S., Basic Energy, BOS Roustabout, and Valdez, a Weatherford-

entity employee.  See MSJ ¶ 5, at 3.  "Neither the Manley Complaint nor the Betancur Complaint alleges any wrongdoing or asserts any claims against Air Tech, ATD, LLC, Mesa Well Servicing, LP, or their employees."  MSJ ¶ 5, at 3.

On February 28, 2013, XTO Energy tendered its defense to Air Tech and ATD, LLC "pursuant to the indemnity provision and the additional insured requirement" in the Master Contract that it signed.  Response ¶ O, at 4.  Zurich Insurance acknowledged XTO Energy's tender of defense and indemnity to Air Tech Drilling in its April 3, 2013 letter to XTO Energy. See Response ¶ P, at 4.[4]  In response to Zurich Insurance's inquiries, XTO Energy informed Zurich Insurance that Air Tech or ATD, LLC "must provide indemnity and a defense pursuant to the MSC."  Response ¶ Q, at 4.

In an email dated November 10, 2013, Zurich Insurance responded to XTO Energy, denying any obligation to indemnify XTO Energy, but agreeing to defend XTO Energy as an additional insured under a reservation of rights.  See Response ¶ R, at 5; Reply ¶ F, at 3.  XTO Energy accepted Zurich Insurance's defense tender, and Zurich Insurance stated that the law firm that XTO Energy retained as counsel, Holland & Hart LLP, was on its approved counsel list. See Response ¶ S, at 5.  Zurich Insurance attempted to reach an agreement with Holland & Hart over the firm's hourly rates for attorney's fees, but did not reimburse XTO Energy for any fees or expenses, notwithstanding that it asked to be billed directly for fees incurred after it accepted the defense tender.  See Response ¶ T, at 5.  Zurich Insurance stated that it would defend XTO Energy only if it could arrive at an agreement over hourly rates for attorney's fees.  See

_____

[4]Zurich Insurance does not dispute this fact, so the Court deems it undisputed.  See D.N.M.LR-Civ. 56(b).

Response ¶ U, at 5.  Zurich Insurance could not reach an agreement on the law firm's hourly rates.  See Response ¶ V, at 5.

**PROCEDURAL BACKGROUND**

XTO Energy's Complaint for Breach of Contract, Unfair Practices and Declaratory Relief, filed November 10, 2014 (Doc. 1)("XTO Complaint"), alleges that "Air Tech and ATD, LLC breached contractual duties under a Master Service Contract to defend XTO against the claims asserted in the Manley and Betancur Complaints."  MSJ ¶ 6, at 3.  It further asserts that Zurich Insurance breached its defense and reimbursement obligations to XTO Energy under the commercial general liability policy that Zurich Insurance issued to Mesa Well Servicing.  See MSJ ¶ 6, at 3-4.  On November 11, 2015, Zurich Insurance filed a summary judgment motion, asking the Court to declare the Master Contract invalid under New Mexico's Oilfield Anti-Indemnity Statute.  See Defendant Zurich American Insurance Company's Motion for Summary Judgment, filed November 13, 2015 (Doc. 32).

1.      **The MSJ MOO.**

On March 11, 2016, the Court denied Zurich Insurance's request for summary judgment on XTO Energy's claims.  See MSJ MOO at 1.  The Court concluded that New Mexico courts have interpreted § 56-7-2 to prohibit only those contracts that provide indemnity for one's own negligence.  See MSJ MOO at 45.  Because the Master Contract's savings clause, § 10.4, stated that the Master Contract did not require indemnity for "one's own negligence," the Court concluded that the savings clause saved the agreement from the New Mexico Oilfield Anti-Indemnity Statute's proscriptions.  MSJ MOO at 1.  It further determined that the New Mexico Oilfield Anti-Indemnity Statute did not void the Zurich Policy.  See MSJ MOO at 1.  The Court

- 12 -

noted, however, that the savings clause limits Zurich Insurance's duties under the Zurich Policy. See MSJ MOO at 1.  Specifically, the savings clause prohibited Zurich Insurance from paying XTO Energy indemnity for its own negligence.  See MSJ MOO at 45-50.

##        2.        **The Motion.**

Zurich Insurance's Motion first asks the Court to reconsider its MSJ MOO.  See Motion at 1.  Zurich Insurance cites the Court's statements recognizing that § 56-7-2(A)(3) is written broadly, but noting that New Mexico courts have interpreted New Mexico's Oilfield Anti-Indemnity Statute more narrowly.  See Motion at 2.  Zurich Insurance argues that the Court should not interpret § 56-7-2(A)(3) so narrowly, because New Mexico courts have not necessarily constricted the statute as narrowly as the Court indicated.  See Motion at 2-3.  Zurich Insurance asserts that the New Mexico cases that the Court cites did not "discuss[] the scope of the text now codified at § 56-7-2(A)(3)."  Motion at 3.  Zurich Insurance argues that "cases are not authority for propositions not considered."  Motion at 4.  In sum, Zurich Insurance contends: "Given that no New Mexico appellate court has specifically discussed the impact and import of § 56-7-2(A)(3), . . . this Court *is* operating under a clean slate and should enforce § 56-7-2(A)(3) as written by holding that § 56-7-2(A)(3) voids the Contractor obligations XTO seeks to enforce here."  Motion at 5 (emphasis in original).

Zurich Insurance requests that, if the Court does not reconsider the MSJ MOO, the Court should clarify its order.  See Motion at 5.  Zurich Insurance explains that the MSJ MOO "clearly states that the MSC obligates Zurich to indemnity XTO *only for Air Tech's percentage of negligence*."  Motion at 5 (emphasis in original).  It also cites XTO Energy's statement acknowledging that "XTO does not require ATD to indemnify it for any of XTO's or the XTO

Group's sole or concurrent negligence." Motion at 7.  Zurich Insurance explains that the Court's order, which states that "§ 56-7-2 does not void the Zurich Policy to the extent that it requires Zurich Insurance to indemnify XTO Group members for claims that do not arise from their own negligence," MSJ MOO at 51, "appears to broaden the scope of Zurich's purported obligations." Motion at 7.  Instead, Zurich Insurance asks the Court to clarify the order to say: "§ 56-7-2 does not void the Zurich Policy to the extent that it requires Zurich to indemnify XTO Group members for any vicarious liability imposed upon them arising from the negligence of Air Tech." Motion at 7.

Finally, Zurich Insurance requests that, if the Court does not reconsider its MSJ MOO, the Court: (i) allow Zurich Insurance an interlocutory appeal under 28 U.S.C. § 1292(b), because the case "involves a controlling questions of law as to which there is substantial ground for difference of opinion," Motion at 8 (quoting 28 U.S.C. § 1292(b)); or (ii) certify the following question to the Supreme Court of New Mexico: "Does the broad language of NMSA § 56-7-2(A)(3) void only those indemnification agreements that require the indemnitor to indemnify the indemnitee against its own negligence?" Motion at 9.

**3.   The Response.**

In response, XTO Energy argues that Zurich Insurance "fails to establish any of the factors necessary for the Court to reconsider its prior ruling."  Plaintiff XTO Energy, Inc.'s Response in Opposition to Defendant Zurich American Insurance Company's Motion for Reconsideration; Alternatively, for Clarification and For Language Permitting Interlocutory Appeal or Certification to the New Mexico Supreme Court, filed April 20, 2016 (Doc. 90)("Response").  XTO Energy observes that the Court "addressed each of the cases cited by

Zurich in its request for reconsideration and provided detailed rationales for why the Court reached [its] conclusion." Response at 4-5. It explains that the Court's decision was not only correct, but thorough: "The Court discussed in detail the New Mexico Supreme Court's rich history articulating the public policy behind these statutes and its consistent opinion that holding all actors at a construction or well site responsible for their own actions serves to promote safety." Response at 5-6. XTO Energy notes that the MSJ MOO resolves the case's main issue, enabling the parties to either resolve or try the case "in a quick and efficient manner." Response at 6. Moreover, XTO Energy contends, the Court should deny the Motion, because: (i) there "has been no intervening change in controlling law;" (ii) Zurich Insurance has cited no new evidence; and (iii) there is no clear error. Response at 7. In short, XTO Energy argues that "Zurich is simply rehashing arguments it raised in its brief," because "Zurich has a difference of opinion with the Court." Response at 7.

Regarding Zurich Insurance's request for clarification, XTO Energy asserts that "Zurich's suggested language completely drops any mention of Zurich's obligations to defend or reimburse defense costs for XTO or XTO Group members." Response at 8-9. XTO Energy states that Zurich Insurance's "proposal actually changes the extent of the order." Response at 9. Next, XTO Energy asserts that the Court should deny Zurich Insurance's requests for an interlocutory appeal or certification to the Supreme Court of New Mexico. See Response at 9-10. XTO Energy explains that, because the Court ruled that the indemnity provisions are valid, the question regarding their validity is no longer a "controlling" issue, which is a prerequisite for an interlocutory appeal under § 1292(b). Response at 9. XTO Energy further asserts that Zurich Insurance does not satisfy § 1292(b)'s requirement that an issue "present substantial ground for

difference of opinion" simply because the Court faces an issue of first impression and predicts how the Supreme Court of New Mexico would rule.  Response at 9-10.  Regarding Zurich Insurance's request to certify a question to the Supreme Court of New Mexico, XTO Energy observes that "federal courts will not generally certify questions to state supreme courts when the requesting party seeks certification only after having received an adverse decision from the district court."  Response at 10.

### 4.  **The Reply**.

In reply, Zurich Insurance asserts that it presents sufficient grounds to warrant reconsideration.  See Zurich American Insurance Company's Reply in Support of Motion for Reconsideration; Alternatively, for Clarification and for Language Permitting Interlocutory Appeal or Certification to the New Mexico Supreme Court (re: Docs. 82, 83, 90), filed May 11, 2016 (Doc. 96)("Reply").  Zurich Insurance argues that "the Tenth Circuit has never held that interlocutory orders may be reconsidered only upon the movant's establishment of a defined set of elements."  Reply at 2.  Instead, Zurich Insurance asserts, district courts have discretion to reconsider interlocutory rulings when courts have "misapprehended the facts, a party's position, or the controlling law."  Reply at 4.  Zurich Insurance argues that it has not previously raised the arguments it now asserts, and that "no injustice to XTO would result from the relief Zurich requests."  Motion at 5.

In response to XTO Energy's assertion that the clarification request inappropriately changes the MSJ MOO's scope, Zurich Insurance notes that its omission of the Court's order that Zurich Insurance must "defend and reimburse XTO Group members for defense costs" was "inadvertent."  Reply at 6 n.2.  Zurich Insurance explains that it omitted the language solely

because its request for clarification pertained only to the Court's first half of the statement.  See Reply at 6.  Zurich Insurance states that the purpose in its clarification request is to "ensure that the order is not used as the basis for an erroneous ruling that Zurich is obligated to indemnify XTO Group members who may be held vicariously liable for acts of contractors or person *other than Air Tech*."  Reply at 6 (emphasis in original).

Finally, Zurich Insurance contends that its requests for interlocutory appeal or certification are proper.  See Reply at 8-10.  In relation to the interlocutory appeal, it notes that an issue is controlling when it is "serious to the conduct of the litigation" and could "materially affect the outcome."  Reply at 8.  Zurich Insurance asserts that an interlocutory appeal would materially advance the litigation, because it will save the parties from having to argue the issue on appeal.  See Reply at 10.  Additionally, it notes that a question of first impression can satisfy § 1292(b)'s requirement that substantial ground for difference of opinion exist.  See Reply at 8-9. Regarding its request for state-court certification, Zurich Insurance argues that "XTO cannot claim prejudice based on a response to a dispositive motion that was filed before any meaningful discovery had taken place . . . ."  Reply at 10.  Furthermore, Zurich Insurance contends, XTO Energy could not have "relied to its detriment on the MOO before the instant Motion was filed." Reply at 10.  Zurich Insurance observes that the Tenth Circuit has certified questions after the requesting party received an adverse ruling, even though it admonishes courts not to do so.  See Reply at 11.

## LAW REGARDING MOTIONS TO RECONSIDER INTERLOCUTORY ORDERS

Except where the Federal Rules of Civil Procedure specify, motions to reconsider fall into three categories:

> (i) a motion to reconsider filed within [twenty-eight] days of the entry of
> judgment is treated as a motion to alter or amend the judgment under rule 59(e);
> (ii) a motion to reconsider filed more than [twenty-eight] days after judgment is
> considered a motion for relief from judgment under rule 60(b); and (iii) a motion
> to reconsider any order that is not final is a general motion directed at the Court's
> inherent power to reopen any interlocutory matter in its discretion. See Price v.
> Philpot, 420 F.3d 1158, 1167 & n.9 (10th Cir. 2005).

Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. 453, 462 (D.N.M. 2009)(Browning, J.).  See Price

v. Philpot, 420 F.3d at 1167; Computerized Thermal Imaging, Inc. v. Bloomberg. L.P., 312 F.3d

1292, 1296 (10th Cir. 2002).

Considerable confusion exists among the bar regarding the proper standard for a district

court to apply when ruling on a motion to reconsider one of its prior "interlocutory" or "interim"

orders, i.e., an order that a district court issues while the case is ongoing, as distinguished from a

final judgment.  This confusion originates from the fact that the Federal Rules of Civil Procedure

do not mention motions to reconsider, let alone set forth a specific procedure for filing them or a

standard for analyzing them.  A loose conflation in terminology in Servants of the Paraclete v.

Does, which refers to rule 59(e) motions -- "motion[s] to alter or amend a judgment" -- as

"motions to reconsider,"[5] compounded that baseline confusion. Fed. R. Civ. P. 59(e) (emphasis

added); Servants of the Paraclete v. Does, 204 F.3d at 1005.

---

[5]The Honorable Paul J. Kelly, Jr., United States Circuit Judge for the Tenth Circuit, who
authored Servants of the Paraclete v. Does, refers to rule 59(e) motions as "motions to
reconsider" several times throughout the opinion.  See, e.g., 204 F.3d at 1005.  He uses the term
"motion to reconsider" as an umbrella term that can encompass three distinct motions:
(i) motions to reconsider an interlocutory order, which no set standard governs, save that the
district court must decide them "before the entry of . . . judgment," Fed. R. Civ. P. 54(b);
(ii) motions to reconsider a judgment made within twenty-eight days of the entry of judgment,
which the Servants of the Paraclete v. Does standard governs; and (iii) motions to reconsider a
judgment made more than twenty-eight days after the entry of judgment, which rule 60(b)
governs.  There is arguably a fourth standard for motions to reconsider filed more than a year
after the entry of judgment, as three of the rule 60(b) grounds for relief expire at that point.

Final judgments are different from interlocutory orders.  See Fed. R. Civ. P. 54(a) ("'Judgment' as used in these rules includes a decree and any order from which an appeal lies.")(emphasis added).  In addition to ripening the case for appeal, see 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts . . . ."), the entry of final judgment narrows the district court's formerly plenary jurisdiction over the case in three ways.  First, for the first twenty-eight days after the entry of judgment, when the court can entertain motions under rules 50(b), 52(b), 59, and 60, the district court's jurisdiction trumps that of the Court of Appeals.  See Fed. R. App. P. 4(a)(4)(B).  Even if a party files a notice of appeal, the Court of Appeals will wait until after the district court has ruled on the post-judgment motion to touch the case.  See Fed. R. App. P. 4(a)(4)(B). Second, after twenty-eight days, when the court may consider motions under rule 60, if a party has filed a notice of appeal, the Court of Appeals' jurisdiction trumps the district court's, and the district court needs the Court of Appeals' permission even to grant a rule 60 motion.  Third, after twenty-eight days, if no party has filed a notice of appeal, district courts may consider motions under rule 60.

Final judgments implicate two important concerns militating against giving district courts free reign to reconsider their judgments.  First, when a case is not appealed, there is an interest in

---

Much confusion could be avoided by using the term "motion to reconsider" exclusively to refer to the first category, "motion to amend or alter the judgment" exclusively to refer to the second category, and "motion for relief from judgment" exclusively to refer to the third category (and arguable fourth category).  These are the terms that the Federal Rules of Civil Procedure -- and other Circuits -- use to describe (ii) and (iii).  The Court agrees with Judge Kelly -- and all he likely meant by using motion to reconsider as an umbrella term is -- that, if a party submits a motion captioned as a "motion to reconsider" after an entry of final judgment, the court should evaluate it under rule 59(e) or 60(b), as appropriate, rather than rejecting it as untimely or inappropriate.

finality.  The parties and the lawyers expect to go home, quit obsessing about the dispute, and put the case behind them, and the final judgment -- especially once the twenty-eight day window of robust district court review and the thirty-day window of appeal have both closed -- is the disposition upon which they are entitled to rely.  Second, when a case is appealed, there is the need for a clean jurisdictional handoff from the district court to the Court of Appeals.  "[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," as doing so produces a "danger [that] a district court and a court of appeals w[ill] be simultaneously analyzing the same judgment."  Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58-59 (1982).

The Court of Appeals needs a fixed record on which to base its decisions -- especially given the collaborative nature of appellate decisionmaking -- and working with a fixed record requires getting some elbow room from the district court's continued interference with the case.  The "touchstone document" for this jurisdictional handoff is the notice of appeal, not the final judgment, see Griggs v. Provident Consumer Discount Co., 459 U.S. at 58 ("The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."  (citations omitted)); Garcia v. Burlington N. R.R. Co., 818 F.2d 713, 721 (10th Cir. 1987)("Filing a timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to the court of appeals.  The district court is thus divested of jurisdiction.  Any subsequent action by it is null and void."  (citations omitted)); Kirtland v. J. Ray McDermott & Co., 568 F.2d 1166, 1170 (5th Cir. 1978)("[I]t is the filing of the appeal, not the entering of a final judgment, that divests the district court of jurisdiction."  (citations omitted)), but, because

- 20 -

the final judgment starts the parties' thirty-day clock for filing a timely notice of appeal, the Federal Rules and the Tenth Circuit have chosen to curtail the district court's jurisdiction over the case in the roughly month-long period of potentially overlapping trial- and appellate-court jurisdiction that immediately follows the entry of final judgment, see Servants of the Paraclete v. Does, 204 F.3d at 1009 (noting that post-final judgment motions at the district court level are "not intended to be a substitute for direct appeal").

Basically, rather than suddenly divesting the district court of all jurisdiction over the case -- potentially resulting in the district court being unable to rectify easily fixable problems with the final judgment before the case goes to the Tenth Circuit, or even requiring appeal of a case that might otherwise not need to be appealed -- the Federal Rules set forth a jurisdiction phased de-escalation process, wherein the district court goes from pre-final judgment plenary jurisdiction, to limited review for the first twenty-eight days post-final judgment, and, finally, to solely rule 60 review after twenty-eight days.  In defining the "limited review" that rule 59(e) allows a district court to conduct in the 28-day flux period, the Tenth Circuit, in Servants of the Paraclete v. Does, incorporated traditional law-of-the-case grounds -- the same grounds that inform whether a court should depart from an appellate court's prior decision in the same case -- into rule 59(e).  See United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir. 1998)(departing from the law of the case doctrine in three exceptionally narrow circumstances: "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice")(citation omitted); Servants of the Paraclete v. Does, 204 F.3d at 1012 (incorporating those grounds into rule 59(e)).

Neither of these concerns -- finality nor jurisdictional overlap -- is implicated when a district court reconsiders one of its own interlocutory orders.  The Federal Rules do not specifically mention motions to reconsider interlocutory orders, but rule 54(b) makes the following open-ended proclamation about their mutability:

> When an action presents more than one claim for relief -- whether as a claim, counterclaim, crossclaim, or third-party claim -- or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.  Otherwise, <u>any order or other decision</u>, however designated, <u>that adjudicates fewer than all the claims</u> or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and <u>may be revised at any time before the entry of a judgment</u> adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b) (emphases added).  Rule 54(b) thus (i) provides that a district court can freely reconsider its prior rulings; and (ii) puts no limit or governing standard on the district court's ability to do so, other than that it must do so "before the entry of judgment."  Fed. R. Civ. P. 54(b).

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." <u>Been v. O.K. Indus.</u>, 495 F.3d at 1225.  In the Tenth Circuit, "law of the case doctrine has <u>no</u> bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another."  <u>Rimbert v. Eli Lilly & Co.</u>, 647 F.3d 1247, 1252 (10th Cir. 2011)(emphasis added)(citing <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225).  In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'"  <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225 (quoting <u>Avitia v. Metro. Club of Chi., Inc.</u>, 49 F.3d 1219, 1227 (7th Cir. 1995)).  In short, a district court can use whatever standard it wants to review a motion

- 22 -

to reconsider an interlocutory order.  It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors.  Cf. Been v. O.K. Indus., Inc., 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'")(citation omitted). First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges.  How "thoroughly" a point was addressed depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue.  A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling was on a criminal suppression motion, class certification motion, or preliminary injunction,[6] than

---

[6]The Court typically makes findings of fact and conclusions of law in ruling on these motions.  At first glance, it appears that the Federal Rules of Civil Procedure set forth additional standards -- beyond that which applies to other interlocutory orders -- for amending findings of fact and conclusions of law:

> **Amended or Additional Findings.**  On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings -- or make additional findings -- and may amend the judgment accordingly.  The motion may accompany a motion for a new trial under Rule 59.

Fed. R. Civ. P. 52(b).  This rule appears to limit motions to reconsider orders with findings of fact and conclusions of law to twenty-eight days.  The rule's use of the term "entry of judgment," its reference to rule 59, and its adoption of the same time period that applies to motions to alter or amend a judgment, all lead the Court to conclude, however, that rule 52(b) -- and its 28-day time limit -- does not apply to interlocutory orders.  The time limit applies only to findings of

- 23 -

when the prior ruling is, e.g., a short discovery ruling.  The Court should also look, not to the overall thoroughness of the prior ruling, but to the thoroughness with which the Court addressed the exact point or points that the motion to reconsider challenges.  A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.

Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling.  See 18B Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Vikram David Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman & Catherine T. Struve, Federal Practice & Procedure § 4478.1 (2d ed.)("Stability becomes increasingly important as the proceeding nears final disposition . . . .  Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling.").  For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the Court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the

---

fact and conclusions of law supporting a case-ending judgment -- such as those entered after a bench trial -- and to those giving rise to an interlocutory appeal that, if filed, divests the district court of its jurisdiction -- such as those entered in support of a preliminary injunction.

plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling that they faced in fighting the motion for protective order the first time.

Third, the Court should consider the Servants of the Paraclete v. Does grounds.   The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii)  new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred.

These three factors should influence the degree to which the Court restricts its review of a prior ruling, but they do not necessarily mean that the Court should always apply a deferential standard of review.   The Court should pause before applying a standard of review to its own interlocutory orders that is more deferential than the standard that the Court of Appeals will apply to it, unless the Court concludes that the alleged error in the prior ruling was harmless, or the party moving for reconsideration waived their right to appeal the alleged error by not raising the appropriate argument.   Even in circumstances where the Court concludes that it is insulated from reversal on appeal, there are principled reasons for applying a de novo standard.   After all, if the Court was wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result -- although the Court should weigh this injustice against any injustice that would result from upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

What the Court means by "restricting its review" is less about applying a deferential standard of review -- although that may be appropriate in some circumstances -- and more about reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party opposing the motion for reconsideration.  The Court should consider the time and expense that the party opposing reconsideration spent in winning the earlier ruling, and should try to prevent that party from having to bear the same impositions again.  Basically, even if the Court ultimately analyzes a motion to reconsider under the same standard that it analyzed the motion that produces the earlier ruling, it should analyze the motion in a different way -- one focused on reducing the litigation burdens of the party opposing reconsideration.  For example, when a party moves the Court for a preliminary injunction, standard practice is that the Court holds an evidentiary hearing as a matter of course, regardless whether it looks as if the party has a good chance of prevailing.  If the party loses and the Court denies the injunction, however, and the party moves for reconsideration, the party should not be entitled to the presumption of an evidentiary hearing merely because he or she received that presumption the first time the Court considered the motion.

In light of these statements, it is perhaps better to characterize the increased burden that a movant for reconsideration faces as one of production, and not of persuasion.  The Court analyzes motions to reconsider by picking up where it left off in the prior ruling -- not by starting anew.  Parties opposing reconsideration can do the same, and they may stand on whatever evidence and argument they used to win the earlier ruling.  Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the

evidence and argument they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they must convincingly refute both the counterarguments and evidence that the opposing party used to win the prior ruling and any new arguments and evidence that the opposing party produces while opposing the motion to reconsider.  Unlike the motion that produced the prior ruling, a motion to reconsider is not -- and is not supposed to be -- a fair fight procedurally.  The deck is stacked against a movant for reconsideration, and if such a movant hopes to prevail, he or she must have not only a winning legal position, but the work ethic and tenacity to single-handedly lead the Court to his or her way of thinking.

## LAW REGARDING CERTIFICATION TO THE TENTH CIRCUIT

Congress has given the Courts of Appeals "jurisdiction of appeals from all final decisions of the district courts of the United States."  28 U.S.C. § 1291.  The restriction of appellate review to final decisions "prevents the debilitating effect on judicial administration caused by piecemeal appellate disposition of what is, in practical consequence, but a single controversy."  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 170 (1974).  Various prescriptions for appeal from interlocutory rulings supplement the general rule requiring final decisions.  In 1958, Congress enacted 28 U.S.C. § 1292(b), which empowers the district courts to certify certain pivotal and debatable decisions for immediate review:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: Provided,

> however, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b).  The Supreme Court of the United States has understood the procedure that 28 U.S.C. § 1292(b) established to "confer on district courts first line discretion to allow interlocutory appeals."  Swint v. Chambers Cty. Comm'n, 514 U.S. 35, 47 (1995).

### 1.    Controlling Questions of Law.

Although the lower courts have provided various definitions of "controlling question of law," there are a few informal rules.  28 U.S.C. § 1292(b).  "Question of law" refers to a "question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine rather than to whether the party opposing summary judgment had raised a genuine issue of material fact."  Ahrenholz v. Bd. of Trustees of Univ. of Ill., 219 F.3d 674, 676 (7th Cir. 2000)(Posner, J.).  It does not include questions requiring a Court of Appeals to "delve beyond the surface of the record in order to determine the facts."  McFarlin v. Conseco Servs., LLC, 381 F.3d 1251, 1259 (11th Cir. 2004).  "The legal question must be stated at a high enough level of abstraction to lift the question out of the details of the evidence or facts of a particular case and give it general relevance to other cases in the same area of law."  McFarlin v. Conseco Servs., LLC, 381 F.3d at 1259.

A legal issue need not be dispositive to be controlling, but it must at least "materially affect the outcome of the case."  In re City of Memphis, 293 F.3d 345, 351 (6th Cir. 2002).  "A 'controlling question' has a broader definition than it is typically accorded in other situations, and it can include not only those issues that will resolve the action in its entirety but also those that are dispositive in other respects, such as whether a particular claim exists."  2 Fed. Proc., L.

Ed. § 3:215.   An issue that could determine the amount of recovery, for example, may be certified.   See Junco v. E. Air Lines, Inc., 399 F. Supp. 666, 667 (S.D.N.Y. 1975)(Knapp, J.)(certifying issue that could have "decisive effect" on the amount of recovery, which was the only remaining issue).   A controlling question of law would generally constitute reversible error on final appeal if the district court arrived at the wrong legal conclusion.   See P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp., 161 F. Supp. 2d 355, 358 (D.N.J. 2001)(Walls, J.).

Discovery issues do not often involve controlling questions of law.   See 10B Fed. Proc., L. Ed. § 26:958.   "Questions of this sort, involving the discretion of the judge in conducting pretrial discovery proceedings, should not be reviewed by an appellate court at this stage of a litigation except where there has been a manifest abuse of discretion."   Atl. City Elec. Co. v. A. B. Chance Co., 313 F.2d 431, 434 (2d Cir. 1963).   See White v. Nix, 43 F.3d 374 (8th Cir. 1994)("[T]he discretionary resolution of discovery issues precludes the requisite controlling question of law.").   See Dorato v. Smith, 2015 WL 10383662, at *44 (D.N.M. Dec. 11, 2015)(Browning, J.); Certain Underwriters at Lloyd's, London, Subscribing to Policy Number 501/NM03ACMB v. Nance, 2006 WL 4109675, at *3 (D.N.M. 2006)(Browning, J.)("The phrase 'question of law' as used in 28 U.S.C. § 1292(b) does not refer to a particular application of facts to the law, but rather 'has reference to a question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine.").

### 2.    Substantial Ground for Difference of Opinion.

Substantial ground for difference of opinion does not exist merely because courts have disagreed on an issue.

There is a substantial ground for difference of opinion which supports a certificate for an interlocutory appeal if a trial court rules in a manner which appears

contrary to the rulings of all courts of appeals which have reached the issue, if the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented.

2 Fed. Proc., L. Ed. § 3:218 (footnotes omitted)(collecting cases).  That a court confronts an issue of first impression does not present substantial ground for difference of opinion.  See Krangel v. Gen. Dynamics Corp., 968 F.2d 914, 916 (9th Cir. 1992); Dorato v. Smith, 2015 WL 10383662, at *34 (stating that confronting an issue of first impression does not mean that substantial ground for difference of opinion exists).  "The mere fact that a substantially greater number of judges have resolved the issue one way rather than another does not, of itself, tend to show that there is no substantial ground for difference of opinion."  Max Daetwyler Corp. v. Meyer, 575 F. Supp. 280, 283 (E.D. Pa. 1983)(Pollak, J.).  An attorney's contention that one precedent rather than another should apply does not merit interlocutory appeal.  See Singh v. Daimler-Benz, AG, 800 F. Supp. 260, 263 (E.D. Pa. 1992)(Newcomer, J.), aff'd, 9 F.3d 303 (3d Cir. 1993).

### 3.    Materially Advance the Litigation's Ultimate Termination.

Interlocutory review is appropriate "only in extraordinary cases where decision might avoid protracted and expensive litigation."  Robbins Co. v. Lawrence Mfg. Co., 482 F.2d 426, 429-30 (9th Cir. 1973).  An immediate appeal advances this termination if it "would (1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, or (3) eliminate issues to make discovery easier and less costly."  Coates v. Brazoria Cty. Tex., 919 F. Supp. 2d 863, 867 (S.D. Tex. 2013)(Costa, J.)(quoting Orson, Inc. v. Miramax Film Corp., 867 F. Supp. 319, 322 (E.D. Pa. 1994)(Joyner, J.)).  "When litigation will be conducted in substantially the same manner regardless of [the court's] decision, the appeal cannot be said to

materially advance the ultimate termination of the litigation."   In re City of Memphis, 293 F.3d at 351 (quoting White v. Nix, 43 F.3d at 378).

The determination whether an appeal will materially advance the litigation's termination "properly turns on pragmatic considerations, assessed by reviewing the 'procedural and substantive status of the case with respect to the progress or completion of discovery, the disposition of pretrial motions, the extent of the parties' preparation for trial, and the nature and scope of the requested relief.'" 2 Fed. Proc., L. Ed. § 3:219 (quoting Fed. Deposit Ins. Corp. v. First Nat. Bank of Waukesha, Wis., 604 F. Supp. 616, 620 (E.D. Wis. 1985)(Warren, J.)).  Cases appropriate for certification involve "a defense disputing the right to maintain the action," on which a decision could swiftly end the lawsuit.   Fed. Hous. Fin. Agency v. UBS Americas, Inc., 858 F. Supp. 2d 306, 337 (S.D.N.Y. 2012)(Cote, J.).   See Certain Underwriters at Lloyd's, London, Subscribing to Policy No. 501/NM03ACMB v. Nance, 2006 WL 4109675, at *3 (denying an interlocutory appeal after the Court had already decided the issue that the movant sought to appeal).

## LAW REGARDING CERTIFICATION TO THE SUPREME COURT OF NEW MEXICO

Rule 12-607 of the Rules of Appellate Procedure provides:

**A. Power to answer.**

(1) The Supreme Court may answer by formal written opinion questions of law certified to it by a court of the United States, an appellate court of another state, a tribe, Canada, a Canadian province or territory, Mexico or a Mexican state if the answer may be determinative of an issue in pending litigation in the certifying court and the question is one for which answer is not provided by a controlling:

> (a) appellate opinion of the New Mexico Supreme Court or the New Mexico Court of Appeals; or

(b) constitutional provision or statute of this state.

N.M.R.A. § 12-607(A)(1).   See, e.g., Walker v. United States, 2007-NMSC-038, ¶ 6, 162 P.3d 882, 885 (2007)(addressing questions that the United States Court of Federal Claims certified); Campos v. Murray, 2006-NMSC-020, ¶¶ 2-3, 134 P.3d 741, 742 (2006)(answering questions that the Honorable Bruce D. Black, United States District Judge for the United States District Court for the District of New Mexico, certified).   Federal courts have the option of determining what a state court would do if confronted with the same issue, see Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938), or of certifying the question to the state appellate court for review, see Allstate v. Stone, 1993-NMSC-066, ¶ 1, 863 P.2d 1085, 1086 ("This matter comes before us by way of certification from the United States District Court for the District of New Mexico.").   See Lehman Bros. v. Schein, 416 U.S. 386, 390-91 (1974)("The decision to certify a question to the state supreme court 'rests in the sound discretion of the federal court.'").

Pursuant to N.M. Stat. Ann. § 39-7-4, the Supreme Court may answer questions that the federal district court certifies to it only "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision or statute of this state."   N.M. Stat. Ann. 1978, § 39-7-4.   See N.M.R.A. 12-607(A); Swink v. Fingado, 1993-NMSC-013, ¶ 1 n.1, 850 P.2d 978, 979 n.1 (citing the pre-1997 provision).   In explaining when it will accept certification from a federal court, the Supreme Court of New Mexico has noted:

> To date, we by and large have limited our acceptance of certifications prior to judgment to those cases in which there is no dispute over the factual predicates to the Court's determination of the questions certified, and our answer either disposes of the entire case or controversy, or disposes of a pivotal issue that defines the future course of the case.

Schlieter v. Carlos, 1989-NMSC-037, ¶ 5, 775 P.2d 709, 710-11.  One federal magistrate judge has stated that litigation is not pending under this statute when the district court "has already ruled upon the issue for which [the party] seek[s] certification."   Hartford Ins. Co. of the Midwest v. Cline, 367 F. Supp. 2d 1342, 1344 (D.N.M. 2005)(Smith, M.J.).

In Stoner v. New York Life Insurance Co., 311 U.S. 464 (1940), the Supreme Court of the United States explained that, "in cases where jurisdiction rests on diversity of citizenship, federal courts, under the doctrine of Erie Railroad Co. v. Tompkins . . . [,] must follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently."  311 U.S. at 467.  "In particular, this is true where the intermediate state court has determined the precise question in issue in an earlier suit between the same parties, and the highest court of the state has refused review."  Stoner v. New York Life Insurance Co., 311 U.S. at 467.  See Adams-Arapahoe Joint School Dist. No. 28-J v. Continental Ins. Co., 891 F.2d 772, 774 (10th Cir. 1989)("With respect to issues which the Colorado Supreme Court has not addressed, we may consider all available resources, including Colorado appellate court decisions, other state and federal decisions, and the general trend of authority, to determine how the Colorado Supreme Court would construe the law in this case.").  The Tenth Circuit explained in Wade v. Emcasco Insurance Co., 483 F.3d 657 (10th Cir. 2007):

> In cases arising under diversity jurisdiction, the federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to ascertain and apply the state law. . . .   The federal court must follow the most recent decisions of the state's highest court. . . .   Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. . . .   In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state . . . . [,] appellate decisions in other states with similar legal principles . . . . [,] district court decisions interpreting the law of the state in question, . . . and the general weight and trend of authority in the relevant area of law. . . .   Ultimately, however, the Court's task is to predict what the state

supreme court would do.  Our review of the district court's interpretation of state law is de novo.

483 F.3d at 665-66 (internal citations and quotation marks omitted).

The Tenth Circuit generally "will not certify questions to a state supreme court when the requesting party seeks certification only after having received an adverse decision from the district court."   Massengale v. Okla. Bd. of Exam'rs in Optometry, 30 F.3d 1325, 1331 (10th Cir. 1994).   See Armijo v. Ex Cam, Inc., 843 F.2d 406, 407 (10th Cir. 1988)(noting that "[c]ertification is not to be routinely invoked whenever a federal court is presented with an unsettled question of state law" and that "the plaintiff did not request certification until after the district court made a decision unfavorable to her"); Boyd Rosene & Assoc., Inc. v. Kan. Mun. Gas Agency, 178 F.3d 1363, 1364 (10th Cir. 1999)("Late requests for certification are rarely granted . . . and are generally disapproved, particularly when the district court has already ruled."); Harvey E. Yates Co. v. Powell, 98 F.3d 1222, 1229 n.6 (10th Cir. 1996)(denying request for certification in removed case where the moving party had not moved for certification in the district court and had received an adverse ruling).  See Martinez v. Martinez, 2013 WL 3270448, at *47 (D.N.M. June 3, 2013)(Browning, J.)(declining to certify a question when the Court could interpret New Mexico precedent); Arnold v. Farmers, Ins. Co. of Ariz., 827 F. Supp. 2d 1289, 1297 (D.N.M. 2011)(Browning, J.)(refusing to certify a question after the Court had already ruled on it).

## ANALYSIS

The Court thoroughly considered the issues that Zurich Insurance raises in its Motion, so the Court therefore denies Zurich Insurance's request to change the Court's ruling that New Mexico's Oilfield Anti-Indemnity Statute does not void the Master Contract.  The Court will,

however, amend its order to clarify Zurich Insurance's obligations. Because Zurich Insurance does not meet § 1292(b)'s requirements for an interlocutory order, the Court will not amend its MSJ MOO to allow Zurich Insurance to seek an interlocutory appeal. Similarly, because the Court has already ruled that the indemnity provisions are valid, it will not certify the issue to the Supreme Court of New Mexico.

**I.      THE COURT WILL NOT CAHNGE THE CORE RULINGS IN ITS MSJ MOO.**

Zurich Insurance faces an uphill battle in asking the Court to reconsider the basis for its entire fifty-three-page opinion. See Anderson Living Trust v. WPX Energy Prod., LLC, 312 F.R.D. 620, 647 (D.N.M. 2015)(Browning, J.)("Anderson Living Trust")(noting that a movant "faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling"). The Court's determination about § 56-7-2(A)(3)'s scope provides the basis for the Court's ruling New Mexico's Oilfield Anti-Indemnity Statute does not void the Master Contract and the Zurich Policy. See MSJ MOO at 33-45. Although Zurich Insurance correctly notes that the Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides, "a district court can use whatever standard it wants to review a motion to reconsider an interlocutory order." Anderson Living Trust, 312 F.R.D. at 647. Zurich Insurance does not meet the Court's criteria for reconsidering interlocutory orders.

Under the Court's first criterion, it considers how thoroughly the Court addressed the conclusions that the Motion challenges. See Anderson Living Trust, 312 F.R.D. at 647. Zurich Insurance does not show that the Court did not thoroughly consider the issues that Zurich Insurance now raises. That Zurich Insurance did not raise the issues in its briefing does not mean that the Court did not consider the issues. The Court recognized that the prior New Mexico cases

analyzed § 56-7-2(A)(1) and (2), and expressly acknowledged that the Wyoming statute contained linguistic differences. See MSJ MOO at 44 n.16. With this information in mind, the Court derived its conclusion only after it traced New Mexico's case law from the earliest decision to the most recent, see MSJ MOO at 33-35, considered how the Tenth Circuit has interpreted similar language in Wyoming's anti-indemnity statute, see MSJ MOO at 35-36, 43-44, compared New Mexico's Oilfield Anti-Indemnity Statute to the Construction Anti-Indemnity Statute, because New Mexico courts interpret the statutes to further the same policy, see MSJ MOO at 36-40, and contemplated which interpretation would best further New Mexico's stated policy of increasing safety at well sites by requiring each party to be responsible for its own negligence, see MSJ MOO at 40-42. In short, the Court not only considered the issues that Zurich Insurance now raises, but it considered them thoroughly and nonetheless arrived at the conclusion with which Zurich Insurance disagrees.

Second, the Court considers the case's overall progress and posture, including the Motion's timeliness relative to the MSJ MOO. See Anderson Living Trust, 312 F.R.D. at 648. Zurich Insurance filed its Motion in a timely manner, which suggests that XTO Energy has not relied to its detriment on the Court's MSJ MOO. See Reply at 5. The Court also acknowledges that the parties briefed and argued the summary judgment issues "before any meaningful discovery had taken place," and instead focused primarily on legal analysis and the few documents at issue. Reply at 5. The Court's MSJ MOO, however, addressed the case's main legal issues: "whether the Master Service Contract . . . between Plaintiff XTO Energy, Inc. and Defendant Air Tech Drilling, Inc. violates the New Mexico Oilfield Anti-Indemnity Statute," and "whether the New Mexico Oilfield Anti-Indemnity Statute voids the commercial general liability

policy . . . between Zurich Insurance and Air Tech."  MSJ MOO at 1.  Zurich Insurance has agreed that "the whole issue boils down to whether the savings clause reforms the indemnity provisions to comply with 56-7-2."  Tr. at 44:16-19 (Johansen).  The parties also devoted significant time and energy into writing their briefs and arguing their positions before the Court, even if they did so before substantial discovery occurred.  See Response at 6.

Third, Zurich Insurance does not demonstrate that any of the Servants of the Paraclete v. Does factors are present: (i) new controlling authority; (ii) new evidence; or (iii) a clear indication that the Court erred.  See Anderson Living Trust, 312 F.R.D. at 648.  Zurich Insurance presents no new controlling authority.  It brings no new evidence.  Finally, it does not demonstrate that the Court clearly erred.  In fact, its request for certification and interlocutory appeal reflect that the Court did not clearly err, because at the same time, Zurich Insurance maintains that substantial difference of opinion exists regarding § 56-7-2(A)(3)'s scope.  See Motion at 8 ("It is also beyond dispute that there is substantial ground for difference of opinion on the issue.").  If such substantial difference of opinion exists as Zurich Insurance suggests, then no error "manifests itself without the need for in-depth analysis or review of the facts." Anderson Living Trust, 312 F.R.D. at 648.

The Court agrees that erroneous decisions should not stand, but the Court's decision faithfully applied New Mexico law to predict how the Supreme Court of New Mexico would rule on the issues before the Court.  See Anderson Living Trust, 312 F.R.D. at 648 ("[I]f the Court was wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result . . . .").  Accordingly, even if the Court reconsidered its rulings, it would not modify them.  Zurich Insurance's main argument for reconsideration is that the Court is writing on a clean slate and

does not have to consider prior New Mexico decisions in determining § 56-7-2(A)(3)'s scope, because those decisions did not specifically analyze the language at issue. See Motion at 5. The Court addressed Zurich Insurance's contentions in its MSJ MOO, however.

As the Court stated in its MSJ MOO, the Court is not writing on a clean slate. See MSJ MOO at 33. New Mexico courts have interpreted New Mexico's Anti-Indemnity Statute, which includes § 56-7-2(A)(3), on numerous occasions. See Pina v. Gruy Petroleum Mgmt. Co., 2006-NMCA-063, ¶ 10, 136 P.3d 1029, 1031-32; Guitard v. Gulf Oil Co., 1983-NMCA-103, ¶ 19, 670 P.2d 969, 973 ("Guitard"); Amoco Prod. Co. v. Action Well Service, Inc., 1988-NMSC-040, ¶ 9, 755 P.2d at 55. Although those New Mexico courts did not expressly analyze (A)(3)'s language, they interpreted the statute's meaning as a whole. See Amoco Prod. Co. v. Action Well Service, Inc., 1988-NMSC-040, ¶ 7, 755 P.2d at 54 (observing that the "court in Guitard construed the provisions of our statute to mean that an indemnitee cannot contract away liability for its own percentage of negligence")(emphasis added). This interpretation led these New Mexico courts to conclude that § 56-7-2, which includes § 56-7-2(A)(3), "permit[s] indemnity agreements that do not purport to relieve the indemnitee from liability for its own negligence." Pina v. Gruy Petroleum Mgmt. Co., 2006-NMCA-063, ¶ 10, 136 P.3d at 1031-32 (discussing Guitard, 1983-NMCA-103, ¶ 19, 670 P.2d. at 973).

The Master Contract does not purport to relieve XTO Energy of its own negligence. See Master Contract § 10.4; MSJ MOO at 5. Instead, it seeks to indemnify XTO Energy for Air Tech's negligence, for which XTO Energy may be held liable. See Tr. at 34:15-19 (Ramirez)("XTO does not require ATD to indemnify it for any of XTO's, or the XTO Group's, sole or concurrent negligence. It's only for ATD's potential responsibility at the end of the

- 38 -

case.").  In 2006, the Court of Appeals of New Mexico reiterated the statute's policy of giving "[b]oth the operator [indemnitee] and the subcontractor [indemnitor]" the "incentive to monitor the safety of the operation knowing that they will be responsible for their respective percentage of negligence."  Pina v. Gruy Petroleum Mgmt. Co., 2006-NMCA-063, ¶ 10, 136 P.3d at 1031-32 (alterations in original).  Moreover, New Mexico courts have allowed indemnity agreements, like this one, that "require the indemnitor to indemnify the indemnitee only for the indemnitor's percentage of negligence."  Pina v. Gruy Petroleum Mgmt. Co., 2006-NMCA-063, ¶ 10, 136 P.3d at 1031-32.  The only way to fulfill New Mexico's stated policy of holding each party responsible for its own negligence is to read § 56-7-2(A)(3) to allow the Master Contract's indemnity provisions, which seek to hold each party responsible for its own negligence.  See MSJ MOO at 35 (concluding that the only way to faithfully comply with the Supreme Court of New Mexico's plain language and to facilitate New Mexico's public policy "requires the Court to read § 56-7-2(A)(3) to preclude only those agreements that purport to indemnify the indemnitee for its own direct negligence, and not negligence attributed to it by virtue of vicarious liability").

As the Court stated in its MSJ MOO, interpreting § 56-7-2(A)(3) to make operators strictly liable for their contractors' actions would not provide contractors with the proper incentive to conduct their operations safely.  See MSJ MOO at 33.  In response, Zurich Insurance argues that contractors have the proper safety incentive, because contractors "can be held liable for their own share of fault."  Motion at 3.  Zurich Insurance therefore agrees that holding contractors liable for their own fault provides them with a proper safety incentive.  At the same time, however, Zurich Insurance admits that contractors cannot be sued when they employ the

injured plaintiff, because New Mexico's Workers' Compensation Act, N.M. Stat. Ann. § 52-1-1 to 52-10-1, provides an injured employee's exclusive remedy. See Motion at 3. Notably, when an operator hires a contractor to perform certain work, the contractor's employees will often, if not always, perform the work, exposing the contractor's employees -- not the operator's employees -- to injury. Because contractors' employees are the most exposed to injury, yet contractors cannot be held liable for their employees' injuries under the New Mexico's Workers' Compensation Act, contractors need a proper safety incentive in these situations.

This case's facts illustrate this situation. Here, Air Tech is shielded from liability on account of its employer status. See Motion at 3. Consequently, the Manleys and Betancurs did not name Air Tech as a defendant in the underlying case. If the Manleys and Betancurs prevail on their joint-and-several-liability claim, XTO Energy -- not Air Tech -- will be responsible for Air Tech's negligence. This case therefore demonstrates that, when contractors cannot be held liable to injured employees, contractors may not have the proper safety incentive if they cannot be required to indemnify operators for their own negligence. In other words, the only way to fulfill the statute's policy of creating safety incentives by holding each party "responsible for their respective percentage of negligence" is to permit the indemnity agreement holding Air Tech responsible for its own negligence. Pina v. Gruy Petroleum Mgmt. Co., 2006-NMCA-063, ¶ 10, 136 P.3d at 1031-32. As the Court explained in its MSJ MOO, this interpretation also aligns with the Supreme Court of New Mexico's interpretation of New Mexico's Construction Anti-Indemnity Statute. See MSJ MOO at 36-37. In relation to that statute, which New Mexico

courts interpret to fulfill the same policy goals as the Oilfield Anti-Indemnity Statute,[7] the Supreme Court of New Mexico allows indemnitors "to indemnify for causes of action that arise from the indemnitor's own negligent conduct . . . . [to] promot[e] safety in construction projects by holding each party to the contract accountable for injuries caused by its own negligence." Safeway Inc. v. Rooter 2000 Plumbing and Drain SSS, 2016 WL 683814, at *15 (N.M. Feb. 18, 2016)(quoting City of Albuquerque v. BPLW Architects & Engineers, Inc., 2009-NMCA-081, ¶ 19, 722, 213 P.3d 1146, 1153).

Zurich Insurance's admission that financial liability serves as a proper safety incentive demonstrates that Air Tech would be incentivized to conduct its operations more safely if it cannot pass off its liability to XTO Energy. Prohibiting indemnity agreements like the Master Contract would remove contractors' incentive to adequately protect their employees: contractors would know that they could neither be sued nor held responsible for indemnifying the operator for their fault. Accordingly, Zurich Insurance's policy arguments are unpersuasive. As New Mexico courts have emphasized for decades, holding each party accountable for its own negligence fulfills New Mexico's important policy of creating proper safety incentives. See Pina v. Gruy Petroleum Mgmt. Co., 2006-NMCA-063, ¶ 10, 136 P.3d at 1031-32; Guitard v. Gulf Oil Co., 1983-NMCA-103, ¶ 19, 670 P.2d at 973; Amoco Prod. Co. v. Action Well Service, Inc., 1988-NMSC-040, ¶ 9, 755 P.2d at 55. In its MSJ MOO, the Court fully considered the issues Zurich Insurance now raises and, after extensive research and analysis, concluded that the Master

---

[7]In United Rentals Northwest, Inc. v. Yearout Mechanical, Inc., 2010-NMSC-030, 237 P.3d 728, the Supreme Court of New Mexico directed courts to interpret the two statutes to further the same policy. See 2010-NMSC-030, ¶¶ 27-28, 237 P.3d at 736. Specifically, it stated that there is "no reason to conclude that the New Mexico Legislature intended to create different protections for mine workers and construction workers." 2010-NMSC-030, ¶¶ 27-28, 237 P.3d at 736.

Contract's indemnity provisions do not violate § 56-7-2(A)(3).  Even if the Court began its analysis anew, New Mexico case law and public policy drives the Court to reach the same conclusion.

## II.    THE COURT WILL CLARIFY THE MSJ MOO'S ORDER.

Zurich Insurance asks the Court to clarify its order, which currently states that "§ 56-7-2 does not void the Zurich Insurance Policy to the extent that it requires Zurich Insurance to indemnify XTO Group members for claims that do not arise from their own negligence, and to defend and reimburse XTO Group members for defense costs."  MSJ MOO at 51.  In response to XTO Energy's remarks, Zurich Insurance explains that it does not ask the Court to omit the phrase: "to defend and reimburse XTO Group members for defense costs."  Reply at 5-6.  It asks only that the Court rephrase part of its order to state that "§ 56-7-2 does not void the Zurich Policy to the extent that it requires Zurich to indemnify XTO Group members for any vicarious liability imposed upon them arising from the negligence of Air Tech . . . ."  Reply at 6 (emphasis added to reflect Zurich Insurance's proposed alteration).

The Court will clarify its order to state that § 56-7-2 does not void the Zurich Policy to the extent that it requires Zurich Insurance to indemnify XTO Group members for any liability imposed upon them arising from Air Tech's fault, and to defend and reimburse XTO Group members for defense costs.[8]  This phraseology better reflects the Court's intended order by

---

[8]To further New Mexico's public policy of requiring each party to take responsibility for its own negligence, the Court concluded that the Master Contract was valid, because it required each party to take such responsibility.  See MSJ MOO at 45.  The Master Contract does not require Air Tech to indemnify XTO Energy for XTO Energy's own fault.  See MSJ MOO at 45 n.17 (asserting that "[i]ndemnity might not be available if the state court determines that XTO Energy was entirely at fault").  Accordingly, if XTO Energy was at fault in supervising or directing Air Tech's actions, or if XTO Energy failed to take adequate safety precautions while

stating it more precisely.  See MSJ MOO at 35 (stating that the only way to faithfully comply with New Mexico case law and to facilitate New Mexico's public policy is "to read § 56-7-2(A)(3) to preclude only those agreements that purport to indemnify the indemnitee for its own direct negligence").  The MSJ MOO's statutory and policy analysis determined only that the Master Contract and Zurich Policy did not violate § 56-7-2, because they did not require Air Tech or Zurich Insurance to indemnify XTO Energy for its own fault.  See MSJ MOO at 45 n.17. The Court then interpreted the Zurich Policy to determine Zurich Insurance's indemnity and defense obligations.  See MSJ MOO at 47-49.  Zurich Insurance's obligations derive entirely from the Zurich Policy, which provides coverage: (i) to the "Named Insured," Air Tech, MSJ

---

performing an inherently dangerous activity without any fault on Air Tech's part, the Master Contract does not require Air Tech "to provide any indemnity for any fault that [XTO Energy] may be held to have at the end of the jury trial."  Tr. at 31:15-17 (Ramirez).  See Tr. at 34:1-3 (Ramirez)(asserting that the "indemnity provision [] asks ATD to answer for its own negligence and its own faulty work"); id. at 56:22-25 (Ramirez)(asserting that XTO Energy does not request indemnity for any XTO Group member's fault); id. at 13:1-3 (Johansen)(explaining that XTO Energy interpreted the Master Contract to not to require indemnity for "XTO's share of fault"). Because the Master Contract does not require Air Tech to indemnify XTO Energy for its share of fault, and requires Air Tech to indemnify XTO Energy only for Air Tech's fault, the Master Contract is fulfills New Mexico's policy of requiring each party to be responsible for its own fault.  See MSJ MOO at 44 (describing New Mexico's policy of "mak[ing] each party responsible for their own fault").

The Court's original statement that the Master Contract does not violate § 56-7-2 to the extent that it does not require indemnity for one's own negligence was overbroad.  The more accurate statement, which aligns with the MSJ MOO's analysis, is that New Mexico law does not void the Master Contract to the extent that it requires Air Tech to indemnify XTO Energy for liability arising from Air Tech's fault, as long as it does not allow XTO Energy to be indemnified for its own fault.  The Master Contract does not violate New Mexico law, because it does not require such indemnity.  As the Court explained, however, vicarious liability does not involve XTO Energy's own direct negligence, so § 56-7-2 does not prohibit Air Tech from indemnifying XTO Energy for XTO Energy's vicarious liability.  See MSJ MOO at 44 ("Because New Mexico courts seek to make each party responsible for their own fault . . . , the Court concludes that New Mexico would similarly interpret § 56-7-2(A)(3) to preclude indemnity only when the indemnitee was directly negligent, and not when the indemnitee was liable in respondeat superior . . . .").

MOO at 6; and (ii) to "Additional Insureds," the XTO Group, MSJ MOO at 6-7, 48.   As to

Additional Insureds, the Zurich Policy provides coverage for their "tort liability," defined as "a

liability that would be imposed by law in the absence of any contract or agreement," where the

insured assumes that liability under an "insured contract."   MSJ MOO at 7-8, 48.   Furthermore, it

provides coverage to Additional Insureds

> only with respect to liability for "bodily injury", "property damage" . . . caused, in
> whole or in part, by: 1. Your acts or omissions; 2. The acts or omissions of those
> acting on your behalf, and resulting directly from your ongoing operations of
> "your work" as included in the "products-completed operations hazard", which is
> the subject of the written contract or written agreement.

MSJ MOO at 7 (emphasis added).   Throughout the Zurich Policy, "the words 'you' and 'your'

refer to the Named Insured shown in the Declarations and any other person or organization

qualifying as a Named Insured under this policy."   MSJ MOO at 6.   Similarly, "Your work" is

defined, in relevant part, as "Work or operations performed by you or on your behalf," again

referring to Air Tech.   Reply at 7 (citing the Zurich Policy).   The Zurich Policy's coverage for

the XTO Group, an Additional Insured, is thus limited to "tort liability" arising from the Named

Insured Air Tech's tortious conduct.

In conclusion, the Zurich Policy does not require Zurich Insurance to indemnify XTO

Energy for other contractors' fault for which XTO Energy may be liable.   XTO Energy informed

the Court that it seeks indemnity only for Air Tech's fault, for which XTO Energy may be held

liable.   See Tr. at 34:15-19 (Ramirez)("XTO does not require ATD to indemnify it for any of

XTO's, or the XTO Group's, sole or concurrent negligence.   It's only for ATD's potential

responsibility at the end of the case."); id. at 56:22-25 (Ramirez)(explaining that XTO Energy

did not seek indemnity for Weatherford's or Basic's fault); id. at 37:7-12 (Ramirez)(asserting

that the issue before the Court is "whether or not XTO can go back and recover" from Air Tech/ATD if "ATD is found negligent, and ATD is deemed to be at fault and contributing to the damages").   The Zurich Policy requires only that Zurich Insurance indemnify XTO Group members for tort liability arising from Air Tech's fault.   The public policy rationale behind the Court's interpretation of § 56-7-2 supports this analysis.

**III.   THE COURT WILL NOT AMEND ITS MSJ MOO TO ALLOW AN INTERLOCUTORY APPEAL.**

The Court will deny Zurich Insurance's request for an interlocutory appeal.   District judges may certify an order to the Courts of Appeals when they determine "that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."   28 U.S.C. § 1292(b).   See Dorato v. Smith, 2015 WL 10383662, at *44 (D.N.M. Dec. 11, 2015)(Browning, J.).   This case does not satisfy these conditions.

First, an interlocutory appeal must involve a controlling "question of law."   28 U.S.C. § 1292(b).   The question involved in the Court's MSJ MOO could possibly be stated at a high enough level of generality to be a controlling question of law, but Zurich Insurance has not stated the question in such a general way.   See Certain Underwriters at Lloyd's, London, Subscribing to Policy Number 501/NM03ACMB v. Nance, 2006 WL 4109675, at *3 (D.N.M. 2006)(Browning, J.)("The phrase 'question of law' as used in 28 U.S.C. § 1292(b) does not refer to a particular application of facts to the law, but rather 'has reference to a question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine.'"); Ahrenholz v. Bd. of Trustees of Univ. of Ill., 219 F.3d at 676 (stating that a "question of law" involves a "question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine").

The question that Zurich Insurance wants to appeal is fact-intensive.  <u>See</u> Motion at 8.

Specifically, Zurich Insurance asks to appeal "whether § 56-7-2(A)(3) voids the Contractor

obligations XTO seeks to enforce."  Motion at 8.  Perhaps Zurich Insurance could have proposed

a superior, more legal question, and perhaps the Court could do the work for Zurich Insurance,

but Zurich Insurance proposed a more case-specific question.  The Court will not craft a question

on Zurich Insurance's behalf.

Zurich Insurance's question asks the Tenth Circuit to "delve beyond the surface of the

record in order to determine the facts."  <u>McFarlin v. Conseco Servs., LLC</u>, 381 F.3d at 1259.  It

requires the Tenth Circuit to interpret not only § 56-7-2(A)(3), but also the Master Contract's

indemnity provisions.  "The legal question must be stated at a high enough level of abstraction to

lift the question out of the details of the evidence or facts of a particular case and give it general

relevance to other cases in the same area of law."  <u>McFarlin v. Conseco Servs., LLC</u>, 381 F.3d at

1259.  Zurich Insurance's question may be central to the dispute, but it is not a controlling

question of law under § 1292(b).  "Irrespective whether the resolution of a particular question

will materially advance the litigation, only questions of law are appropriate for interlocutory

review."  <u>Certain Underwriters at Lloyd's, London, Subscribing to Policy Number</u>

<u>501/NM03ACMB v. Nance</u>, 2006 WL 4109675, at *4 (citing <u>Harrison Svenska AB v. Harris</u>

<u>Corp.</u>, 947 F.2d 627, 631 (2d Cir. 1991)).  Although the fact-based question that Zurich

Insurance proposes no doubt will advance the case, it is not a pure question of law.

Second, Zurich Insurance has not shown that substantial ground for difference of opinion

exists.  Uncertain precedent, especially in the face of conflicting opinions, may be one element

that suggests that substantial ground for difference of opinion exists.  <u>See</u> <u>Adams v. Cyprus</u>

Amax Minerals Co., 149 F.3d 1156, 1157-58 & n.1 (10th Cir. 1998)(allowing an interlocutory appeal where four circuits had ruled on the issue presented but the Tenth Circuit had not). Nevertheless, that a court confronts an issue of first impression does not mean that substantial ground for difference of opinion exists.   See Dorato v. Smith, 2015 WL 10383662, at *34; Krangel v. Gen. Dynamics Corp., 968 F.2d at 916.   Here, no substantially conflicting case law exists.   Rather, New Mexico courts have consistently and repeatedly interpreted § 56-7-2 to allow indemnity agreements that do not indemnify an indemnitee for its own negligence.   See MSJ MOO at 35.   Although these opinions have not directly considered § 56-7-2(A)(3)'s language, the New Mexico cases have considered § 56-7-2 as a whole, and the opinions provide insight into how New Mexico courts would interpret that provision.   See MSJ MOO at 33 (citing Pina v. Gruy Petroleum Mgmt. Co., 2006-NMCA-063, ¶ 10, 136 P.3d at 1031-32).   After reviewing substantial case law in the Court's MSJ MOO, the Court predicted how the Supreme Court of New Mexico would interpret that provision and whether the provision would invalidate the Master Contract.   See MSJ MOO at 33 (stating that "[t]he Court must apply the law as the Supreme Court of New Mexico would apply it").   That Zurich Insurance disagrees with the Court's conclusion does not mean that substantial ground for difference of opinion exists under § 1292(b).   Zurich Insurance does not point to an on-point case, from any court, with which the Court had to disagree.   It does not point to a concurring or dissenting opinion, or even to a law review article.   Indeed, the only one that appears to hold Zurich Insurance's view is Zurich Insurance.   A disagreement of one is not enough to create a substantial ground for difference of opinion.

- 47 -

Finally, Zurich Insurance does not show that an interlocutory appeal will materially advance the litigation's ultimate termination.  The Court already decided any controlling question of law in its MSJ MOO.  Although the question "materially affect[ed] the outcome of litigation in the district court" when the Court decided the issue, In re Cement Antitrust Litig. (MDL No. 296), 673 F.2d 1020, 1026 (9th Cir. 1981), no controlling question of law remains to be decided.  Moreover, the Court's denial of Zurich Insurance's summary judgment motion will not lead to protracted litigation and extensive discovery.  The case has been streamlined and can be resolved quickly.  XTO Energy asserts that "the pending action boils down to the parties entering into a protective order so that they can share information and determine how much Zurich will pay for XTO's and the XTO Group members' defense."  Response at 9.  See id. at 10 (asserting that "the remaining issues to be litigated are minimal" and involve only "Zurich's obligations to pay for XTO and XTO Group members' defense and how the parties can ensure protection of information they share").  It is almost solely in Zurich Insurance's control whether it wants to appeal the case.  It has lost the big issues in the case.  It can wrap up the details here and have the Court enter a final judgment.  If it wants to fight over the details, it can, but Zurich Insurance -- not the Court -- is delaying the case's resolution.  Zurich Insurance is trying to appeal the Court's ruling, not save the Court any work.

An interlocutory appeal will only prolong the district court litigation and the time before which Zurich Insurance may appeal.  Zurich Insurance already had the opportunity to make its arguments in support of its summary judgment motion.  If Zurich Insurance disagrees with the Court's application of the law to this case's facts, it may raise its arguments on appeal once the Court enters final judgment, which the Court will most likely do soon.  See Certain Underwriters

- 48 -

at Lloyd's, London, Subscribing to Policy Number 501/NM03ACMB v. Nance, 2006 WL
4109675, at *3 (denying an interlocutory appeal after the Court had already decided the issue
that the movant wanted to appeal). The Honorable Richard Posner, Circuit Court Judge for the
United States Court of Appeals for the Seventh Circuit, emphasizes that a "denial of summary
judgment is a paradigmatic example of an interlocutory order that normally is not appealable."
Ahrenholz v. Bd. of Trustees of Univ. of Ill., 219 F.3d at 676. The Court agrees with Judge
Posner's statement as it applies to this case and will therefore not amend its MSJ MOO to allow
Zurich Insurance to appeal under § 1292(b).

## IV.   THE COURT WILL NOT CERTIFY A QUESTION TO THE SUPREME COURT OF NEW MEXICO.

Zurich Insurance asks the Court to certify the following question to the Supreme Court of
New Mexico: "Does the broad language of NMSA § 56-7-2(A)(3) void only those
indemnification agreements that require the indemnitor to indemnify the indemnitee against its
own negligence?" Motion at 9. Zurich Insurance asserts that "no New Mexico appellate court
has been asked to construe § 56-7-2(A)(3)" and that "the question is dispositive of this
litigation." Motion at 9.[9]

---

[9]The Court did not hold that § 56-7-2(A)(3) voided only those indemnification
agreements that require the indemnitor to indemnify the indemnitee against its own negligence.
Rather, it concluded that § 56-7-2(A)(3) would permit an indemnity agreement, like the one at
issue here, that did not indemnify the indemnitee for the indemnitee's own fault. See MSJ MOO
at 44 (explaining that "New Mexico courts seek to make each party responsible for their own
fault"); id. at 45 n.17 (explaining that XTO Energy cannot be indemnified for its own fault and
that the "Court determines only that the Master Contract as written does not violate New Mexico
law").

Any statement that § 56-7-2 prohibits "only" certain agreements were in the context of
vicarious liability. MSJ MOO at 43-44. The Court explained that, if a contract indemnified an
indemnitee for negligence, § 56-7-2 would prohibit "only" those agreements that indemnified an
indemnitee for its own direct negligence "and not when the indemnitee was liable in respondeat

Under N.M. Stat. Ann. § 39-7-4, the Supreme Court may answer questions that the federal district court certifies to it only "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision or statute of this state." N.M. Stat. Ann. 1978, § 39-7-4 (emphasis added). Because the Court already decided this case's controlling issue -- that § 56-7-2(A)(3) permits the Master Contract's indemnity provisions, because they do not require the indemnitor to indemnify an indemnitee against its own fault, see MSJ MOO at 36 -- the issue is no long "pending" under § 39-7-4. Hartford Ins. Co. of the Midwest v. Cline, 367 F. Supp. 2d at 1344 (stating that litigation is not pending under § 39-7-4 when the district court "has already ruled upon the issue for which [the party] seek[s] certification"). It is true that an interlocutory order can always be reversed, but the issue is no longer pending in any practical sense. The Court has done its work. The dispute is over.

The Court followed Supreme Court and Tenth Circuit precedent, which give courts the duty to predict how the state's supreme court will rule on an issue. See Stoner v. New York Life Insurance Co., 311 U.S. at 467; Adams-Arapahoe Joint School Dist. No. 28-J v. Continental Ins. Co., 891 F.2d at 774. As directed, the Court: (i) "follow[ed] the most recent decisions of the state's highest court"; and (ii) sought "guidance from decisions rendered by lower courts in the relevant state . . . . appellate decisions in other states, . . . and the general weight and trend of

---

superior." MSJ MOO at 44. See MSJ MOO at 35 (explaining that "the Supreme Court of New Mexico sought to void only those agreements where the indemnitor seeks indemnity for its own direct negligence and not for those accidents where it is vicariously liable for the indemnitor's negligence"). In sum, § 56-7-2(A)(3) may void other agreements, but it does not avoid agreements like the Master Contract that do not require indemnity for one's own fault. This distinction does not change the Court's ruling, but makes its ruling as precise as possible to avoid further need for clarification.

authority in the relevant area of law." <u>Wade v. Emcasco Insurance Co.</u>, 483 F.3d at 665-66 (internal citations and quotation marks omitted).  <u>See</u> <u>Rimbert v. Eli Lilly and Co.</u>, 577 F. Supp. 2d 1174, 1214 (D.N.M. Aug. 22, 2008)(Browning, J.)(declining to certify a legal question and noting that the "Court's task is to consider [New Mexico Courts of Appeals] opinions carefully and determine whether there is a good indication of how the Supreme Court of New Mexico would rule if the question was presented to it").

Moreover, Zurich Insurance requests certification only after the Court ruled against it. The Tenth Circuit generally "will not certify questions to a state supreme court when the requesting party seeks certification only after having received an adverse decision from the district court."  <u>Massengale v. Okla. Bd. of Exam'rs in Optometry</u>, 30 F.3d 1325, 1331 (10th Cir. 1994).  <u>See</u> <u>Armijo v. Ex Cam, Inc.</u>, 843 F.2d 406, 407 (10th Cir. 1988)(noting that "[c]ertification is not to be routinely invoked whenever a federal court is presented with an unsettled question of state law" and that "the plaintiff did not request certification until after the district court made a decision unfavorable to her"); <u>Boyd Rosene & Assoc., Inc. v. Kan. Mun. Gas Agency</u>, 178 F.3d 1363, 1364 (10th Cir. 1999)("Late requests for certification are rarely granted . . . and are generally disapproved, particularly when the district court has already ruled."); <u>Harvey E. Yates Co. v. Powell</u>, 98 F.3d 1222, 1229 n.6 (10th Cir. 1996)(denying request for certification in removed case where the moving party had not moved for certification in the district court and had received an adverse ruling).  Zurich Insurance was aware of the state of New Mexico case law when it filed for summary judgment.  It could have sought certification when it realized that no New Mexico appellate courts have interpreted § 56-7-2(A)(3)'s language.  Instead, Zurich Insurance argued its position, causing the Court and both of the parties

to incur substantial costs researching, writing, and arguing.  After losing, Zurich Insurance now insists that insufficient authority exists to determine the proper answer.  The Court will not exercise its discretion to now certify Zurich Insurance's question to the Supreme Court of New Mexico.  See Martinez v. Martinez, 2013 WL 3270448, at *47 (D.N.M. June 3, 2013)(Browning, J.)(declining to certify a question when the Court could interpret New Mexico precedent); Arnold v. Farmers, Ins. Co. of Ariz., 827 F. Supp. 2d 1289, 1297 (D.N.M. 2011)(Browning, J.)(refusing to certify a question after the Court had already ruled on it).

IT IS ORDERED that the requests in Zurich American Insurance Company's Motion for Reconsideration; Alternatively, for Clarification and for Language Permitting Interlocutory Appeal or Certification to the New Mexico Supreme Court (re: Doc. 82), filed March 25, 2016 (Doc. 83), are granted in part and denied in part.  The Court clarifies its ruling to make it more precisely state: § 56-7-2 does not void the Zurich Policy to the extent that it requires Zurich Insurance to indemnify XTO Group members for any liability imposed upon them arising from Air Tech's fault, and to defend and reimburse XTO Group members for defense costs.  The Court will not: (i) change the ruling in its Memorandum Opinion and Order, filed March 25, 2016 (Doc. 83); (ii) allow an interlocutory appeal under 28 U.S.C. § 1292(b); or (iii) certify an issue to the Supreme Court of New Mexico pursuant to N.M. Stat. Ann. § 39-7-4.

UNITED STATES DISTRICT JUDGE

Counsel:

Bradford C. Berge
Holland & Hart LLP
Santa Fe, New Mexico

- 52 -

-- and --

Katie K. Custer
Holland & Hart LLP
Denver, Colorado

-- and --

Jose A. Ramirez
Holland & Hart LLP
Greenwood Village, Colorado

 *Attorneys for Plaintiff XTO Energy, Inc.*

Sam L. Fadduol
Joshua K. Conaway
Fadduol, Cluff, Hardy & Conaway, P.C.
Albuquerque, New Mexico

-- and --

Maureen A. Sanders
Sanders & Westbrook, P.C.
Albuquerque, New Mexico

 *Attorneys for Plaintiffs-in-Intervention Scott Manley, Shanna Manley, Jose Betancur, and*
  *Virginia Betancur*

Terry R. Guebert
Robert Gentile
Guebert Bruckner, P.C.
Albuquerque, New Mexico

 *Attorneys for Defendant ATD, LLC*

James H. Johansen
Shawn S. Cummings
Amy Elizabeth Headrick
Rheba Rutkowski
Butt, Thornton & Baehr, P.C.
Albuquerque, New Mexico

 *Attorneys for Defendant and Third-Party Plaintiff Zurich American Insurance Company*